```
1                 IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                   Plaintiff,        )
                                      )
6                                     ) Case No.
            vs.                       ) 8:21-CR-00103-VMC-AAS
7                                     )
                                      )
8    OMAR AMBUILA,                    )
                                      )
9                   Defendant.        )

10

11

12   _____

13              EXCERPT OF JURY TRIAL, DAY 1
        BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
14                  UNITED STATES SENIOR JUDGE

                       JANUARY 27, 2025
15                        2:24 P.M.
                        TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23              DAVID J. COLLIER, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24          801 NORTH FLORIDA AVENUE, 7TH FLOOR
                 TAMPA, FLORIDA  33602
25
```

```
1   APPEARANCES:

2

3   FOR THE GOVERNMENT:

4           Joseph Palazzo

5           Ariana Lazzaroni

6           Adrienne Rosen

7           United States Department of Justice

8           Criminal Division

9           1400 New York Avenue, Suite 10302

10          Washington, D.C.  20001

11          (202) 445-7910

12

13  FOR THE DEFENDANT OMAR AMBUILA:

14          Victor Daniel Martinez

15          Victor D. Martinez, PA

16          110 North 11th Street, First Floor

17          Tampa, Florida  33602

18          (813) 289-0600

19

20

21  INTERPRETERS:

22  James Plunkett
    Victoria C. Spellman
23  Jesse Leonor
    Beatriz Velasquez

24

25
```

```
 1                          I N D E X

 2
    GOVERNMENT'S WITNESSES:                           PAGE
 3

 4

 5  GUSTAVO ADOLFO MARIN LOPEZ

 6  Direct examination by Mr. Palazzo                   15

 7  Cross-examination by Mr. Martinez                   52

 8

 9  GOVERNMENT'S EXHIBITS                             PAGE

10

11  1501  web service query issued by the National      29
          Civil Registry of Colombia re: Omar Ambuila
12  1505  disc containing videos                        34
    1502  photograph                                    43
13  1504  photograph                                    43
    1503  photograph                                    48
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        E X C E R P T

 2                     - - - o0o - - -

 3          MS. LAZZARONI:  Good afternoon, everyone.  Thank you

 4   again for being here.  My name is Ariana Lazzaroni, and I work

 5   for the Department of Justice.  Along with my colleagues

 6   Joseph Palazzo, Adrian Rosen and Alexis Spencer Anderson from

 7   the Department of Justice and our case agent Kelly Hite from

 8   Homeland Security Investigations, we will be presenting this

 9   case to you.

10          Now, first, please allow me to do a brief

11   introduction.

12          This case, ladies and gentlemen, is about corruption

13   and drugs.  You will hear evidence about how the defendant Omar

14   Ambuila used an official Government position to get rich and to

15   make his family rich.

16          Defendant and his co-conspirators took drug money and

17   bribe money and then disguised the source of that money through

18   complicated transactions so it could be spent on a lavish

19   lifestyle without leaving a trace.  He used his authority to

20   enrich himself through bribes, illegal shipments, drugs and

21   money laundering.

22          The defendant began working at the Port of

23   Buenaventura in Colombia as an official many, many years ago.

24   He worked for the DIAN, which stands for Dirección de Impuestos

25   y Aduanas Nacionales in Spanish.  I'm just detailing out the
```

1    acronym for you, but you will hear this referred to by its

2    acronym DIAN.  And what is the DIAN?  It's best translated as

3    the Colombian Tax and Customs Directorate, or sort of a hybrid

4    between -- for what us is the U.S. Customs and Border

5    Protection, the people who inspect you when you land at the

6    U.S. airport, and also the Internal Revenue Service or the

7    tax agency.

8            So the defendant worked in this Colombian Tax and

9    Customs Directorate, the DIAN, for many, many years, and by

10   2017 the defendant was one of the highest ranking officials in

11   the Port of Buenaventura.  And as you will hear one of our

12   witnesses tell you, Buenaventura is not just any other coastal

13   city in Colombia, it's a very important port for the whole

14   region.  It's close to the Panama Canal, it's on the Pacific

15   Ocean, and its location ties up with several rivers from the

16   interior of South America.

17           He was high up, but he was a Government official, so

18   the evidence will show you he did make a modest salary, but the

19   defendant used his authority as a public servant and turned it

20   into a money maker.  He used his power to collect bribes from

21   people who had to do business with the Port.  And what could

22   people who do business at a port need?  They would need someone

23   to look the other way when they wanted to ship something and

24   they didn't want anyone asking questions.

25           One of the Government's witnesses will testify that

1    he needed the defendant to let his shipments go through and
2    that his shipments contained cocaine, and our witness will tell
3    you that the defendant agreed to help for a price.  Others who
4    had import/export businesses with the Port, either illegal or
5    not, arranged favors for the defendant so that they would be in
6    a good position with him, since he was a boss at the Port, so
7    that in the end the defendant and his family could live
8    extravagantly.
9              And what did defendant do with this extra money?  He
10   used it on extravagant goods here in the U.S.  But he didn't
11   want anyone to know what he was doing, so he had to make sure
12   no one knew where it came from.  And how did he -- and how did
13   he do this?  The evidence will show that the defendant used his
14   network in both Colombia and the United States to move the
15   money he received, all the while hardly leaving a trace
16   connected to his name because he was so careful.  He had
17   co-conspirators collect and deliver his bribe money to other
18   co-conspirators in three or more steps, cash from bribes that
19   would be turned into wires and then withdrawn into cash and
20   hand delivered, or sent to different stores for purchases in
21   other people's names, all for the defendant's benefit but never
22   in his name.
23             The money was spent on luxury goods here in the U.S.,
24   many for his adult daughter Jenny.  Some examples that the
25   evidence will show you are a Porsche that cost upwards of

1    $70,000 in 2013, Louis Vuitton shoes, designer bags, a
2    Lamborghini that cost upwards of $300,000 in 2016, luxuries
3    that seem out of reach to most but not to the family of the
4    defendant.
5            The evidence will show you pictures of these luxury
6    goods, you will hear testimony about it, and it's what one of
7    the witnesses will tell you most that they -- one of the
8    witnesses will tell you that they remember the most vivid
9    details about when they met the daughter -- when they met the
10   defendant's daughter.
11           For these actions the defendant is charged with
12   conspiracy to commit money laundering.  As the Judge will tell
13   you more about at the end of the case, conspiracy is just an
14   agreement to commit a crime.  In the United States money
15   laundering is the crime of moving criminal money through the
16   United States.  In this case the defendant is charged with
17   conspiring to move criminal money through the United States
18   that came from two different crimes, first, bribery, in
19   violation of the bribery and anticorruption laws of Colombia;
20   and two, working with others to distribute cocaine.  You'll
21   learn more about these laws later from the Judge.
22           Now, how will the Government prove these charges?
23   You will hear from witnesses about the defendant's actions.
24   You will hear his own words on recorded calls discussing the
25   conspiracy with his other co-conspirators, you will see

1  documents from banks and other businesses, and you will hear

2  from a forensic accountant who will describe how the bribes

3  that the defendant received in Colombia made their way here

4  through a complicated series of transactions before being used

5  to pay for luxury items.

6          Let me start with the witnesses.  All of our

7  witnesses are here under oath to tell the truth, but some of

8  them do have their own baggage, some of them have been

9  convicted of crimes, and they will tell you that, but they are

10  under oath to tell you the truth.

11          One witness, Mr. Peña, will tell you he started by

12  acting as the family's personal Uber on their luxury family

13  trips, and then he became not only the family's Uber but the

14  family's own money launderer.  He was used to get all the

15  defendant's bribe monies to the United States without it being

16  discovered as tied to the defendant.  This was the beginning of

17  an ongoing relationship that lasted several years between the

18  defendant and Mr. Peña, his own money launderer.

19          Our witness Mr. Peña will show you the lengths the

20  defendant went through to conceal the money.  First someone in

21  Colombia would pick up the defendant's bribe money for him, and

22  then, two, deliver that money to Mr. Peña via wire, who then,

23  three, would withdraw most of it in cash, and then, four,

24  physically deliver the money to the defendant's daughter in her

25  Sunny Isles condo before, five, finally she would either

```
 1    deposit it in cash at her bank or use it for several different
 2    purchases.  Hundreds of thousand of dollars in cash were
 3    transferred in this way.
 4          You will also hear from a convicted money launderer
 5    who has affirmed under oath that the money that the defendant's
 6    daughter received was from illegal sources.
 7          The defendant also did sometimes try to use his own
 8    devices to get his cash into the United States, and for that we
 9    will have a Customs and Border Protection Officer tell you
10    about that.
11          In 2014 defendant said he had $10,000 in his bag, but
12    upon further inspection the officer will tell you he found
13    21,000.  Other CB -- other Customs and Border Protection
14    reports throughout the years show that defendant and his
15    daughter brought in over $100,000 in cash throughout ten years,
16    but the defendant got tired of being inspected each time he
17    entered the U.S. for the amount of money he was bringing in, so
18    that's why you -- the evidence will show you all these
19    different other ways of bringing the money to the
20    United States.
21          Now, as I mentioned before, sometimes the defendant
22    asked people to send wires for him straight to the sellers of
23    his luxurious purchases.  Three of these wires, as the evidence
24    will show, went straight to Prestige Auto Imports of Miami for
25    the purchase of a custom made cherry red Lamborghini Huracán
```

1  Spyder.  But the wires were not traceable back to the

2  defendant's bank accounts.  They were sent for the purchases

3  for the defendant's daughter but were not sent by him.  It was

4  someone else in his web of co-conspirators, one of the

5  witnesses you will hear from.  And why would this witness make

6  a wire for the defendant?  Because, as our witness will tell

7  you, our witness had a business in the Port of Buenaventura and

8  thought it would be a good idea to do a favor for someone in

9  the defendant's position who had authority in the Port.

10          You will hear from another witness, John, who also

11  helped make the payment for this Lamborghini Spyder, and he

12  helped because his uncle asked him to, his uncle who also had a

13  business in exporting and importing goods through the Port of

14  Colombia.

15          You will also hear from a convicted narco trafficker,

16  Diego, who will testify that he needed the defendant to make

17  sure he could send his cocaine shipments out of Buenaventura.

18  He needed the defendant's power and authority within the Port

19  to make sure his cocaine would evade inspection.  With the

20  defendant's blessing, the shipment of drugs could leave from

21  the Port of Buenaventura and continue its way to the

22  United States and Europe.

23          Diego will also testify that this cooperation from

24  the defendant was not for free.  He sent a payment through

25  other co-conspirators for his services.

1          You're not only going to hear testimonial evidence

2     though.  You will see bank records showing the wire transfer

3     from the witness who sent the 100,000 wires for the

4     Lamborghini.  You'll see the record showing deposit after

5     deposit and the corresponding withdrawals from the accounts

6     that Mr. Peña would use to deliver money to the defendant's

7     adult daughter Jenny.  You'll also hear recordings of the

8     defendant and his co-conspirators.  You will hear in his own

9     words his concerns about concealing the signs of his wealth and

10    planning money distributions, and conversations from his

11    co-conspirators about these payments.  You'll see the records

12    where he states his different professions, none of which seem

13    to be matching with someone who could afford the type of

14    lifestyle shown by his adult daughter on her social media.

15          Members of the jury, after you have seen this

16    evidence you will hear from us again, and at that time we will

17    ask you to return the only verdict that is supported by all of

18    the evidence that you will see, and that is that the defendant

19    is guilty of money laundering conspiracy.

20          Thank you.

21          THE COURT:  All right.  Thank you very much.

22          Are you ready with your first witness?

23          MR. PALAZZO:  May we approach briefly, Your Honor,

24    with a small issue to sidebar?

25              *(The following bench conference was held.)*

```
 1              MR. PALAZZO:  The Government has prepared binders
 2   with all our evidence, our written evidence, for the Court, for
 3   the courtroom deputy and the court reporter even.  I want to
 4   give them to you if it's appropriate.
 5              THE COURT:  Sure.
 6              MR. PALAZZO:  If you don't need them, that's fine.
 7   I just wasn't sure if I should do it in front of the jury.
 8              THE COURT:  Yeah, you should do it in front of the
 9   jury.  That's fine.
10              MR. PALAZZO:  Thank you.
11     (End of bench conference; proceedings resume in open court.)
12              THE COURT:  All right.  Thank you.  So I think you
13   were going to give us the binders?
14              MS. ROSEN:  Yes, Your Honor.
15              THE COURT:  He went to get them.  Okay.
16              MS. ROSEN:  Apologies.
17              THE COURT:  That's okay.  No problem.
18              All right.  Do we have our first witness?
19              MR. PALAZZO:  Yes, Your Honor.  The Government calls
20   Gustavo Marin to the stand.  He'll be testifying via an
21   interpreter.
22              THE COURT:  Okay.
23              MR. PALAZZO:  They need to be sworn.
24              COURTROOM DEPUTY:  Judge, did you want me to swear in
25   the interpreter first?
```

```
 1                THE COURT:  Did we swear in the interpreters?
 2                COURTROOM DEPUTY:  We swore in Mr. Plunkett and
 3     Ms. Spellman.
 4                THE COURT:  Oh, we've got -- yes.  Mr. Leonor will be
 5     translating.  We will go ahead and swear in this -- you both
 6     will be working as interpreters?  Okay.  We'll swear in both of
 7     these interpreters.  And, please, both of you just state your
 8     names for the record so it's clear.
 9                INTERPRETER VELASQUEZ:  Yes, Your Honor.
10                INTERPRETER LEONOR:  My name is Jessie Leonor,
11     L-E-O-N-O-R.
12                INTERPRETER VELASQUEZ:  Beatriz Velasquez.
13                THE COURT:  Okay.  Thank you.
14                And these are more interpreters, because this
15     interpreter -- or these interpreters will be translating this
16     witness's testimony, we have the other interpreters back there
17     translating the testimony for the defendant.  Okay?
18                So we'll swear in the interpreters.
19                COURTROOM DEPUTY:  Do you each solemnly swear or
20     affirm that you will truly, fairly and impartially act as a
21     Spanish interpreter in the matter now before the Court?
22                INTERPRETER VELASQUEZ:  I do.
23                INTERPRETER LEONOR:  I do, so help me God.
24                COURTROOM DEPUTY:  Thank you.
25                Please take the stand.
```

```
 1              Oh.  I've got to swear him in.

 2              Do you solemnly swear or affirm, under penalty of

 3     perjury, that the testimony you're about to give in this cause

 4     will be the truth, the whole truth and nothing but the truth?

 5              THE WITNESS:  I swear.

 6              COURTROOM DEPUTY:  Can you please state your name for

 7     the record.

 8              THE WITNESS:  Gustavo Adolfo Marin Lopez.

 9              COURTROOM DEPUTY:  Thank you.  You may take the

10     stand.

11              INTERPRETER LEONOR:  Can I have one moment,

12     Your Honor?

13              THE COURT:  Yes.  Of course.

14              Let me just ask, does anybody here in the jury speak

15     or understand Spanish?

16              Okay.  So if you speak or understand Spanish, you

17     need to base your decision on -- you need to, I should say,

18     analyze the evidence based on what the translator translates,

19     so that everybody is on the same sheet of music, okay?

20              I told my -- I told the lawyers that last week I had

21     a jury trial where the language was Mandarin, and the defense

22     att -- the -- yeah, the defense attorney spoke Mandarin, and he

23     objected to the translation that the translator provided, so he

24     stood up and objected.  So, you know, Mandarin I don't

25     understand, Spanish I do, but Mandarin I don't, so, you know,
```

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 15 of 64 PageID 584
GUSTAVO ADOLFO MARIN LOPEZ  JANUARY 27, 2025      15
Direct examination by Mr. Palazzo

1  this is the problem, we've all got to be reading off the same

2  sheet of music here.  So if, for instance, you are concerned

3  about the translation and you hear something, you know, you can

4  let me know, you can raise your hand or do something so that I

5  can deal with it immediately, but generally speaking you should

6  focus on what the translators say, recognizing that sometimes

7  you do have idiosyncrasies and sometimes things are said one

8  way and could be okay the other way, but I have worked with all

9  four of these translators, they are outstanding.  I mean, these

10  are people who know what they're doing, and they're Court

11  translators, they're not paid for by private parties, they're

12  paid for by the Court, so they're quite good.

13          Okay.  The witness has been sworn in.  You may begin

14  with your direct exam.

15          Well, normally I'll give the witness some

16  instructions.  All I will tell this witness is if you don't

17  understand the question, please say so, so that the lawyer can

18  word it a different way.

19          THE WITNESS:  Understood, Your Honor.

20          THE COURT:  Okay.  You may proceed.

21          MR. PALAZZO:  Thank you, Your Honor.

22          Welcome, sir.

23      **DIRECT EXAMINATION OF GUSTAVO ADOLFO MARIN LOPEZ**

24  **BY MR. PALAZZO:**

25  Q    Could you please state your name.

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      16
Direct examination by Mr. Palazzo

1   A    Gustavo Adolfo Marin Lopez.

2   Q    And in what country do you live, sir?

3   A    In Colombia.

4   Q    And what do you do for work?

5   A    I'm a part of the Investigative Technical Corps of the

6   National Police of Colombia.  It's known by its acronym CTI.

7            THE COURT:  Let me just say, can the jury hear the

8   translator?

9            JURORS:  Yes.

10           THE COURT:  I'm not certain they can hear you, Mr. --

11  you're going to have to speak up, because I can -- I can hear

12  you, but it's not perfect.

13  BY MR. PALAZZO:

14  Q    Could you tell us a little bit about the responsibilities

15  of the CTI.

16  A    The Technical Investigative Corps is in charge of

17  supporting the Department of Justice, and it's in charge of

18  investigating conduct that has the characteristics of being

19  criminal, and in that way criminal organizations can be

20  tracked, and to submit to authority the people that are

21  involved in different types of crimes.

22  Q    And what types of crimes does your agency investigate?

23  A    All conduct that has the characteristics of crime.

24  Q    And how long have you worked at this agency?

25  A    At the Investigative Technical Corps, one month.

Case 8:21-cr-00103-VMC-AAS   Document 131   Filed 02/18/25   Page 17 of 64 PageID
586
GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025      17
Direct examination by Mr. Palazzo

1           THE COURT:  All right.  Mr. Leonor, you're going to

2    need to use a handheld mic.  I know this is more convenient.

3    The handheld mic, we can hear you better.  That's all there is

4    to it.

5           Do we have a handheld mic?

6           COURTROOM DEPUTY:  Yes, Your Honor.

7           INTERPRETER LEONOR:  Testing, one, two.

8           THE COURT:  That's better.

9           Magaly, I want to make certain all the jurors can

10   hear.

11           Ladies and gentlemen of the jury, I want you to tell

12   me if you can't hear, because I can't guess, I can only guess

13   by your facial expressions whether you can hear or not.

14   BY MR. PALAZZO:

15   Q    And, sir, do you have a title or rank at your agency?

16   A    Currently I am a Technical Investigator Grade One.

17   Q    May I call you Chief Investigator?

18   A    That's fine.

19   Q    And, sir, before this position, what did you do for work?

20   A    I worked for 22 years with the Colombian National Police

21   as a Chief Quartermaster, and I worked as a Criminal

22   Investigator and an Intelligence Analyst.

23   Q    And what was your position directly previous to joining

24   CTI?

25   A    I belonged to the TCIU, an investigative unit of the

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        18
Direct examination by Mr. Palazzo

1   National Police, where we worked in coordination with the

2   Agency of Customs and -- of the United States of America.

3   Q    And what types of crimes did you investigate there?

4   A    Money laundering, weapons trafficking and contraband.

5   Q    And how long were you in that unit?

6   A    It's been five years.

7   Q    And, in total, how long have you been a police officer or

8   a Federal agent?

9   A    I was at the police for 22 years, and the month that I've

10  been at CTI.

11  Q    And at the TCIU?

12  A    I was there from the year 2018 until 2022.

13  Q    And did you cover a particular city or region within

14  Colombia?

15  A    I belong to the Pacific Commission or Committee, and

16  I investigated crimes that took place in Cali and Buenaventura,

17  Colombia.

18  Q    Did you make arrests as part of your job?

19  A    That's right.

20  Q    And throughout your career, as part of your job did you

21  ever have the need to locate people that were hiding from

22  law enforcement?

23  A    That's right.  It's a common characteristic that people

24  are not findable when they are being sought out by justice.

25  Q    And so what are some of the typical investigative steps

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 19 of 64 PageID
588
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      19
Direct examination by Mr. Palazzo

1    that you would take to locate someone that was hiding from

2    police?

3    A    First we would access public information.  Afterwards, if

4    it was a person who had been detained or captured, we could

5    check in the registry of the Bureau of Prisons of Colombia, if

6    that individual had been registered, and also information that

7    is contained in the National Civil Registry.

8    Q    Could you please explain to the jury, what is the National

9    Civil Registry?

10   A    The National Civil Registry is an institution that's in

11   charge of recording babies upon their birth.  When that child

12   becomes of age, which in Colombia is at 18 years, a national

13   ID, a cédula, is then generated, and that national ID contains

14   personal information, biological information, and to produce

15   this document a fingerprint card is taken with the ten fingers,

16   and in that manner we Colombian citizens are identified.

17   Q    And besides fingerprinting that you mentioned, what other

18   types of information is kept in this database?

19   A    Their full name, the date of birth and the addresses

20   provided, their phone number, the signature of the person, the

21   date of issue of the document, and any identifying

22   characteristics, such as scars, their race.

23   Q    And how is that information gathered by the National

24   Registry?

25   A    The person appears at the offices, places their prints,

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 20 of 64 PageID 589
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        20
Direct examination by Mr. Palazzo

1  signs a biometrical registry, and provides their address and

2  phone information.

3  Q    And is this a voluntary program?

4  A    It's mandatory.

5  Q    And so does everyone have a cédula?

6  A    That's right.

7  Q    Now, as a police officer, you mentioned that you were

8  assigned to some sort of Pacific region of responsibility;

9  is that right?

10  A    That's right, yes.

11  Q    What cities were you assigned to during this period?

12  A    To the City of Cali and Buenaventura.

13  Q    And did you have occasion to work criminal cases in

14  Buenaventura?

15  A    That's right.

16  Q    What are some important things to know as a police officer

17  about the City of Buenaventura?

18  A    Well, Buenaventura is located on the Colombian Pacific,

19  it's one of the -- it has one of the primary ports of the

20  country.  Almost 30 percent of the cargo that arrives at

21  Colombia enters through there, coming from countries such as

22  China, the United States, South America, Panama, Europe.

23  The importance of Buenaventura as a port is that its seabed is

24  quite deep and it allows for large size ships, freighters, to

25  arrive with a great number of containers.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 21 of 64 PageID
590
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        21
Direct examination by Mr. Palazzo

1    Q    I heard you also mention the City of Cali, Colombia.  Did

2    you have occasion to investigate cases as a police officer in

3    Cali, Colombia?

4    A    That's right.

5    Q    Could you just tell the jury, how far is Cali from

6    Buenaventura, in approximation?

7    A    It's approximately two and a half hours away.  It's got

8    some rough geography.  You have to go through tunnels and

9    mountains.

10   Q    And does Cali play any kind of role in the economic life

11   of Buenaventura that you were describing earlier?

12   A    That's right.  Cali is the capital of the Department or

13   State of Valle del Cauca, and it is the financial hub of the

14   South, of the South, Southwest of the country.  It's a half

15   distance away from the coast of Nariño and the Pacific coast.

16   And in Nariño is where the production of drug trafficking is

17   generated, and then the Pacific is used for going out to sea,

18   and the funds that come about from those activities generally

19   go through the City of Cali.

20   Q    Throughout your career were you ever made familiar with an

21   agency in Colombia known as the DIAN?

22   A    That's right.  I formed a partner -- or worked in

23   conjunction with the Directorate of Customs and Taxation.

24   Q    And could you please describe for the jury a little bit

25   about what their typical responsibilities are.

Case 8:21-cr-00103-VMC-AAS   Document 131   Filed 02/18/25   Page 22 of 64 PageID 591
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      22
Direct examination by Mr. Palazzo

1   A    The directorate -- the National Directorate of Customs and

2   Taxation is in charge of the -- controlling customs for the

3   country and tax revenue, and as far as customs, they're in

4   charge of ensuring that the merchandise that reaches Colombia

5   meets the requirements for merchandise and that the appropriate

6   tariffs are paid and any fees that are required to be paid

7   regarding the type of merchandise.

8   Q    And does the DIAN have any specific enforcement

9   responsibilities?

10  A    That's right.  They have to check the containers and to

11  verify in a physical manner that these activities are followed

12  through.  There are situations where the companies are

13  identified as AEO, an authorized financial operator, and those

14  types of companies have been bonded by the State and they are

15  let through without revision, without checking.

16  Q    You described containers being an important part of their

17  enforcement responsibilities.  Can you elaborate a little more

18  on what you're talking about when it comes to containers?

19  You're describing containers of goods or products, or how does

20  that work?

21  A    The containers carry the merchandise that enters the

22  country, it could be textiles and footwear, which is the type

23  of merchandise that requires controlling, because the

24  admittance of those into the country is regulated to promote

25  local production, protect local production, and in those

1  containers other products that other companies might need also

2  arrive, which is goods, consumable goods.

3  Q     And have you come across, throughout your career, members

4  of the private sector who also work closely with DIAN as cargo

5  agents?

6  A     The private sector?  I don't understand the question, from

7  the private sector.

8  Q     Nonmembers of the DIAN who deal with the DIAN on behalf of

9  customers.

10  A     Yes.  The customs agencies.

11  Q     And what are their role?

12  A     They're in charge of checking the entrance of merchandise

13  into the country, and they report to DIAN what type of

14  merchandise is entering.  They produce a statement of this

15  merchandise and then a document is generated on behalf of DIAN.

16  Q     You mentioned earlier that Buenaventura is a large and

17  important port in Colombia.  Does the DIAN play a role in the

18  daily life of Buenaventura?

19  A     Of course.

20  Q     Having worked with the DIAN being a Federal police officer

21  for over 20 years, are you aware of any laws that restrict DIAN

22  employees from wire transferring money outside of Colombia?

23  A     I'm not aware of it being prohibited to wire out.

24  Q     And are you aware of any laws preventing Federal Police

25  Officers from wire transferring money outside of Colombia?

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 24 of 64 PageID
593
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      24
Direct examination by Mr. Palazzo

1   A    It's not prohibited.

2   Q    And what about internally, are there internal rules at the

3   Colombian National Police or the DIAN restricting or

4   prohibiting the wire transfer of money outside of Colombia?

5   A    It's not prohibited, but one has to be honest before the

6   country and declare those funds.

7   Q    What about banks or financial institutions, do Colombian

8   banks have special rules that only apply to police and customs

9   officers preventing them from wire transferring money outside

10  of the country?

11           THE COURT:  We're going to take a short break, ladies

12  and gentlemen.  Please don't discuss the case or form any

13  opinions until you've heard all the evidence.  We'll see you

14  back here in ten minutes.

15                  *(Jury exits proceedings.)*

16           THE COURT:  All right.  Thank you.

17           We will take our break.  The translator could please

18  translate to the witness, we're in the middle of your

19  testimony, you are not to discuss it with anybody.

20           THE WITNESS:  Okay, Your Honor.

21           THE COURT:  Very good.  We'll be in recess.

22                      - - - - -

23           (Recess at 3:10 p.m. until 3:24 p.m.)

24                      - - - - -

25           THE COURT:  Welcome back, ladies and gentlemen.

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        25
Direct examination by Mr. Palazzo

1              I remind the witness that you are still under oath.

2    Do you understand that?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  Okay.  Very good.

5              You may continue with your direct examination.

6    BY MR. PALAZZO:

7    Q    So I believe before we took a break you didn't get a

8    chance to answer, but I asked you what about banks in Colombia,

9    do they have special rules restricting police officers and

10   customs officers from wire transferring money outside of the

11   country.

12   A    Banks as private entities do not have any norms that would

13   prohibit Government officials, but there is a prohibition in

14   our civil code where Government employees cannot be

15   characterized as businessmen, so this type of transaction is

16   done in commerce, generally speaking.

17   Q    I'm turning your attention now to the month of April in

18   the year 2021.  Where were you working at that point in time?

19   A    At TCIU on the Pacific Commission.

20   Q    And in what city were you located?

21   A    In the City of Cali, Colombia.

22   Q    Did you get any important or significant orders from your

23   superiors during that time?

24   A    That's right.

25   Q    What were they?

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        26
Direct examination by Mr. Palazzo

 1  A    I received the orders of locating and to capture for

 2  purpose of extradition the citizen Omar Ambuila.

 3  Q    And the Omar Ambuila that you were ordered to arrest, is

 4  he in the courtroom today?

 5  A    Yes, sir.

 6  Q    Please take a moment, point him out, and describe an

 7  article of clothing that he's wearing.

 8  A    Excuse me.  The gentleman is wearing a blue jacket, a gray

 9  shirt, and he is currently writing.

10  Q    Thank you.

11          MR. PALAZZO:  And, Your Honor, just to complete the

12  record of what has transpired, I'm noting that the witness has

13  identified the defendant.

14          THE COURT:  The record will so reflect.

15  BY MR. PALAZZO:

16  Q    Sir, on what basis were you ordered to arrest the

17  defendant?

18  A    Based on an arrest warrant that the Attorney General of

19  the nation issued at the time.

20  Q    And do you recall the charges that warrant was based on?

21  A    That arrest warrant was issued based on an extradition

22  treaty that the Government of Colombia has with the

23  United States and based on a diplomatic notice that the

24  Department of Justice of the United States sent, and citizen

25  Omar Ambuila was being charged with the crime of money

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 27 of 64 PageID 596
GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025        27
Direct examination by Mr. Palazzo

1    laundering in a court in the Middle District of Florida.

2    Q    Sir, at the time you received orders to arrest the

3    defendant, did you know where he was located?

4    A    No, sir.

5    Q    I thought you testified earlier that everyone is required

6    by law to register their address through the cédula system that

7    you described?

8    A    That's right.

9    Q    Did you check the defendant's cédula?

10   A    Yes, sir.

11   Q    And was there an address?

12   A    There was an address in the Pance neighborhood.

13   Q    Sir, with the Court's permission, I'd like to approach and

14   put some documents in front of you that are marked for

15   identification purposes only as Exhibit 1501.

16          MR. PALAZZO:  May I approach the witness, Your Honor?

17          THE COURT:  Yes, you may.

18   BY MR. PALAZZO:

19   Q    Sir, do you recognize all three pages in that document?

20   Please take a moment.

21   A    Yes, sir.

22   Q    Do you recognize them?

23   A    That's right.

24   Q    And have you seen them before?

25   A    Yes, sir.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 28 of 64 PageID
597
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        28
Direct examination by Mr. Palazzo

1   Q    Starting with that top page, what is that?

2   A    This is a web service query issued by the National Civil

3   Registry of Colombia, and here it can be identified that it is

4   related to citizen Omar Ambuila.

5   Q    And is there a date that it was generated?

6   A    This is a -- this is a duplicate that according to this

7   document was issued September 6th of 2018.

8   Q    And now turning to the next page, do you recognize that

9   document?

10  A    That's right.

11  Q    And what is that?

12  A    This is another web services query issued by the National

13  Civil Registry of Colombia which was issued on the 18th of

14  May 2005.

15  Q    And have you seen it before?

16  A    Yes, sir.

17  Q    Now, the third page, what is that?

18  A    It is a photograph of Mr. Omar Ambuila on the day that he

19  was captured at his residence.

20  Q    And were you at that arrest and capture?

21  A    That's right.

22  Q    And so is that photograph a fair and accurate

23  representation of what he looked like on that day?

24  A    Yes, sir.

25  Q    And are those first two documents that you looked at

Case 8:21-cr-00103-VMC-AAS   Document 131   Filed 02/18/25   Page 29 of 64 PageID
598
GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025      29
Direct examination by Mr. Palazzo

1   cédulas that you examined during your investigation?

2   A    Yes, sir.

3         MR. PALAZZO:  Your Honor, the Government moves to

4   admit Exhibit 1501 into evidence as Government's Exhibit 1501.

5         MR. MARTINEZ:  Without objection.

6         THE COURT:  Okay.  Thank you.  Government's Exhibit

7   you said 1501 is received into evidence, may be published to

8   the jury.

9         MR. PALAZZO:  Thank you, Your Honor.

10  BY MR. PALAZZO:

11  Q    Let's -- up on the screen here -- there's a screen in

12  front of you.  Hopefully it's working.

13  A    It is.

14  Q    Let's turn to the third page.

15        Okay.  You testified or you mentioned earlier that

16  you recognize this.  What is it again?

17  A    It is a web services query issued by the National Civil

18  Registry of Colombia.

19  Q    And who is that a photo of in the middle?

20  A    It is of Colombian citizen Omar Ambuila.

21  Q    And is there a signature on this document?

22  A    Yes, sir, in the upper portion on the right-hand side.

23  Q    Now, is there a birth date listed, or --

24  A    Yes, sir, on the left-hand module in the middle, it is the

25  3rd of March of 1961.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 30 of 64 PageID
599
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025    30
Direct examination by Mr. Palazzo

1    Q    And you mentioned earlier a requirement to list an

2    address.  Is there an address listed here for the defendant?

3    A    That's right.  On the right-hand module, below where it

4    says identifying characteristics of scar on hand, the address

5    says road number 113, house number 11, 100.

6    Q    Are you familiar with that address?

7    A    That's right.

8    Q    Did you visit it as part of your investigation to locate

9    the defendant?

10   A    Yes, sir.

11   Q    And did the defendant reside there?

12   A    No, sir.

13   Q    Can we go to now the middle page in that three page

14   document that's Government's Exhibit 1501.

15         So here it's identified at the bottom with a 00039.

16   Do you recognize this document?

17   A    That's right.

18   Q    And tell us what this is again.  It looks similar to the

19   previous document.

20   A    It's that same previous document, but issued at an earlier

21   date.  That happens when a person reused their national ID or

22   requests a new document, but the information contained is an

23   exact copy of the original.

24   Q    And does it contain the same biographical information?

25   A    It contains the same biological information, but the

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 31 of 64 PageID
600
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        31
Direct examination by Mr. Palazzo

1  address of residence and phone can change.

2  Q    And I asked you earlier this afternoon whether or not this

3  is a voluntary program by the Government of Colombia.  Is there

4  a requirement to update some of the basic information on this?

5  A    At the time of obtaining a new duplicate it's necessary to

6  update the time to -- the information of address and phone to

7  the current time.

8  Q    And is there an address here on this cédula?

9  A    That's right.  It's located at the same place that we saw

10 it on the previous one.

11 Q    Same location in the city, a different address?

12 A    It is a different address, but it doesn't mention the

13 city, so we don't know where it's located.

14 Q    Was this address useful in your investigation of trying to

15 locate the defendant to arrest him?

16 A    No, sir.

17 Q    What investigative steps did you take to locate the

18 defendant?

19 A    I checked the address that he had registered at the

20 National Bureau of Prisons, INPEC, but it was an address of his

21 parents.

22 Q    Was he there?

23 A    No, sir.

24 Q    Did you eventually see the defendant on surveillance?

25 A    Yes, sir.

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025       32
                    Direct examination by Mr. Palazzo

 1    Q     Could you describe surveilling the defendant.

 2    A     We leaned on technology, unmanned aircraft, drones, and we

 3    were able to confirm and see Mr. Omar Ambuila as he entered a

 4    condominium of houses and climbed out of a Kia vehicle.

 5    Q     Was the vehicle registered in his name?

 6    A     No, sir.

 7    Q     You mentioned drone technology.  Did the drone capture

 8    still photos or video of the surveillance?

 9    A     Yes, sir.

10    Q     And what did you do with -- was it video?  Sorry.

11    Strike that.

12              Was it video or was it still photographs?

13    A     Video.

14    Q     And what did you do with the video after the drone

15    recorded it?

16    A     We took the information of the house to be able to request

17    from the Attorney General of the nation a search warrant.

18    Q     And the video itself, did you store it somewhere or did

19    you leave it on the drone?

20    A     The video was downloaded to my computer.  It was

21    downloaded directly from the drone and then afterwards it was

22    stored on a hard drive.

23    Q     And did you eventually put a copy onto a disc?

24    A     That's right.

25    Q     And did you mark the disc in a unique way to remember that

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 33 of 64 PageID
602
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        33
Direct examination by Mr. Palazzo

1    it contained the drone video?

2    A    Yes, on a CD, I marked it as a video for Ambuila case,

3    26 of January, 2025, and I signed it.

4    Q    And did you put any other videos from the investigation on

5    the disc?

6    A    Yes, the videos of when we entered the structure, went to

7    arrest Mr. Ambuila.

8          MR. PALAZZO:  Your Honor, if I may, I'd like to

9    approach the witness and show him this disc.

10          THE COURT:  Sure.  You may do so.

11          MR. PALAZZO:  It's marked for identification purposes

12    only as Exhibit 1505.

13    BY MR. PALAZZO:

14    Q    Sir, could you take a look at that and let the Court know

15    if you recognize it.

16    A    That's right, Your Honor.  I do recognize that it has my

17    handwriting and my signature.

18    Q    And is this the disc that you put the videos?

19    A    Yes, sir.

20    Q    The drone and the arrest videos?

21    A    Yes.  The arrest video is in a folder and the drone video

22    is in a separate folder.

23          MR. PALAZZO:  Your Honor, I move to have Exhibit 1505

24    admitted into evidence as Government Exhibit 1505 so we can

25    play it for the jury.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 34 of 64 PageID 603
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      34
Direct examination by Mr. Palazzo

```
 1              MR. MARTINEZ:  Without objection.

 2              THE COURT:  All right.  1505 received into evidence,

 3    may be published to the jury.

 4              COURTROOM DEPUTY:  Ms. Velasquez, could you speak up

 5    a little bit when you're translating?  The juror can't hear

 6    you.

 7    BY MR. PALAZZO:

 8    Q    What should we be focusing our attention on, sir?

 9              INTERPRETER VELASQUEZ:  May the interpreter have a

10    repetition?

11    Q    What should we be focusing on in this video, sir?

12    A    In this video you can observe the vehicle that Mr. Omar

13    Ambuila is driving.  It was recorded in the City of Cali and

14    the neighborhood of Pance.  It's a condominium made up of

15    homes, two story homes.  There are 28 of them.

16              THE COURT:  Translator, we cannot hear you.  You need

17    to speak into the microphone when you translate, because we

18    cannot hear you.

19              INTERPRETER VELASQUEZ:  Yes, Your Honor.

20              THE COURT:  I'm sorry.  I think that the witness

21    needs to repeat that last statement.  Honestly, we couldn't

22    hear.

23              THE WITNESS:  Could you repeat the question?

24    BY MR. PALAZZO:

25    Q    Yes.  Chief Investigator, what should we be focusing on in
```

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 35 of 64 PageID 604
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025          35
Direct examination by Mr. Palazzo

1    this video as it's played?

2    A    We're able to observe Mr. Omar Ambuila, who is entering a

3    condominium of homes.  He's driving a Kia vehicle.  This video

4    was recorded in the neighborhood of Pance, in the City of Cali,

5    it's a condominium made up of 28 homes, and Mr. Omar Ambuila is

6    arriving to number 21.  The house is number 21.

7              THE COURT:  Madam translator, I need you to speak up.

8    If you're softer spoken, we can't hear you, so please speak up,

9    otherwise we need to get another translator.  It's that simple.

10   I can hear most of what you're saying, but every now and then a

11   word gets past me.  I need to make certain the jury can hear

12   you.

13             INTERPRETER VELASQUEZ:  May the interpreter just make

14   sure that the microphone is turned on?

15             THE COURT:  Maybe you could switch off with another

16   translator, but I need somebody whose voice will project.

17             COURTROOM DEPUTY:  Ms. Velasquez, can you test it

18   real quick?

19             INTERPRETER VELASQUEZ:  1, 2, 3.  That's much better.

20             THE COURT:  What a world of difference.  Why didn't

21   we do that earlier?

22   BY MR. PALAZZO:

23   Q    Chief Investigator, if you might, sir, where is the

24   defendant in this video?

25   A    He is located aboard the vehicle.  He's driving.  He's

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        36
Direct examination by Mr. Palazzo

1   about to make the entry into home number 21.  This was the
2   location where he was captured.
3           We're able to observe him here getting out of the
4   vehicle.  He's wearing a blue shirt.
5   Q    And, sir, for the sake of the technical difficulties
6   earlier with the microphone, can you just tell us again what
7   neighborhood this is and where it is in conjunction with the
8   rest of Cali?
9   A    It's the neighborhood of Pance.  It's a higher
10  socioeconomic area.  The condominium is named Portal de la
11  Rivera.  There are only 28 homes.  It also has private
12  security.  Its entry is limited to its residents.
13  Q    And at the start you said something about security.
14  Is that -- do we see a gate there?
15  A    There is electric security and also physical security
16  provided there.
17  Q    Chief Investigator, after you confirmed this location, did
18  you make the arrest?
19  A    Yes, sir.
20  Q    And do you recall the date of the arrest?
21  A    That's right.  April 23rd of 2021.
22  Q    And you testified about being a senior officer.  Did you
23  personally participate in the arrest?
24  A    Yes, sir.
25  Q    How many others accompanied you on the arrest on

Case 8:21-cr-00103-VMC-AAS     Document 131     Filed 02/18/25     Page 37 of 64 PageID
606
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025          37
Direct examination by Mr. Palazzo

1   April 23rd, 2021?

2   A     Approximately ten police officers were present for this

3   process.

4   Q     And were they all from your unit?

5   A     There were five police officers that belonged to my unit

6   and then there were other operators that were like a SWAT.

7   Q     And so could you talk a little bit about the division of

8   responsibilities on the arrest team that day.

9   A     So the command operators were in charge of ensuring that

10  the structure was safe, they cleared it and made sure that it

11  was safe so that we could then follow up as detectives doing

12  the investigation and then later on also search the structure.

13  Q     Do you recall what time of day you arrived?

14  A     Yes.  It was approximately 6:00 in the morning.

15  Q     How did you arrive?

16  A     We arrived aboard vehicles.  We knocked on the door.  We

17  announced or introduced ourselves as the National Police.

18  There was no answer at the door, and so the team breached the

19  door in order to enter the structure.

20  Q     And what happened next?

21  A     Once the team assured that they searched the structure and

22  made sure that the structure was safe, Mr. -- the citizen

23  Omar Ambuila was coming down the stairs at that point.  I then

24  proceeded to give him instructions, orders to lay down on the

25  ground.  My colleagues took care of calming down his wife and

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 38 of 64 PageID
607
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025          38
Direct examination by Mr. Palazzo

1    his daughters, who were a bit upset.  Once the situation had

2    been calmed down or deescalated and then it became safe for

3    everyone, the whole family was taken to the main living room.

4    I then presented to them the search warrant that had been

5    issued by the Attorney General of the nation.

6              So after that I sat down with Mr. Ambuila and showed

7    him the search -- the arrest warrant that had been issued with

8    extradition, and then I informed him of the rights that he had

9    now that he was detained.

10   Q    And what were some of those rights?

11   A    He had the right to remain silent, to communicate with a

12   family member that he was detained, and that he had a right to

13   an attorney.  In case that he did not have one, the Colombian

14   Government would provide one to him.  At that moment those

15   rights were carried out.  He made use or exercised his right to

16   remain silent, his wife was informed of his capture, and he

17   proceeded to contact his attorney, who then was present at that

18   time.

19   Q    Did the defendant resist your arrest in any way?

20   A    No, sir.  He followed my instructions.

21   Q    And where did he go next?

22   A    To the crime lab located in the neighborhood of Pance.

23   Q    During the arrest was -- were any videos taken?  You

24   mentioned that there were videos on the disc that you made

25   earlier.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 39 of 64 PageID
608
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025    39
Direct examination by Mr. Palazzo

1   A     That's right.  For purposes of transparency we record any

2   proceedings that we carry out.  The videos are recorded from

3   when we entered the structure and when we carried out the

4   capture of citizen Omar Ambuila.

5   Q     And now we're going to look again at the videos that are

6   on Government Exhibit 1505.

7                        *(Video played.)*

8   BY MR. PALAZZO:

9   Q     Maybe we could mute the sound but play it again.

10          Can you tell us what is going on in that video.

11  A     At that moment we arrive aboard a bus, and the command

12  operators enter the building through the main door, and at that

13  time I am wearing a green jacket and I'm walking backwards, or

14  I have my back facing the camera that's recording the video.

15          Here I am walking with my back facing the camera

16  toward another -- a secondary door.  So I'm able to see through

17  the vegetation that the operators have cleared the home and

18  I entered through the door that they had already opened.

19  Q     Now, the other videos are from different vantage points,

20  I believe.

21          MR. PALAZZO:  Let's play the second video.

22                        *(Video played.)*

23  BY MR. PALAZZO:

24  Q     So now without the sound, can you describe what's

25  happening?  Is this the house?  Do you recognize this?

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 40 of 64 PageID
609
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025    40
Direct examination by Mr. Palazzo

1   A    That's the house where we captured citizen Omar Ambuila,

2   and the operators are stating out loud "National Police, open

3   the door."  Once they don't have any kind of response, they

4   proceed with the -- they proceed with breaching the door.

5   Q    And how many doors do you recall did this residence have?

6   Was this the only one?

7   A    There are two access doorways.

8   Q    All right.  Let's go to video 3.

9        Do you recall what transpired in that video?  Can you

10  tell us a little bit about the context.

                                *(Video played.)*

12  A    We're able to observe the operators entering the

13  structure.  They clear the home.  Mr. Ambuila's wife and his

14  daughters are upset due to the situation.  My colleagues tried

15  to calm them down.

16       I proceed to search Mr. Ambuila's waist for his own

17  safety and for my safety, to ensure that he didn't have any

18  weapons.

19  Q    And did he make any statements?

20  A    No, sir.

21  Q    What happened next?

22  A    After the process he was upset because we had damaged the

23  door and he refused to sign the certificate of no mistreatment

24  due to the fact that we had damaged the door.

25  Q    But he didn't ask you what he did?

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 41 of 64 PageID
610
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        41
Direct examination by Mr. Palazzo

1   A    No, sir.

2   Q    He didn't say, "What's this all about?"

3   A    Afterwards in the living room I read him the arrest

4   warrant, which detailed all of the reasons.

5   Q    And did he receive a copy of it?

6   A    We do not normally leave a copy.

7   Q    And were any photographs taken during this time?

8   A    That's right.  My colleague Alejandra was recording and

9   also taking pictures of the whole process.

10  Q    And did you review those photographs after the fact?

11  A    That's right.

12       MR. PALAZZO:  Your Honor, if I may, I'd like to

13  approach the witness with two exhibits marked for

14  identification only as 1502 and 1504.

15       THE COURT:  1502 and 1504, did you say?

16       MR. PALAZZO:  Yes, Your Honor.

17       THE COURT:  Okay.  Sure.

18  BY MR. PALAZZO:

19  Q    Sir, please take a moment and review those.

20       Have you seen them before?

21  A    Yes, sir.

22  Q    What is depicted in those photographs, starting with 1504?

23  A    This is a picture of the exterior of the house where

24  Mr. Omar Ambuila was captured.

25  Q    And you recognize it because you were there?

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        42
Direct examination by Mr. Palazzo

1    A    That's right.

2    Q    Moving to the other exhibit marked 1502, what is depicted

3    in that photograph?

4    A    I appear there with a green jacket that shows -- or says

5    Police on the back.  Mr. Omar Ambuila is seated on the sofa

6    with his arms crossed, and what's going on there is that I'm

7    reading him the arrest warrant for purposes of extradition.

8    This takes place in -- inside in the interior of the living

9    room of Mr. Omar Ambuila.

10        MR. PALAZZO:  Your Honor, I move -- pardon me.

11   Strike that.

12   BY MR. PALAZZO:

13   Q    Sir, so do these two photographs -- do they both represent

14   a fair, accurate depiction of what transpired that day?

15   A    That's right.

16        MR. PALAZZO:  Your Honor, the Government now moves to

17   admit Exhibits 1502 and 1504 into evidence as Government

18   Exhibit 102 and 104.

19        MR. MARTINEZ:  No objection.

20        THE COURT:  All right.  Those documents are received

21   into evidence.  You said it's Exhibit 102 and 104?

22        MR. PALAZZO:  1502 and 1504.

23        THE COURT:  Okay.  Then I thought you gave it a new

24   number at the end.  Did you not?

25        MR. PALAZZO:  Oh.  If I did, I misspoke, Your Honor.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 43 of 64 PageID 612
GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025      43
Direct examination by Mr. Palazzo

1          THE COURT:  Okay.

2          MR. PALAZZO:  I apologize.

3          THE COURT:  All right.  So 1502, 1504.  Yes, that's

4    what I've written down.  I thought you called it something

5    else.  Okay.  That's fine.  Received into evidence.

6          MR. PALAZZO:  And could we publish them to the jury,

7    Your Honor?

8          THE COURT:  Yes, of course you may.

9    BY MR. PALAZZO:

10   Q    So starting on your right, Chief Investigator, 1504,

11   Government Exhibit, what is this again?

12   A    That's the exterior or the facade of the structure where

13   Mr. Omar Ambuila was captured.

14   Q    And in the driveway, the sport utility vehicle, do you

15   recognize it?

16   A    That's right.  That is the truck that Mr. Omar Ambuila

17   used to -- as transportation, and it's also the same one that

18   appears that we saw in the drone video.

19   Q    Now, zooming back out, on the extreme right side there is

20   a vehicle that seems to be cut off but is somewhat captured in

21   the photograph.  Do you recognize it?

22   A    That's the vehicle that we, the police officers, arrived

23   in in order to carry out the search warrant.  This indicates

24   that this picture was taken on the day that we arrived to

25   capture him.

1   Q    And there seems to be an individual in the doorway of the

2   home?

3   A    That's Special Officer Fernandez, and he is part of the

4   National Police, INTERPOL and DIJIN.

5   Q    Now, moving to photograph -- Government's Exhibit 1502,

6   where is the defendant in this photograph, if at all?

7   A    Mr. Omar Ambuila is sitting on the sofa with his arms

8   crossed.  He's wearing a black shirt and black shorts.

9   Q    And are you depicted in this photograph?

10  A    That's right.  I'm wearing a green jacket and on the back

11  it says Police, and I'm reading a document.

12  Q    And what is transpiring in this photograph?

13  A    I am notifying Mr. Omar Ambuila of the arrest warrant

14  with -- for purposes of extradition, and I'm reading him his

15  rights as a detainee.

16  Q    And where is this transpiring?

17  A    In the neighborhood City of -- excuse me, in the

18  neighborhood of Pance in the City of Cali, inside of the

19  residence where Mr. Omar Ambuila lived.

20  Q    Did you also observe the rest of the residence during the

21  time of this arrest?

22  A    That's right.  At the time that we carried out the search

23  of the whole structure.

24  Q    Could you relate those observations to the jury.

25  A    It was a two story house with two entryways.  There was

GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025      45
Direct examination by Mr. Palazzo

1  exterior parking lot for vehicles.  On the first floor there

2  was a living room and also an outdoor living room.  There was

3  also the bedroom of Ms. Jenny Ambuila.  There were three

4  bedrooms on the second floor, and we observed a balcony that

5  was connected to the main bedroom.

6  Q    What happened next after what transpired in this

7  photograph?

8  A    We proceeded to search the structure and Mr. Omar

9  Ambuila's bedroom.

10          INTERPRETER:  The interpreter just needs to clarify.

11  A    So on top of a night table there were two iPhones that

12  were seized.  There were other -- there were other items.

13  There were -- there was a cell phone that belonged to Mr. Omar

14  Ambuila's wife, there was a video recorder, a voice recorder,

15  some CDs, some CDs, a USB and a hard drive.  So those items

16  were left to the Attorney General's disposition, and

17  subsequently I received the order to deliver them to the HSI

18  agency.

19  Q    And you testified earlier that the defendant after this,

20  from his residence, was taken to a second location.  What was

21  that?

22  A    This was the criminalistic or crime lab belonging to

23  DIJIN, D-I-J-I-N.

24  Q    And for what purpose?

25  A    To carry out his identification, to take his fingerprints,

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 46 of 64 PageID
615
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025    46
Direct examination by Mr. Palazzo

1    to take an album of pictures, and to create reports, to then

2    hand over the citizen to the Attorney General of the nation.

3    Q    And is that something specially done just for the

4    defendant, this visit to the crime lab?

5    A    No, this is done for all detainees.

6    Q    And where was the defendant taken after that?

7    A    After this he was taken to Bogotá, which is the Capitol

8    City of Colombia, so that he would be left at the disposition

9    of the Attorney General of the nation to then subsequently be

10   sent to a maximum security jail waiting or pending his

11   extradition to the United States.

12   Q    And was that the last time that you saw the defendant

13   before today?

14   A    Yes, sir.  The day of the capture, afterwards he was taken

15   to Bogotá.  That was the last time that I saw him.

16   Q    When were your orders from your superiors deemed complete?

17   A    At the time that through a written order I left him at the

18   disposition of the National Attorney General.

19   Q    You mentioned that some photographs were taken at the

20   crime lab.

21   A    That's right.

22   Q    Did you get a chance to see any of them after they were

23   taken?

24   A    Yes, sir.

25              MR. PALAZZO:  Your Honor, with the Court's

Case 8:21-cr-00103-VMC-AAS     Document 131     Filed 02/18/25     Page 47 of 64 PageID
616
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025     47
Direct examination by Mr. Palazzo

1    permission, I'd like to approach the witness and show him

2    what's marked just for identification as Exhibit 1503.

3              THE COURT:  1503.  You may do that.

4    BY MR. PALAZZO:

5    Q    Sir, please take a moment and review what I've handed you.

6    A    Okay.

7    Q    Is it a photograph?

8    A    That's right.

9    Q    Do you recall when it was taken?

10   A    At the crime lab in Cali, Colombia.

11   Q    And were you there when the photo was taken?

12   A    That's right.

13   Q    And where at the crime lab was it being taken?

14   A    This lab is located in the neighborhood of Pance, and the

15   picture was taken in one of the main hallways of the lab.

16   Q    And are you depicted in the photograph?

17   A    That's right.

18   Q    And is that photograph a fair and accurate representation

19   of being in the hallway with the defendant that day?

20   A    That's right.  Yes, sir.

21             MR. PALAZZO:  Your Honor, the Government moves to

22   admit Exhibit 1503 as Government Exhibit 1503 and publish to

23   the jury.

24             THE COURT:  All right.  1503.  Sorry.  Was there any

25   objection?

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 48 of 64 PageID 617
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      48
Direct examination by Mr. Palazzo

1              MR. MARTINEZ:  No objection.

2              THE COURT:  Thank you.

3              1503 is received into evidence, may be published to

4    the jury.

5    BY MR. PALAZZO:

6    Q    So, again, are you depicted in this photograph?

7    A    Yes, sir.  Yes, I'm on the -- if I look at it from my

8    point of view, I'm on the left, wearing a green jacket and a

9    mask.

10   Q    And where is the defendant in this photograph?

11   A    He's on my left-hand side and I'm holding his arm.

12   Q    And are the other two depicted in the photograph

13   law enforcement officers?

14   A    That's right.  There's a Special Agent from the HSI, and

15   my partner appears.  He is my partner in the TCIU.

16   Q    And, again, is this a photograph specially taken for the

17   defendant, or is this standard operating procedure at the lab?

18   A    It's a standard operating procedure.

19             MR. PALAZZO:  Now, if we could go back to Government

20   Exhibit 1501, and maybe side-by-side if possible.

21   Q    Were both of these photographs taken on the day of the

22   arrest?

23   A    That's right.  It was taken on the same date but at

24   different locations.

25   Q    And is the defendant wearing the same articles of clothing

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025      49
Direct examination by Mr. Palazzo

1    in both photographs?

2    A    No, sir.  In the picture on the left he is wearing the

3    clothing that we found him in at the time of the capture, and

4    in the second picture he's wearing the clothing that we allowed

5    him to change into before leaving his house.

6    Q    And was this special treatment, allowing him to change his

7    clothes?

8    A    This isn't special treatment.  This is in compliance with

9    the Colombian Constitution in regards to the dignity of all

10   citizens, regardless of their judicial status.

11            MR. PALAZZO:  Thank you, Chief Investigator.  I have

12   no further questions at the moment, but I'd like, if possible,

13   to approach at sidebar.

14            THE COURT:  Okay.  Sure.

15            *(The following bench conference was held.)*

16            THE COURT:  Go ahead.

17            MR. PALAZZO:  Your Honor, regrettably, the Government

18   would like to ask you to strike several questions and responses

19   during the Direct testimony, specifically the Government

20   questioning the Chief Investigator regarding the silence that

21   he chose to invoke, and I would move not only to strike but to

22   instruct the jury to disregard those questions and answers.

23            THE COURT:  Mr. Martinez?

24            MR. MARTINEZ:  I would agree.  I was going to

25   approach it on Cross.

1              THE COURT:  Yeah.  Okay.  I will do that, and I will

2       tell them that they cannot consider that in any way.

3              MR. PALAZZO:  Thank you, Your Honor, and it won't

4       happen again.

5              THE COURT:  It's stricken from the record.  Okay.

6       Thank you.  And then I think we'll call it a day, since it's

7       4:30, okay?

8              MR. MARTINEZ:  Do you want me to do Cross, or do it

9       tomorrow?

10             THE COURT:  Do you have a short amount of Cross?

11             MR. MARTINEZ:  Yeah, it's a short amount of Cross.

12             THE COURT:  Okay.  Let me do the striking first.

13        *(End of bench conference; proceedings resume in open court.)*

14             THE COURT:  Okay.  Mr. Martinez says that he has a

15      short Cross.  I know it's a little bit after 4:30, but just to

16      be finished with this witness, so Mr. Martinez is going to do a

17      short Cross.

18             I believe there were some questions asked, and I'm

19      going to go back and I'm going to look at these exactly so that

20      I can give you a better instruction, but concerning certain

21      questions that were asked and answers that were given when this

22      gentleman spoke with the defendant, and I'm going to ask you to

23      disregard those questions, but give me a moment to -- disregard

24      it from the testimony.  Remember, I told you earlier that

25      sometimes I'm going to ask you to please strike certain

1  evidence that's been received, and I'm going to ask you to do

2  that here, but give me a moment to go back and let me look at

3  that so that I can tell you specifically what needs to be

4  stricken, all right?  It's just going to take me a minute to

5  find that.

6          Mr. Martinez, do you wish to go ahead?

7          Or why don't you give me a moment, I'll tell you, so

8  that I'm not doing two things at the same time.  Give me a

9  moment to please find those, okay?

10         Well, I'll tell you, it's just going to take me a

11 moment to find it, and I don't want to waste your time, so when

12 we resume tomorrow morning I'll tell you exactly what it was,

13 but there was certain testimony given that needs to be stricken

14 and that you should not consider it.  But I think the best

15 thing is if, Mr. Martinez, you move forward, and in the

16 meantime I'll see if I can locate it.  If not, I will be able

17 to read it to the jury tomorrow morning, what they should

18 disregard, okay?

19         And, I'm sorry, go ahead, Mr. Martinez.  Sorry that

20 I'm not able to find it.

21         MR. MARTINEZ:  And, Your Honor, for clarification

22 then, I should not Cross on that subject?  I'll let you

23 instruct.

24         THE COURT:  No, because it's going to be stricken

25 from the record.

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 52 of 64 PageID
621
GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        52
Cross-examination by Mr. Martinez

 1          MR. MARTINEZ:  Very well.

 2          THE COURT:  It's going to be stricken from record,

 3  and in case there's any misunderstanding we'll keep this

 4  witness here.

 5          Government Counsel, he should not fly back tomorrow

 6  until we're able to resolve this issue.

 7          It's just going to take me a moment to find it.  I'm

 8  just having trouble locating it.

 9          MR. PALAZZO:  Very well, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          You may proceed, Mr. Martinez.

12          MR. MARTINEZ:  Thank you, Your Honor.

13          Good afternoon, Chief Officer.

14          THE WITNESS:  Good afternoon.

15          MR. MARTINEZ:  Basically -- well, first of all, my

16  name is Victor Martinez and I represent Mr. Ambuila.

17          **CROSS-EXAMINATION OF GUSTAVO ADOLFO MARIN LOPEZ**

18  **BY MR. PALAZZO:**

19  Q    During the course of your Direct, you mentioned that he

20  called a lawyer after he was arrested.  Just to be clear, that

21  was not me, right?

22  A    No, sir.

23  Q    Okay.  That was a Colombian lawyer.  Okay.

24          And, in essence, your testimony here today explains

25  why we find Mr. Ambuila in the United States courtroom here in

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025       53
Cross-examination by Mr. Martinez

1    the United States of America, correct?

2    A    That's right.

3    Q    And he is here because this Government requested that he

4    be extradited here for this trial?

5    A    Yes, sir.

6    Q    And you were part of the team that arrested him to get the

7    extradition process started, correct?

8    A    That's right.

9    Q    Okay.  Now, in addition to mentioning -- in addition to

10   testifying as to those matters, you were also asked some

11   questions that went beyond that.  Do you recall those

12   questions?

13   A    No, sir.

14   Q    Okay.  For example, you were asked questions about bank

15   rules in Colombia.  Do you remember that?

16   A    Yes, sir.

17   Q    You were asked under what circumstances can civilians in

18   Colombia wire monies internationally.  Do you remember that?

19   A    That's right.

20   Q    And you were asked questions as to under what

21   circumstances Government employees can wire money internally,

22   inside the country, and internationally, correct?

23   A    Correct.

24   Q    You were also asked about general wire rules regarding

25   wiring of money out of Colombia.  Do you remember that?

GUSTAVO ADOLFO MARIN LOPEZ - JANUARY 27, 2025        54
Cross-examination by Mr. Martinez

1   A    That's right.

2   Q    You also mentioned that there were rules regarding the

3   driving of automobiles not registered to particular

4   individuals.  Do you remember that?

5   A    That's right.

6   Q    Okay.  And, finally, you were asked questions about

7   address registration requirements where all members of the

8   Colombian population had to give the Government notice of where

9   they lived at all times.  Do you remember that?

10  A    There's a misinterpretation there of the word "at all

11  times."  It is at the time of the issue of citizenship cédula

12  or national ID, upon carrying out the registration at the civil

13  registry, at the National Civil Registry.

14  Q    Okay.  With that explanation, with regard to those items

15  that I just went over with you, you understand that those are

16  all rules in Colombia, right?

17  A    That's right.

18  Q    You're not trying to suggest that those are United States

19  laws in any regard, are you?

20  A    No, sir.

21  Q    And you're not trying to suggest to this jury that they

22  should consider that, those items that are laws in Colombia, in

23  this case in the United States, are you?

24  A    No, sir.

25  Q    Okay.  You understand that he is only on trial here in the

Case 8:21-cr-00103-VMC-AAS    Document 131    Filed 02/18/25    Page 55 of 64 PageID
624
GUSTAVO ADOLFO MARIN LOPEZ, JANUARY 27, 2025    55
Cross-examination by Mr. Martinez

```
 1   United States for the charges as set forth in the Indictment
 2   and nothing else, correct?
 3   A    That's right.
 4   Q    Okay.  So you were not trying to suggest anything
 5   otherwise in answering those questions, were you?
 6   A    No, sir.
 7   Q    Okay.
 8            THE COURT:  All right.  Mr. Martinez, I found it, and
 9   I'd rather do it now while it's still fresh in my mind.
10            MR. MARTINEZ:  And, Judge, that was it.  I have no
11   further questions at that point.
12            THE COURT:  Okay.  Thank you, Mr. Martinez.
13            So, you know, ladies and gentlemen, sometimes these
14   things happen and there are questions asked that should not be
15   asked, and so that's what happened here, and what I'm going to
16   do is I'm going to strike it from the record, but I have to
17   tell you what it is.  So it's sort of like I'm telling you to
18   unring the bell, but here I am ringing the bell, but it's the
19   only way that I can do it, all right?  And that is -- the
20   question was asked did he make any statements.  So this is
21   after Mr. Ambuila was detained, this gentleman, the witness was
22   asked did Mr. Ambuila make any statements, and the witness
23   answered that question that -- "no, sir."  And, you know, that
24   is not permissible, so you need to -- it's not permissible for
25   you to consider it, so here I am telling you to unring the
```

```
 1   bell, but this is the only way I know how to do it, is to just
 2   tell you again that this you cannot consider.  It is stricken
 3   from the record.  That was not an appropriate question to ask,
 4   but, you know what, sometimes these things happen because none
 5   of us are perfect and we all make errors.  So I'm here to tell
 6   you, please don't consider that or anything adjoining that
 7   statement.  That's what I -- in reviewing this very quickly,
 8   that's what I find that should not have been asked, so please
 9   don't consider that, all right?
10         Can all of you guarantee me that, that you can do
11   that, that you will not consider that?
12         JUROR:  So we wouldn't consider --
13         THE COURT:  I'm sorry.  I'm not going to be able to
14   hear you.  We're going to need to get that microphone to you.
15   I'm very sorry.
16         INTERPRETER LEONOR:  May I, Your Honor?
17         THE COURT:  Yes, you may.  Thank you.
18         JUROR:  I just want to confirm, we wouldn't consider
19   the -- sorry, I wouldn't consider the fact that he got a lawyer
20   then afterwards?
21         THE COURT:  You should not consider the fact that he
22   was -- did he make any statements.
23         JUROR:  Okay.
24         THE COURT:  That's what you cannot consider.
25         JUROR:  Okay.
```

```
 1              THE COURT:  That question, did he make any

 2    statements, and the answer was "no, sir."  You can't consider

 3    that.

 4              JUROR:  Okay.  Got it.

 5              THE COURT:  All right?  You can't consider that.

 6              JUROR:  Yes.

 7              THE COURT:  And, Counsel, you all can think about

 8    this, if you feel there's some additional instruction that

 9    I ought to give, I will do it.  That's -- going through this

10    pretty quickly, that's what I see as the problem.

11              So they'll think about it.  If there's an additional

12    instruction, I'll give it to you again, okay?

13              Okay.  Was there any redirect for this witness?

14              MR. PALAZZO:  No, Your Honor.

15              THE COURT:  Okay.  I will then excuse the witness.

16              Do you want me to keep him longer, Mr. Martinez?

17              MR. MARTINEZ:  No, Your Honor.  May we approach one

18    moment?

19              THE COURT:  Of course.

20               (The following bench conference was held.)

21              THE COURT:  That's always very challenging,

22    Mr. Martinez, and I'm happy to do whatever else we need to do

23    to cure it.

24              MR. MARTINEZ:  Right.  The only other thing I would

25    suggest, Judge, is that the jury was told to disregard the
```

1    answer to the question, you know, did you make any statements,

2    he said no.  I just think it would be helpful if you would just

3    explain to the jury that the reason that they can't consider it

4    is because in the United States, like in Colombia, they have

5    the right to remain silent.

6             THE COURT:  Right.  Well, I didn't know if I should

7    go into that.  You know, I asked --

8             MR. MARTINEZ:  And I think at that, they all

9    understand that.

10            THE COURT:  Okay.  All right.  You know what?

11   I think that's a fine idea.

12            MR. MARTINEZ:  Okay.

13            THE COURT:  Okay?

14            MR. MARTINEZ:  Yes, Your Honor.

15            THE COURT:  All right.

16    *(End of bench conference; proceedings resume in open court.)*

17            THE COURT:  Okay.  I'm going to give you one more

18   explanation so that you understand it, and I think that's

19   actually a good idea.

20            So we have the right to remain silent.  You know,

21   it's interesting, because I told you at the beginning of the

22   case that we all have the right to remain silent and you can't

23   use somebody's right to remain silent against them.  Well, it's

24   a similar version of that.  This gentleman, you know, when

25   he -- when the witness was asked did he make any statements and

1    the answer was "no, sir," Mr. Ambuila, in essence, was -- just

2    as in the United States, they have in Colombia the right to

3    remain silent, and that can't be used against him.

4          So here nobody intended to do anything wrong,

5    you know what, it just happened, and that's what I believe, it

6    just happened, so that's why I'm telling you to please

7    disregard it.

8          All right.  And if, Counsel, you think of anything

9    else, you can let me know tomorrow morning, we can deal with it

10   then.  I can remind the jury again of it.

11         MR. MARTINEZ:  There won't be anything else,

12   Your Honor.

13         THE COURT:  Okay.  All right.

14         MR. MARTINEZ:  If you want to excuse the witness,

15   that's fine with the defense.

16         THE COURT:  Okay.  I will excuse the witness.

17   Thank you.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  You may leave.  Thank you for having come

20   in today to testify.

21         Tomorrow morning we need to start a little bit later

22   than what we normally do because I have another matter that

23   I need to take care of.  I am pretty certain that we can start

24   by 10:45.  Just bear with me.  If I am running a little bit

25   late, I will do everything I can, but 10:45, and what we'll do

1   is we'll go from 10:45 to noon and take our lunch break and

2   then resume in the afternoon and take an afternoon break,

3   all right?

4          So we'll start at 10:45 tomorrow morning.  All right?

5          So I appreciate everybody being here and

6   participating in this case.  We'll see you tomorrow morning at

7   10:45 a.m.

8          Thank you.

9          JUROR:  Your Honor, I had a question.  You had

10  mentioned something about getting something for our work.

11         THE COURT:  Yes.

12         JUROR:  I wanted to get something.

13         THE COURT:  Magaly is working on it.

14         Magaly, can you work with the gentleman on the

15  letter?

16         COURTROOM DEPUTY:  Yes, Your Honor.

17         THE COURT:  So letters for your work, same thing, you

18  should have the phone order so you can bring all of those

19  things in, but we will do -- I've got a form letter that I send

20  out that I don't even need to look at it, she just sends it out

21  to whoever it needs to go to.  So just make certain that you

22  tell her to whom it needs to go, like an e-mail address, and

23  we'll get it out to that person as soon as possible.

24         JUROR:  Yes, ma'am.  Thank you.

25         THE COURT:  Okay.  Anything else?

1          Okay.  Very good.  We'll see you tomorrow morning at

2     10:45.

3                    *(Jury exits proceedings.)*

4          THE COURT:  It's okay, Counsel for the Government.

5     You know what, these things happen.  Don't worry about it.

6     I know you didn't mean anything.

7          You know, I actually -- as a judge it happened

8     when -- one of the first trials I did in Fort Myers, when I was

9     assigned to Fort Myers, so -- but the lawyer did it in closing

10    argument as opposed to -- I think what he said was if this

11    defendant were not guilty, he would have protested when he was

12    arrested, or something along those lines, is what he said, and

13    I had to give a curative instruction for the jury as well.

14         So, listen, I appreciate that you, you know, said

15    something.  Mr. Martinez was going to handle it in

16    cross-examination or come up to the Court and have him give an

17    instruction.  It's okay.  You know, let he who is perfect cast

18    the first stone, and there isn't anybody here who is perfect.

19    We've all done things that, you know, we wish we had done

20    differently.  So it's all okay.

21         Like I said, I have to start later tomorrow.  I've

22    missed so many things in my children's life because of working.

23    I'll just tell you, I have Grandparents Day at my

24    grandchildren's school.  I just don't want to miss it.

25    I really don't.

 1              You know, 20 years ago I would have missed it with my

 2      own children, but today with my grandchildren, I just don't

 3      want to, so -- and unfortunately their school is way out there,

 4      so even though it's at 8:00 a.m., I just can't -- it's like

 5      from 8:00 to 9:30.  I just want to make certain that I can be

 6      back.  It's probably going to take me 45 minutes, but I just

 7      want to give myself a little bit of time so that I don't feel I

 8      have to rush over the Courtney Campbell Expressway.

 9              So, anyway, I just wanted to let you know, that's

10      what I've got to do tomorrow morning.

11              So I think that's it.

12              Mr. Martinez, anything?

13              MR. MARTINEZ:  Your Honor, I just wanted to make sure

14      that it would be okay to leave the notebooks here in the

15      courtroom until --

16              THE COURT:  I don't have anything at all.  I've

17      canceled the sentencing that I had tomorrow morning, so I don't

18      think anybody else is going to come in here at all, right,

19      Aaron?  He keeps good tabs on these things, so I think we'll be

20      in good shape.

21              MR. MARTINEZ:  Thank you, Judge.

22              THE COURT:  Okay.  Anything else?

23              All right.  Very good.  We'll see you tomorrow

24      morning.  What did I say, 10:45?  10:45 tomorrow morning.

25              I'm just going to stay here for a minute.  Thank you.

1                        - - - - -

2            (Proceedings adjourned at 4:47 p.m.)

3                        - - - - -

1                           C E R T I F I C A T E

2

3          This is to certify that the foregoing excerpt

4    transcript of proceedings taken in a jury trial in the United

5    States District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 27th day of January,

8    2025.

9

10

11                                 /S/ DAVID J. COLLIER

12

13                                 DAVID J. COLLIER

14                                 OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25