IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
                                    ) Case No.
        vs.                         ) 8:21-CR-00103-VMC-AAS
                                    )
                                    )
OMAR AMBUILA,                       )
                                    )
              Defendant.            )

_____

JURY TRIAL - DAY 2 and CHANGE OF PLEA HEARING
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES SENIOR JUDGE

JANUARY 28, 2025
10:45 A.M.
TAMPA, FLORIDA
_____

Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

**APPEARANCES:**

**FOR THE GOVERNMENT:**

    *Joseph Palazzo*

    *Ariana Lazzaroni*

    *Adrienne Rosen*

    United States Department of Justice

    Criminal Division

    1400 New York Avenue, Suite 10302

    Washington, D.C.  20001

    (202) 445-7910

**FOR THE DEFENDANT OMAR AMBUILA:**

    *Victor Daniel Martinez*

    Victor D. Martinez, PA

    110 North 11th Street, First Floor

    Tampa, Florida  33602

    (813) 289-0600

*INTERPRETERS:*

Jose Vega
Victoria C. Spellman

**I N D E X**

**GOVERNMENT'S EXHIBITS**                                                  **PAGE**

101                                                                          9
102                                                                          9
103                                                                          9
104                                                                          9
105                                                                          9
106                                                                          9
107                                                                          9
108                                                                          9
109                                                                          9
110                                                                          9
111                                                                          9
112                                                                          9
113                                                                          9
114                                                                          9
115                                                                          9
117                                                                          9
118                                                                          9
119                                                                          9
120                                                                          9
121      social media photos                                                9
123                                                                          9
124                                                                          9
125                                                                          9
126      Lamborhini Miami dealer jacket                                     9
127                                                                          9
128                                                                          9
129                                                                          9
130      application for bank account at Banco de                           9
         Bogotá
131      U.S. Customs and Border Protection, U.S.                           9
         Department of Homeland Security, TECS-Person
         Encounter List
132                                                                          9
133                                                                          9
134                                                                          9
135                                                                          9
136                                                                          9
137      application for visa for a non-immigrant re:                       9
         Omar Ambuila
139                                                                          9


**GOVERNMENT'S WITNESSES:**                                                 **PAGE**

SPECIAL AGENT STEPHEN MAJERT
Direct examination by Mr. Palazzo                                            9

1               P R O C E E D I N G S

2                 - - - o0o - - -

3          THE COURT:  Good morning, everybody.  We'll get

4     started in just a few minutes.

5          MR. MARTINEZ:  May we approach?

6          THE COURT:  Let me just call the case.

7          Our trial is resumed.  Counsel would like to have a

8     conversation at sidebar, so please come to sidebar.

9               *(The following bench conference was held.)*

10         MR. MARTINEZ:  This morning Mr. Ambuila asked me if

11    it would be possible to have 10 minutes or 15 minutes before we

12    called in the jury.  He wanted me to sit in the room with the

13    prosecutor and the interpreter to talk about maybe resolving

14    the case.

15              I know.

16         THE COURT:  Well, sure.  Sure.  We can do that.

17         MR. MARTINEZ:  I guess we can move out of the

18    courtroom into the little --

19         THE COURT:  Wherever the marshals -- I just need the

20    marshal up here.

21   *(U.S. Deputy Marshall enters bench conference proceedings.)*

22         THE COURT:  They would like to have a discussion, the

23    lawyers, with the defendant there, so where could they meet

24    so --

25         U.S. DEPUTY MARSHAL:  The conference room.

1          THE COURT:  So where would that be?

2          U.S. DEPUTY MARSHAL:  It would be on the fourth floor

3     in the conference room.

4          THE COURT:  That's what we'll do then.

5          U.S. DEPUTY MARSHAL:  I'll contact my supervisor just

6     to make sure.

7          THE COURT:  Why don't you do that and we'll hold on.

8          MR. MARTINEZ:  My apologies, Judge.  We were just

9     thinking about how --

10          THE COURT:  It's not you.

11          MR. MARTINEZ:  I know.  The first thing the

12     Government asked me this morning, "Any surprises?"  I said,

13     "No, everything is fine."  Ten minutes later.  Sometimes it

14     takes a while for a lightbulb to go off.

15          THE COURT:  So I don't think we need to be at sidebar

16     anymore.  Let's see what the gentleman says and we'll talk to

17     him.

18                    *(End of bench conference.)*

19               (Recess at 10:50 a.m. until 11:19 a.m.)

20                         - - - - -

21          THE COURT:  We're on the record.

22          We finished with that witness, right, Government

23     folks?

24          MR. PALAZZO:  Yes.

25          THE COURT:  Anything else anybody wants me to say as

1     an instruction?  I think I've beat that dead horse as much as
2     necessary.
3             So, Government, are you ready with your next witness?
4             MR. PALAZZO:  Yes, Your Honor.
5             THE COURT:  Bring your person in here.
6             MR. PALAZZO:  Your Honor --
7             THE COURT:  We'll bring the jury in and have that
8     person ready to roll.
9             COURTROOM DEPUTY:  Judge, do you want me to swear the
10    new interpreter in when the jury gets in?
11            THE COURT:  Yes, do it with the jury.  Good point.
12                    *(Jury enters proceedings.)*
13            THE COURT:  Thank you for your patience this morning,
14    ladies and gentlemen.  That is a false alarm, do not worry.
15    Do not worry, it is a false alarm.  They're doing construction
16    on another floor and somebody is causing that mishap.
17            Right, Aaron?
18            Yes, he has verified that.
19            Are you ready with your next witness, Government?
20            MR. PALAZZO:  Yes, Your Honor.  The United States
21    calls Steven Wajert to the stand.
22            THE COURT:  All right.  Where is Mr. Wajert?
23            COURTROOM DEPUTY:  Can I swear in --
24            THE COURT:  Oh.  Swearing in the Spanish interpreter.
25    Yes.

1          Mr. Wajert, come forward.

2          We do need to swear in the Spanish interpreter.

3          We have a different Spanish interpreter today, so we

4     are just going to swear him in.

5          Go ahead, Magaly.

6          COURTROOM DEPUTY:  Please raise your right hand.

7          Do you solemnly swear or affirm that you will truly,

8     fairly and impartially act as a Spanish interpreter in the

9     matter now before the Court?

10          INTERPRETER:  I so do.

11          COURTROOM DEPUTY:  Please state your name for the

12     record.

13          DEFENDANT 3:  José Vega, Federally Certified Court

14     Interpreter.

15          THE COURT:  All right.  Thank you.

16          And now we'll swear in the witness.

17          COURTROOM DEPUTY:  Please raise your right hand.

18          Do you solemnly swear or affirm, under the penalty of

19     perjury, that the testimony you're about to give in this cause

20     will be the truth, the whole truth and nothing but the truth?

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  Thank you.

23          Can you please state and spell your last name for the

24     record.

25          THE WITNESS:  Yes.  Steven Wajert.  Last name is

spelled W-A-J-E-R-T.

COURTROOM DEPUTY:  Thank you.  You may take the stand.

COURT REPORTER:  Is Stephen with a V or a P-H?

THE WITNESS:  A P-H.

THE COURT:  Thank you.

And I just got an e-mail verifying that it's a false alarm from GSA, so I didn't want anybody to be worried.

All right.  So just a few things.  You're going to be asked some questions by the Department of Justice lawyer.  If you don't understand the question, please say so, so they can state it a different way.  Wait until the question is finished before you begin answering so we don't have two people speaking at the same time.  And if you're soft-spoken, speak up.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

MR. PALAZZO:  Your Honor, based on the motions in limine that were granted yesterday, the Government now moves to admit several exhibits that I will read out solely for the Court, but I'll be asking for these business records and public records to be admitted into evidence.

THE COURT:  Okay.

MR. PALAZZO:  They are exhibits marked for identification as 101 through 115.  So 101 through and including 115.

1          THE COURT:  Right.  So 101 to 115.  Got it.

2          MR. PALAZZO:  117 through and including 121.

3          THE COURT:  117 to 121.

4          MR. PALAZZO:  123 through and including 137.

5          THE COURT:  123 to 137.

6          MR. PALAZZO:  139 and 140.

7          THE COURT:  139 and 140.

8          MR. PALAZZO:  Oh, just 139.  There's no 140.

9  I'm sorry.

10         THE COURT:  Okay.  So 101 to 115, 117 to 121, 123 to

11 137 and 139?  Right?

12         MR. PALAZZO:  Yes, Your Honor.

13         THE COURT:  Okay.  Objections?

14         MR. MARTINEZ:  No objection.

15         THE COURT:  They are received into evidence, may be

16 published to the jury.

17         MR. PALAZZO:  Good morning, sir.  Thank you for being

18 here.

19         THE WITNESS:  Good morning.

20     **DIRECT EXAMINATION OF SPECIAL AGENT STEPHEN MAJERT**

21 **BY MR. PALAZZO:**

22 Q    What do you do for a living?

23 A    I am a Special Agent with I.R.S. Criminal Investigation.

24 Q    And when did you join?

25 A    I joined the I.R.S. Criminal Investigation in

1   September 2009.

2   Q    What was your education prior to joining Criminal

3   Investigative Service of the I.R.S.?

4   A    I have a Bachelor's in accounting and I have a Master's in

5   Business Administration.

6   Q    And did you receive any training upon becoming a Special

7   Agent?

8   A    I did.

9   Q    Could you please describe some of that training for the

10  jury.

11  A    Yes.  So all I.R.S. Special Agents are required to go

12  through 26 weeks of training at the Federal Law Enforcement

13  Training Center located in Glynco, Georgia.  The first 12 weeks

14  consist of the Criminal Investigative Training Program, which

15  is what all criminal investigators in the Federal Government,

16  with the exception of the FBI and DEA, go through, so ATF,

17  Secret Service, HSI, those type of agencies also go through the

18  same 12 week training.  It consists of a foundational

19  understanding of how criminal investigators work, such as how

20  to draft warrants, court orders, how to interview witnesses,

21  how to write reports of those interviews, how to conduct or

22  collect evidence.

23          THE COURT:  Sorry.  I'm sorry, Mr. Witness.

24  You know, nothing we can do.  Please go ahead.  Continue.

25  A    So collect evidence, we also go through driving during

1   that 12 week, basic firearms, and then defensive tactics.

2            So after those first 12 weeks are done, you

3   physically graduate from that program, the Criminal

4   Investigator Training Program, and it is a physical graduation

5   similar to a high school or a college graduation.

6            The next 14 weeks is specific to I.R.S. Special

7   Agents, so in I.R.S. we call that Special Agent Basic Training,

8   so it's essentially everything you learned during the first

9   12 weeks but as it applies to I.R.S. Criminal Investigation.

10           On top of that, we go through mock cases, all of

11  which are of financial nature, so financial investigations,

12  they include criminal tax cases, money laundering cases, and

13  other fraud cases that revolve around financial investigations.

14  You also learn how to write memorandum inside of I.R.S.

15  policies, rules and procedures, you learn how criminal tax

16  counsel or in-house counsel works during that Special Agent

17  basic training, you learn mock courtroom procedures as well as

18  testimony, and then on the back end of those 14 weeks it's

19  another's physical graduation, so it's another ceremony similar

20  to a high school or college.

21           So in total it's 26 weeks at the Federal

22  Law Enforcement Training Center before any Special Agents with

23  I.R.S. leave and become fully and duly sworn Special Agents.

24  Q    You mentioned that money laundering is part of the second

25  half of your Special Agent training.  Is narcotics-related

1  money laundering part of that training?

2  A    It is.

3  Q    After graduation, what was your first assignment after the

4  Special Agent Training Academy?

5  A    My first assignment was located in Cincinnati, Ohio.

6  Q    And from what years did you serve in Cincinnati, Ohio?

7  A    I was there from 2009 to 2016.

8  Q    What were your responsibilities as a Special Agent?

9  A    So as a Special Agent in Cincinnati, Ohio, I investigated

10  criminal tax violations, along with other fraud, to include

11  narcotics-derived money laundering as well as other money

12  laundering that wasn't derived from narcotics.  That may --

13  that could be like bank fraud, wire fraud, and then the

14  individual who committed that act went on to spend the money in

15  a nature that was consistent with money laundering.

16  Q    And how did the Cincinnati office work in terms of

17  division of responsibility?  Were you assigned some sort of

18  criminal specialty, were you a generalist?  Like what did you

19  concentrate on?

20  A    So between 2010 and 2013 I worked general economic crimes,

21  so financial investigations.  Starting in 2013 I was assigned

22  to both the Cincinnati Police Department and the FBI office

23  there to combat narcotics-derived money laundering.

24  Q    What are some of the investigative tools and techniques

25  that you typically used to build your cases?

1   A    So for us, because we follow the money, we would conduct a

2   financial analysis on bank records using subpoenas, so we would

3   subpoena the bank, obtain the records, and then conduct

4   financial analysis on said records, we would interview

5   individuals, we would subpoena other things, such as car

6   dealers, mortgage records, to derive and figure out the

7   financial aspect of those as it relates to the case, we would

8   conduct search warrants, it could be a physical residence or an

9   electronic device, such as an e-mail or an electronic account,

10  we would do court orders, and we would also do surveillance.

11  Q    Did any of your investigations in the Cincinnati field

12  office lead to arrests?

13  A    They did.

14  Q    Did any of your money laundering investigations in the

15  Cincinnati field office lead to arrests?

16  A    Yes.

17  Q    And did you have occasion to interview arrestees as part

18  of your regular duties?

19  A    I did.

20  Q    And did any of your post-arrest interviews ever lead to

21  new information?

22  A    Yes.

23  Q    And did that new information ever lead to new

24  investigations into new potential targets?

25  A    It did.

1   Q    I believe you testified that your service in the

2   Cincinnati field office was until 2016; is that right?

3   A    That's correct.

4   Q    And where did you serve after that?

5   A    I served in the Tampa field office, specifically the

6   Sarasota post of duty.

7   Q    And where have you served since the Sarasota field office?

8   A    So after Sarasota I was the supervisory Special Agent in

9   Detroit from 2017 to 2020, where I oversaw a money laundering

10  task force, a corporate fraud task force, and a joint terrorism

11  task force in Detroit.  After that I also served as the acting

12  Assistant Special Agent in Charge in the Cincinnati field

13  office, where I had final approval authority -- final approval

14  authority over all investigative initiations as well as

15  recommendations to the Department of Justice.  The Cincinnati

16  field office covers the entire State of Ohio and the entire

17  State of Kentucky.

18           And then most recently I was the supervisory Special

19  Agent at the Dallas HIDTA office.  HIDTA is a High Intensity

20  Drug Trafficking Area, specifically this was Texoma HIDTA, so

21  that HIDTA is responsible for the northern portion of Texas as

22  well as the entire State of Oklahoma.  There I supervised

23  agents whose sole mission was to combat illicit financing that

24  was derived from narcotics.

25  Q    Back to your service in the Sarasota field office.

1          When you arrived in Sarasota, did you begin any joint

2     investigations with other agencies?

3     A    I did.

4     Q    What was the other agency?

5     A    Department of Homeland Security, specifically Homeland

6     Security Investigations.

7     Q    Did one of those Homeland Security Investigations that you

8     joined involve someone named Omar Ambuila?

9     A    It did.

10    Q    What crime were you primarily investigating him for?

11    A    Narcotics-derived money laundering.

12    Q    And is the Omar Ambuila that you investigated for

13    narcotics-derived money laundering in the courtroom today?

14    A    Yes.

15    Q    Could you take a moment to look around the room, locate

16    him, point to him, and describe an article of clothing that

17    he's wearing.

18    A    Yeah.  He is the individual at this table wearing the blue

19    sweater.

20          MR. PALAZZO:  Your Honor, to complete the record, I'd

21    just like to point out that the witness has pointed to the

22    defendant.

23          THE COURT:  Do you want me to make a finding?

24          MR. PALAZZO:  Yes, Your Honor.

25          THE COURT:  Okay.  I find that the witness has

1  identified the defendant by the article of clothing.

2  Thank you.

3  BY MR. PALAZZO:

4  Q    Sir, who was Omar Ambuila to you at the time and why did

5  you start investigating him?

6  A    Mr. Ambuila was a customs official in Colombia, and we

7  started investigating Mr. Ambuila because we saw that another

8  individual that we -- that was a target of our investigation --

9         MR. MARTINEZ:  Objection, Your Honor, without first

10  establishing the predicate for knowledge.

11         THE COURT:  Okay.  Sustained.  You can lay a

12  foundation.

13  BY MR. PALAZZO:

14  Q    Special Agent Wajert, could you tell us about the Homeland

15  Security investigation that you joined upon arrival in the

16  Sarasota office.

17  A    Upon my arrival in the Sarasota office, I joined Homeland

18  Security to investigate a drug trafficking organization

19  operating out of Colombia and a nexus to a brother of the

20  individuals engaged in the drug trafficking operation that was

21  operating out of Hialeah, Florida.

22  Q    And what was your responsibility in that investigation of

23  this Hialeah, Florida individual?

24  A    The brother located in Hialeah, Florida was suspected of

25  laundering proceeds of the drug trafficking organization out of

1   Colombia.  My responsibilities were to follow the money

2   associated with said money laundering and determine if a crime

3   indeed took place.

4   Q    And who was the individual in Hialeah, Florida that you

5   were investigating?

6   A    Jorge Peña Ramirez.

7   Q    And you mentioned that you were following the money.

8   Where did you follow the money to?

9   A    During the course of reviewing Mr. Peña Ramirez's

10  financial activity, the defendant's adult daughter regularly

11  occurred in his bank statements, and that is how I uncovered

12  Omar Ambuila, the defendant.

13  Q    Now, what investigative steps -- you mentioned the --

14  Mr. Peña's financial records; is that right?

15  A    That's correct.

16  Q    Did you or your investigative team acquire those financial

17  records?

18  A    We did.

19  Q    And from where did you acquire those financial records?

20  A    Multiple financial institutions.

21  Q    Do you recall how many bank accounts that Mr. Peña had at

22  the time you and your team were investigating him?

23  A    At least ten.

24  Q    I am now going to -- I'm going to turn your attention now

25  to Government's Exhibits 1 through 14.  Just a moment.  I'm

 1   going to bring them over to you.

 2              THE COURT:  Are these the 101s you're referring to?

 3              MR. PALAZZO:  Yes.

 4              THE COURT:  Okay.

 5              MR. PALAZZO:  101 through and including 114.

 6              THE COURT:  Okay.  That fine.  Thank you.

 7   BY MR. PALAZZO:

 8   Q    Please take a moment, Special Agent Wajert, and then I'm

 9   going to ask you to confirm whose records these are and what

10   banks and account numbers are listed.

11              Have you had a chance to review them?

12   A    I have.

13   Q    Have you seen them before today?

14   A    I have.

15   Q    Whose records are they?

16   A    These are the financial records of Mr. Jorge Peña Ramirez.

17   Q    And this is the same Mr. Peña that you were referring to

18   earlier in your testimony?

19   A    That's correct.

20   Q    Now, I just want you to confirm, if you can, but here we

21   have in Exhibit 101 Wells Fargo 0581.

22              And in Wells Fargo -- in Exhibit 102 we have

23   Wells Fargo 2119.

24              And in Exhibit 103 we have Ocean Bank 3406.

25              In Exhibit 104 we have TD Bank 6715.

1            In Exhibit 105 we have TD Bank 8160.

2            In Exhibit 106 we have Bank of America accounts 4189

3    and 8176.

4            In Exhibit 107 we have Bank of America 0457.

5            In 108 we have Bank of America 6866.

6            In Exhibit 109 we have JPMorgan Chase 3950.

7            In Exhibit 110 we have JPMorgan Chase 8600.

8            In Exhibit 111 we have United Bank 3189.

9            In Exhibit 112 we have Citibank Exhibit 0303.

10           In Exhibit 113 we have JPMorgan Chase exhibit --

11   account number ending in 5917.

12           And in Exhibit 114 we have TD Bank accounts 8928 and

13   2816.

14           Is that correct?

15   A    Yes, that's accurate.

16   Q    Now, you as a U.S. Special Agent from the Criminal

17   Investigative Service of the I.R.S. on this task force, did you

18   investigate where the defendant was living at this time?

19   A    I did.

20   Q    And where was he living?

21   A    He was residing in Colombia.

22   Q    And where was his adult daughter living?

23   A    She was living in Miami, Florida.

24   Q    And Mr. Peña was living, you said, in Hialeah; is that

25   right?

1    A    That's correct.

2    Q    Why as a U.S. Special Agent were you interested in the

3    defendant while he was residing in Colombia?

4    A    After reviewing several financial institutions' records

5    that were provided to the investigative team in the name of

6    Jorge Peña Ramirez, we saw several transactions that went to

7    benefit the defendant's adult daughter.  Shortly thereafter we

8    scraped social media for the defendant's adult daughter's name

9    and we uncovered that the defendant's adult daughter was

10   driving a $330,000 Lamborghini, and typically, based on my

11   training and experience, individuals employed in -- whether it

12   be our government or other governments, typically cannot afford

13   a $330,000 car.

14   Q    Did you investigate the defendant's travel after scraping

15   social media?

16   A    Myself with the team did, yes.

17   Q    And what investigative steps did you or the team take?

18   A    The investigative team would have pulled database reports

19   from the Department of Homeland Security.

20   Q    I'm putting in front of you Government Exhibit 131.

21        Do you recognize this document, sir?

22   A    I do.  I do.

23   Q    Have you seen it before today?

24   A    I have.

25   Q    Where have you seen it?

1    A    We saw it during the course of this investigation.

2    Q    Can you read the title?

3    A    Yes.  U.S. Customs and Border Protection, U.S. Department

4    of Homeland Security, TECS-Person Encounter List.

5    Q    Okay.  And so what is this, in lay terms, please, for the

6    jury?

7    A    This is a database that tracks individuals that both leave

8    the United States and come back into the United States.

9    Q    And is there a date when this was generated?

10   A    Yes.  It was generated September 15th, 2017.

11   Q    And does this -- well, let's read some of data that it

12   captures.  The bolded column or the bolded row at the top,

13   we're just going to make it bigger for the jury, and then can

14   you read from left to right what this record captures.

15   A    Sure.  It captures the last name and first name of the

16   traveler.  It captures the date of birth, the date of the

17   travel, the time of the travel, the carrier code, which is the

18   airline code, the carrier number, which is going to be the

19   flight number.  I/O is inbound or outbound.  The site is in the

20   event of an inspection.  An inspection, or INSP, is probably

21   going to list the name of the inspector.  The type is APIS,

22   that is a DHS term.  The status is either going to be on board

23   or off or not on board.  Reference could reference Customs or

24   other DHS entities.  Arrival location would be where the plane

25   arrived, and then departing location would be where the plane

1   departed from.

2   Q     And is this information that that database captured just

3   for the defendant?

4   A     No.

5   Q     Is this information kept in the ordinary course?

6   A     It is.

7   Q     And for whom is it kept?

8   A     All travelers.

9   Q     This is, I think, a four page list.  It's in reverse

10  chronological order; is that right?

11  A     That's correct.

12  Q     Let's turn now to page 2 of this document, and I'd like to

13  draw your attention to the third row from the bottom, and

14  I know it's a little bit light on the big screen here, but can

15  you read what is captured in this row?

16  A     Yes.  So the defendant's name, last name Ambuila, first

17  name Omar.  The defendant's date of birth, 3-3 of 1961.  The

18  arrival time of his flight.  The carrier code here is AV,

19  which, based on my understanding, that stands for Avianca,

20  which is an airline out of Colombia.  Carrier number, or the

21  flight number in this instance, is 38.  "I" is inbound.  So he

22  left Colombia to come to the United States.  Because the INSP

23  has a number here, it would mean that the individual was

24  inspected.  He was on board the flight.  The flight arrived

25  from Cali to Miami International Airport.

1          MR. PALAZZO:  Your Honor, may I just have a quick

2    word with defense counsel?

3          THE COURT:  Yes.

4    BY MR. PALAZZO:

5    Q    Sir, do you recall this border crossing from your

6    investigation?

7    A    I do.

8    Q    Did you investigate this particular border crossing

9    further?

10   A    Yes, the team and I did.

11   Q    And what did you and the team learn?

12   A    On this day the defendant, Mr. Ambuila, was inspected, and

13   when he was inspected he stated that he had $10,000 of cash on

14   him, and upon further inspection he had 21,000 United States

15   dollars on him.

16   Q    And why did this catch your attention?

17   A    First and foremost, as a foreign customs official, a lot

18   of other countries have similar rules as the United States,

19   where you have to declare when you bring in in excess of

20   $10,000; and, secondly, as a customs official, you would -- you

21   would think that Mr. Ambuila would know the rules of the

22   United States, especially since he has traveled here numerous

23   times.

24   Q    And is that what this record reflects, there is travel

25   previous to this?

1   A    Correct.

2   Q    And just to be clear, the incident at this border

3   crossing, was that U.S. dollars that you're describing?

4   A    Correct.  21,000 U.S. dollars.

5   Q    Let's go now back to page 1, if we could, and the fifth

6   row down from the top.  I believe there is another crossing,

7   December 24th, is that right, 2016?

8            Yes.  That's the one.

9            Okay.  Could you, again, just repeat where -- or read

10  from here where the defendant is coming to and arriving to.

11  A    So the defendant, Omar Ambuila, with a date of birth

12  3-3-1961, arrived on 12-24-2016 at 3:24.  He's flying in on

13  Avianca again, and he's flying in from Cali, Colombia to Miami,

14  Florida.

15  Q    And let's take a look maybe at the then previous entry

16  then.  Would that be a departure from the country?

17  A    Yes.  So the "I" would indicate inbound on 12-24 of '16,

18  and the "O" would indicate outbound on 1-8 of '17, and he was

19  on board for both flights.

20  Q    And did you or your team investigate this particular trip

21  to the United States further?

22  A    We did.

23  Q    And what did you learn?

24  A    Two days after the defendant Omar Ambuila arrived to the

25  United States, his adult daughter purchased a $330,000

1   Lamborghini.

2   Q     And do you recall where it was purchased?

3   A     It was purchased in the Miami area.

4   Q     I'm going to switch gears now and put in front of you

5   Government Exhibit 137.  Do you recognize this document?

6   A     I do.

7   Q     From where do you recognize it?

8   A     From the course of the investigation.

9   Q     And what is this document?

10  A     This document is an application for a visa for a

11  non-immigrant.

12  Q     And is there a date on which this was generated?

13  A     There is.  September 15th, 2017.

14  Q     And is that the date that this report was generated or

15  is that the date of this application?

16  A     That's the date the report was generated.

17  Q     Okay.  Who is that pictured?

18  A     That is the defendant, Omar Ambuila.

19  Q     And what other types of information is captured here in

20  this document?

21  A     So the defendant's photo is captured, the defendant's last

22  name, first name, date of birth, and gender.  It was also

23  classifying the visa class, so it's a temporary visitor visa,

24  or -- yeah.  It also says where he's coming from, and it also

25  lists his e-mail address.

1   Q    What does it list his e-mail address as?

2   A    OAmbuila030361, which is his date of birth, at

3   Hotmail.com.

4   Q    And did you or your investigative team take further steps

5   to investigate that e-mail address?

6   A    We did.

7   Q    What did you do?

8   A    Ultimately a search warrant was executed on that e-mail

9   address.

10  Q    And did you review the returns of that?

11  A    I did.

12  Q    Were there any connections in that e-mail address to

13  anyone that you've mentioned in this case?

14  A    There was.

15  Q    What was that connection?

16  A    There was an e-mail between Jorge Peña Ramirez and the

17  defendant.

18  Q    And did you review that e-mail?

19  A    I did.

20  Q    Do you recall what was communicated in that e-mail?

21  A    To the best of my recollection, Mr. Peña Ramirez provided

22  the defendant his Wells Fargo account number.

23  Q    I'm now going to put in front of you a Government

24  Exhibit 130, and I believe you'll see that the original is in

25  Spanish, and so that's marked as Government Exhibit 130B, and

1  then 130A is the English, and we'll try to put them

2  side-by-side.  Please take a moment and review this.

3            Have you had a chance to review it?

4  A    I have.

5  Q    Do you recognize this document?

6  A    I do.

7  Q    From where do you recognize it?

8  A    The course of the investigation.

9  Q    Can you read -- well, first, what is this, generally?

10  A    It is an application for a bank account at Banco de

11  Bogotá.

12  Q    And for whom?

13  A    The defendant, Omar Ambuila.

14  Q    And what is the occupation listed in the top middle of

15  this document?

16  A    The occupation is listed as civil servant.

17  Q    And I apologize, I should have said this at the beginning

18  of your testimony.  If at any time you want a hard copy, if

19  that's more convenient for you than what's on the screen,

20  I have those, and I can ask the Court to approach you and give

21  you a copy.

22  A    Okay.  Thank you.

23  Q    Is there the name of the applicant's employer?

24  A    There is.  It's DIAN, and in English it is translated as

25  the Colombian Customs and Tax Bureau.

1    Q    And is there a home address?

2    A    Yes.

3    Q    What is that?

4    A    CL 13A 108-130 CA 28 Jockey Club 7.

5    Q    And is there a work address directly underneath it?

6    A    There is.

7    Q    And what is that?

8    A    CR 100 11-60 Ed Holguinez Treid Center OF 609 Torre Far.

9    Q    Now, further down on this document I see that there's a

10   section called financial information, and I believe there's a

11   total monthly income in pesos that is listed on this document.

12   Do you see that?

13   A    I do.

14   Q    And can you tell the jury what it says.

15   A    3.5 million pesos in monthly income.

16   Q    Did you investigate this figure a little closer?

17   A    I did.

18   Q    And did you investigate the U.S. dollar equivalent?

19   A    I did.

20   Q    An approximation, at this time, what was the U.S. dollar

21   equivalent?

22   A    Anywhere from 1800, 1,800, to 2,000.

23   Q    That's dollars per monthly -- per month?

24   A    Yeah, U.S. dollars per month.

25   Q    And so on a 12 month basis, what would that be a reported

1   annual salary of?

2   A     22 to $24,000 annually.

3   Q     And then down at the bottom of the Exhibit 130B version,

4   there is signatures, okay, and there is no name printed there

5   though; is that right?

6   A     That's correct.

7   Q     Could we now go to Government Exhibit 1501, page 3,

8   please.

9               All right.  Do you see that photograph?

10  A     I do.

11  Q     Well, first of all, have you seen this document before?

12  A     I have.

13  Q     What is this document?

14  A     I believe it is the defendant's cédula information.

15  Q     Okay.  Is his signature anywhere on here?

16  A     In the upper right-hand corner of the document.

17              MR. PALAZZO:  Your Honor, respectfully, the

18  Government is about to start sort of like another section of

19  the testimony.  Is this a good time to --

20              THE COURT:  Well, you know, we started late, so

21  I don't know, jurors, we've only been here like 40 minutes, are

22  you okay going like another half an hour or so?  Everybody okay

23  going another half an hour or so?

24              Go another half an hour or so.  You may proceed.

25

1   BY MR. PALAZZO:

2   Q    Let's pull up Government Exhibit 121.

3            Oh.  Actually -- sorry.  Okay.  Let's go to

4   Government Exhibit 121.  Take a moment -- I have hard copies if

5   you'd like, but let's scroll through.

6            You mentioned earlier conducting a -- you and your

7   team conducting a search of social media, a scrape, is that

8   what you referred to it as?

9   A    Yeah, I referred to it as a scrape.

10  Q    And then did you and your team follow up with any other

11  investigative steps based on that scrape?

12  A    That's correct.

13  Q    And what did you do?

14  A    The team issued or executed a search warrant on the social

15  media account of the defendant's adult daughter.

16  Q    And do you recognize these photographs?

17  A    I do.

18  Q    And are they from that search warrant return?

19  A    They are.

20  Q    And have you seen them before today?

21  A    I have.

22  Q    You mentioned the purchase of a $330,000 vehicle earlier;

23  is that right?

24  A    That's correct.

25  Q    And that was something you said was spotted in these

1   social media photographs?

2   A    That's correct.

3   Q    And it drew your attention?

4   A    Yes.

5   Q    Let's go to that photo.  I believe it's number 6.

6        That has a vehicle in it; is that right?

7        Do you recognize that vehicle?

8   A    I do.

9   Q    Is that the vehicle that you were referring to?

10  A    It is.

11  Q    Did you -- where does this appear to take place?

12  A    At the Lamborghini dealership located in or around Miami,

13  Florida.

14  Q    Do you recall the name of the dealer?

15  A    Prestige Imports.

16  Q    And did you or your team have occasion to investigate the

17  purchase further?

18  A    I did.

19  Q    And what steps did you take?

20  A    I subpoenaed the dealership for the dealer jacket and

21  other related materials.

22  Q    And then did you review those records when they came in?

23  A    I did.

24  Q    Let's bring those dealer documents -- let's put them on

25  the screen in front of you here.

1          Government Exhibit 126.

2          All right.  Looking at the first page here, again,

3    why don't you take a moment -- I have a hard copy here --

4          MR. PALAZZO:  Your Honor, may I approach the witness?

5          THE COURT:  Yes, you may do so.

6          MR. PALAZZO:  This is a hard copy of Government

7    Exhibit 126.  Would you please take a moment to review it.

8    BY MR. PALAZZO:

9    Q    Is this the dealer jacket that you or your team requested

10   during the investigation?

11   A    It is.

12   Q    Okay.  Let's take a look at the top third there, there's

13   some information we can look at.

14          Could you read the name again of the dealer at the

15   top here.

16   A    Yes.  The name of the dealer is Lamborghini Miami, which

17   is a division of Prestige Imports.

18   Q    And is there an address for that dealer?

19   A    Yes.

20   Q    Could you read it, please.

21   A    It is 14800 Biscayne Boulevard, North Miami Beach, Florida

22   33181.

23   Q    Did you or your team visit that location?

24   A    Yes.

25   Q    Is there a date to this document right under that?

1    A    There is.

2    Q    All right.  Could you read that, please.

3    A    December 26th, 2016.

4    Q    And does that date match the border crossing trip that we

5    examined earlier?

6    A    It's two days after the border crossing.

7    Q    Could you read the buyer's name and address here.

8    A    The buyer's name is Jenny Lizeth Ambuila-Chara.  The

9    address is 18201 Collins Avenue, PH 407, Sunny Isles Beach,

10   Florida  33160.

11   Q    And did you investigate that address further?

12   A    I did.

13   Q    What investigative steps did you take to investigate that

14   address further?

15   A    Conducted surveillance of that address, spoke with the

16   general manager of that building, and then we identified checks

17   from both the defendant's adult daughter and Jorge Peña Ramirez

18   for a unit in that building.

19   Q    Could you please read what is being purchased in this

20   document.

21   A    So what is being purchased is a 2017 Lamborghini Huracán

22   Spyder, red in color.

23   Q    And, to your knowledge, is that the car that you

24   identified in Government Exhibit 121?

25   A    It is.

1   Q   Do you know the status of that vehicle today?

2   A   That vehicle was seized pursuant to a seizure warrant at

3   the address listed on this document and it is currently held in

4   the custody of the United States Government.

5   Q   Okay.  Let's review the cost of the car, if it's

6   documented here on this record.

7        So take a look there on the first page, I believe at

8   the bottom right corner, and is there a grand total for the

9   cost of this car?

10   A   There is.

11   Q   What is that?

12   A   $329,323.84.

13   Q   Now, you reviewed this before today, you testified?

14   A   I did.

15   Q   Is there a breakdown of payment information in this

16   document?

17   A   There is.

18   Q   Let's turn to that.  Why don't you try to locate it and

19   just tell us, what page is it?

20        Yes, sir.

21   A   Yes.  So at the bottom it has MLARS hyphen or underscore

22   00471.

23   Q   Okay.  Let's turn to that page.

24        Okay.  What are we looking at here?

25   A   You are looking at a deposit in the amount of $18,700

1  directly into the account of Prestige Motorcar, Inc. or

2  Imports, Inc.  The individual who signed, that made the deposit

3  is a Karina Leal.

4  Q    And did you or your team acquire the bank records for

5  Prestige Motor?

6  A    The team or I did, yes.

7  Q    And what is the bank account number for them?

8  A    The bank account ends in 1331.

9  Q    And were there others that you acquired, or you and your

10  team acquired?

11  A    Yes.

12  Q    Did you investigate the name here that's listed?  You said

13  it was Karina Leal?

14  A    Yes, the team or I did.

15  Q    And what did the team discover about Karina Leal?

16  A    Ms. Leal was an associate of a convicted narcotics money

17  launderer.

18  Q    And did you acquire bank records for Ms. Leal?

19  A    Yes, the team or I did.

20  Q    Let's pull up Government Exhibit 139, and we'll get back

21  to this one in a minute.

22       Okay.  Looking at the top portion here, what are we

23  looking at?

24  A    We're looking at what appears to be a temporary check.

25  So when you just open a checking account, oftentimes a bank

1  will provide temporary checks before you get your permanent

2  checks with your address and other identifying information on

3  them.  It is from a Wells Fargo bank account ending in 3745, it

4  is paid to the order of Prestige Motorcar Import, Inc., the

5  date of the check is 12-27 of '16, and the check number was

6  1001, and the total amount on the check was $18,700.  The memo

7  line lists Carro Bogotá, and then Ms. Leal's signature is there

8  on the right, the bottom right-hand corner of the check.

9  Q    And can you point to any reference to the defendant?

10 A    I cannot.

11 Q    Can you point to any reference to the defendant's adult

12 daughter?

13 A    No.

14       MR. PALAZZO:  All right.  Let's go back to the dealer

15 jacket and the page we were looking at.  I think it was --

16 I believe it was Government's Exhibit 137.

17       Could I just approach the witness?

18       THE COURT:  Yes, you may.

19       MR. PALAZZO:  What Exhibit Number is that?  126.

20 BY MR. PALAZZO:

21 Q    126.  All right.  And then what was that page number?

22 A    So the next transaction -- do you want the one that we

23 just went over?

24 Q    Yes.  Could you go to the next page.

25 A    Yes.  The next page should be ending 000472 at the bottom

1  middle.

2  Q    Okay.  And let's take a closer look at the top of the

3  document.

4          Okay.  So what do we see here?

5  A    We see another deposit into the dealer's account, Prestige

6  Motorcar Imports.  This one was in the amount of $3300.

7  Q    And it's deposited where?

8  A    Into the bank account ending in 1331 in the name of

9  Prestige Motorcar.

10  Q    And did you investigate this payment further?

11  A    The team or I did.

12  Q    And what did you or the team observe regarding -- well,

13  what did you and the team learn about this transaction?

14  A    That another third-party made a payment on behalf of the

15  adult defendant's daughter.

16  Q    And who was that?

17  A    John Eric Marin.

18  Q    And did you or the team get a chance to meet with or talk

19  to Mr. Marin?

20  A    Yes.

21  Q    Did you or the team acquire bank records for Mr. Marin?

22  A    Yes.

23  Q    Let's go to Government Exhibit 127, please.

24          What, if anything, did you learn -- did you or your

25  team learn about Mr. Marin?

1   A     Mr. Marin was a -- was the nephew of a known contraband

2   smuggler in Colombia.  He also owned an export company in

3   Miami, Florida.

4   Q     And what investigative steps did you take regarding

5   Mr. Marin besides meet with him?

6   A     Can you repeat that?

7   Q     What other investigative steps did you take to investigate

8   Mr. Marin?

9   A     Mr. Marin's bank account records would have been reviewed

10  by the team or I.

11  Q     All right.  Let go back to Government Exhibit 126, and

12  I think the page marked 72.  We now want to go to the next one,

13  page 72.

14        Let's make it a little bigger, or if you want I can

15  give you maybe the hard copy, but let's take a closer look at

16  this.  Please review it and tell me if you recognize what this

17  document is.

18  A     I recognize the document.

19  Q     And what is it?

20  A     It is a -- information regarding a wire.

21  Q     And to whom is the wire?

22  A     The wire is to Prestige Motorcar Imports doing business as

23  Lamborghini Miami.

24  Q     And who is the originator?

25  A     Imp y Commercializadora Jisara.

1    Q    And what does originator mean?

2    A    The individual who sent the wire.

3    Q    And how much is this wire for?

4    A    $99,963.20.

5    Q    And towards the bottom of this blowup, is there some sort

6    of note from the originator right underneath Bank of America,

7    Charlotte, North Carolina?

8    A    There is.

9    Q    And what does that say?

10   A    RFB/anticipos proforma.

11   Q    Did you investigate this transaction further?

12   A    The team or I did, yes.

13   Q    Oh, and what is the date on this?

14   A    The date of this is 12-14-2016.

15   Q    Okay.  Let's go to the next page.

16        Okay.  What's the date on this?

17   A    The date on this wire is December 5th, 2016.

18   Q    And who is the originator?

19   A    Jisara.

20   Q    And what is the amount?

21   A    $97,763.20.

22   Q    And to whom is this wire?

23   A    The beneficiary of this wire is Prestige Motorcar Imports,

24   Inc.

25   Q    And let's now go to the next page.  Just take a moment to

1   review.

2          Who is the originator or what are we looking at here?

3   A    This is another document pertaining to a wire.

4   Q    And what's the date on this wire?

5   A    The date on this wire is December 9th, 2016.

6   Q    And who is the originator?

7   A    Jisara.

8   Q    What's the amount?

9   A    The amount is $99,763.20.

10  Q    And, again, it's to Prestige Motorcar Imports?

11  A    That's correct.

12  Q    Why is this wire and the previous two -- why are they in

13  the dealer jacket?

14  A    That is how the car was paid for.

15  Q    Okay.  So you mentioned that there's three wires here in

16  the dealer jacket and then there were two deposits, is that

17  right, two cash deposits that we saw in the previous pages?

18  A    One was a check deposit, but, yes, that's accurate.

19  Q    Okay.

20  A    Actually, I think both were check deposits.

21  Q    Okay.  And is that the total for the price of the car?

22  A    No.

23  Q    And are there other -- were there other payments made?

24  A    There were.

25  Q    Let's turn to the page, if any, of that document.

1              All right.  What are we looking at here?  This is
2    still in Government Exhibit 126.  We're now on page 8, and it's
3    marked MLARS 000476 at the bottom, and what do we see here?
4    A    This is a receipt from Prestige Imports in the amount of
5    $10,000 that was paid by check, and it was for the deposit on
6    the red Lamborghini, as previously discussed.
7              THE COURT:  All right.  It's 12:30, so we're going to
8    go ahead and break, all right?
9              MR. PALAZZO:  Thank you, Your Honor.
10             THE COURT:  It's almost 12:30.
11             Ladies and gentlemen, we're going to take our lunch
12   break.  We will resume at 1:30.  Please remember not to discuss
13   the case or form any opinions until you've heard all the
14   evidence.  We'll see you back here at 1:30.
15                     *(Jury exits proceedings.)*
16             THE COURT:  Okay.  The witness is excused.  We're in
17   the middle of your testimony, so you're not to discuss your
18   testimony with anybody.
19             THE WITNESS:  Yes, Your Honor.
20             THE COURT:  But you are excused.  You may leave the
21   courtroom.
22             We're going to resume at 1:30.  If you want to talk
23   during the lunch hour, that's fine, but, you know, let me --
24   I have to go back on CM/ECF.  I think we had -- actually,
25   I probably have it in front of me here.  I don't know how many

oral motions to continue we've had.  There have been quite a few of them.  And, you know, I don't know, I can't find here when you were appointed, Mr. Martinez.

MR. MARTINEZ:  That was in April, Your Honor.

THE COURT:  Of what year?

MR. MARTINEZ:  2024.

THE COURT:  April 2024?

MR. MARTINEZ:  Yes.  It's been about seven months.  Seven or eight months.

THE COURT:  April of 2024.  That's absolutely correct.  He had another lawyer before you, and he was at least arrested with respect to this charge on November 16th, 2023, his previous lawyer filed a notice of appearance November 14th, 2023, you filed a notice of appearance April 8th, or you were appointed, right, April the 8th, 2024, and here we are in January 2025, with continuance after continuance after continuance, with a hearing last week -- not last week, last month, or earlier this month, with respect to the *Frye* matter, and I think that was on -- the Lafler *Frye* hearing, that was on January the 3rd.

So all of the expenses that have been undertaken, the Government has paid for three lawyers to fly down from Washington, their per diem here to litigate this case, the paralegal, these agents, four interpreters.  I wish I could take that money, if he's going to plead guilty, and do

1  something really productive, like, you know, feed the hungry or

2  do something.

3           So, you know, he wants to plead, it makes no

4  difference to me, he can plead all he wants, but what a waste

5  of money.  But you can take your hour right now and you can

6  talk to him, but we're going to resume at 1:30 and I'm not

7  going to give any more time for him to discuss this with the

8  other side.  Obviously you can meet with him, you're his

9  lawyer, Mr. Martinez, you can meet with him as much as you deem

10  appropriate, you're his lawyer, he's entitled to sit and talk

11  to you and decide what's the best thing to do, but, I mean,

12  I feel a certain obligation here to not waste Government

13  resources.  I mean, this just -- all the money that they've

14  spent.  I don't know what to say.

15           Well, anyway, you can talk to him, but we're going to

16  resume at 1:30.

17           All right.  So we'll see you back here at 1:30.

18  We're in recess.

19                        - - - - -

20           (Recess at 12:30 p.m. until 1:27 p.m.)

21                        - - - - -

22           THE COURT:  So what's the story?  Your client wants

23  to plead guilty, Mr. Martinez?

24           MR. MARTINEZ:  Yes, Your Honor.  We went down to the

25  Marshal's holding cell, the Government prosecutors and myself,

1  we got a copy of the plea agreement that had previously been

2  tendered to him, we -- José, the interpreter, read the

3  Stipulated Facts section to him, and before Your Honor took the

4  bench was reading over the plea agreement with him as well.  He

5  recollects it.  I went through it with him historically and so

6  did the lawyer previous to me.

7              THE COURT:  Okay.

8              MR. MARTINEZ:  So at this point in time --

9              THE COURT:  Okay.  Well, we're going to do it right

10 now.

11             MR. MARTINEZ:  -- with the Court's permission --

12 Okay.

13             THE COURT:  Do you have the plea agreement signed?

14             Are you offering him the same deal as before the

15 trial, Government, in the middle of trial?

16             MR. PALAZZO:  Um --

17             THE COURT:  I don't want to get involved in

18 plea agreements, but -- in plea negotiations, but it sounds

19 like you are.

20             MR. PALAZZO:  Your Honor --

21             THE COURT:  That's all I'm going to say.  It sounds

22 like you are.

23             All right.  Let's get the plea agreement.  Let me see

24 it, please.

25             I cannot release the jury until this is finished, so

1  you're going to have to tell them they're going to have to stay

2  put for a while.

3          I wanted to see, is there a mandatory -- Government,

4  is there a forced sentence in here, or do I have the right to

5  sentence as I deem fit?

6          MS. ROSEN:  There's no --

7          THE COURT:  Okay.

8          MS. ROSEN:  -- proposed sentence, Your Honor.

9          THE COURT:  All right.

10         MS. ROSEN:  It's a one count Indictment, so it's

11 basically just pleading to that one count, which we can't ask

12 for more than that, and then sentence is up to Your Honor.

13         THE COURT:  You know, again, I know judges aren't

14 supposed to get involved in pleas.  You've already heard my

15 feelings on this, and that's all I'm going to say.

16         MR. MARTINEZ:  May I approach?

17         THE COURT:  Sure.

18         There's a request here for acceptance of

19 responsibility.  It's in the middle of trial.

20         MR. MARTINEZ:  Your Honor, that was -- that's the

21 same plea agreement that was offered previously, but we -- in

22 the holding cell downstairs we told him that that decision,

23 because it comes so late in the game, will be up to Your Honor.

24         THE COURT:  Yeah.  I mean something like 98 percent

25 of all people in the Middle District of Florida plead guilty.

1    I'm very used to plea agreements.  That's the way, generally

2    speaking, we operate.  I believe this is the first in the

3    middle of a trial that I've had.  Maybe there was another one,

4    I can't put my finger on it, but in Federal Court, as you know

5    Mr. Martinez, you work in Federal, that just doesn't happen

6    very often, because the whole idea is, honestly, I don't like

7    wasting money.

8          MR. MARTINEZ:  Understood.

9          THE COURT:  I don't like wasting money, and they've

10   paid for these people to fly here, for the interpreters, like I

11   said, their per diem, their flight costs.  Oh, my gosh,

12   you know, it's -- he wants to plead.  This is terrific, he

13   wants to plead guilty, it's just that Friday would have been --

14         MR. MARTINEZ:  A better day.

15         THE COURT:  -- even okay, even okay Friday.  It's in

16   the middle of trial, so you don't get the same benefits when

17   the Government has had to spend that money.  You just don't get

18   the same benefits.  You certainly do not get, in my opinion,

19   I'll think about it some more, a two level downward adjustment

20   for acceptance of responsibility, because you're doing it after

21   the Government has already been put to task, put -- to meet its

22   burden.

23         MR. MARTINEZ:  Understood, Judge.

24         THE COURT:  Well, they can move for it.  It rests

25   with the Government.  But that's fine.  The Government can do

1　as it deems fit.

2　　　　Let me ask the Government something.  On paragraph 7,

3　is this the standard language from the Middle District of

4　Florida on the waiver of right to appeal, that the sentence

5　exceeds the defendant's applicable guideline range?  You have

6　to understand, as a District Court Judge I don't take guilty

7　pleas, that's done by the magistrate judge, unless somebody

8　pleads the morning of sentence, which I have had that, as

9　opposed to this -- I mean, the morning of trial, excuse me, or

10　the day before.  I've done those guilty pleas.

11　　　　MR. MARTINEZ:  I can tell Your Honor --

12　　　　THE COURT:  I don't know if that's standard lingo.

13　　　　MR. PALAZZO:  Your Honor, I expect that it is.

14　　　　THE COURT:  Okay.  Let me go find another

15　plea agreement here.  Just give me a second.

16　　　　MR. MARTINEZ:  And, Your Honor, it's the same

17　standard waiver that I have seen in all of mine as well.

18　　　　THE COURT:  Okay.  Thank you, Mr. Martinez.  Let me

19　just -- let me just doublecheck that.  I want to make

20　certain --

21　　　　MR. PALAZZO:  And that was the intent, Your Honor.

22　　　　THE COURT:  Huh?

23　　　　MR. PALAZZO:  And that was the intent, to comport

24　with whatever happens here.

25　　　　THE COURT:  I just want to make certain it's

1  consistent with what we do here.

2          Government, what are the guidelines as you've

3  interpreted them for this case?  Do you know what they are, the

4  guideline range?

5          MR. PALAZZO:  Your Honor, I'd like the plea agreement

6  to stand for itself.  I don't --

7          THE COURT:  I just want to know what it is.

8          MR. PALAZZO:  We have not reached that point yet.  It

9  was -- I was told that the custom here is to not include a

10  recommended guideline sentence.

11          THE COURT:  It's not.  I'd like to know what we're

12  talking about.

13          MR. PALAZZO:  Your Honor, if I could have a few

14  minutes.  I wasn't --

15          THE COURT:  That's all right.  If you can't figure it

16  out, that's okay.  I don't -- we don't see that many money

17  laundering cases.  I had one maybe a year and a half ago.  We

18  just -- they're just not prosecuted very often, because

19  normally you'll prosecute the specified unlawful activity --

20          MR. PALAZZO:  Yes, Your Honor.

21          THE COURT:  -- which you have to establish anyway,

22  and I think that's why there are so few money laundering cases

23  prosecuted today versus -- I think that statute was passed in

24  1988, I think is when it was, something like that, that's when

25  you saw a lot of them.

1          Okay.  I've gone through it.

2          So just to verify, this is -- and I always get the

3    letters mixed up, the one -- do you have the section here that

4    it is -- let me find it.  Hold on one second.  Where the

5    recommend -- yes, 11(c)(1)(B).  Okay.  So it's a recommendation

6    to the Court.  That's why I wanted to know about what we were

7    talking about here.

8          Wait a minute.  Let's just see something here.

9          I've looked at this.  This seems consistent at least

10   with what I've seen in one other case, so I just wanted to make

11   certain, since they don't practice in the Middle District of

12   Florida, that there wasn't something that's not common to the

13   Middle District of Florida, something that I hadn't seen

14   before, but it seems to be fairly consistent.

15         Again, I'm looking at this in about ten minutes time,

16   and I've got, you know, 14 people sitting there who have spent

17   all day yesterday.  Is today Tuesday?  Today is Tuesday.  They

18   spent all day yesterday and, you know, half of today here.

19         So, you know, don't misunderstand, I'm delighted your

20   client has decided to plead guilty, I really am, I'm delighted,

21   I can go home this afternoon.

22         MR. MARTINEZ:  All of us.

23         THE COURT:  One less thing to worry about in my life.

24         MR. MARTINEZ:  Thank you, Your Honor.

25         THE COURT:  I just -- you know --

1          MR. MARTINEZ:  It's frustrating.  I appreciate it.

2          THE COURT:  I just wish that before all this money

3    had been spent to bring these people here, the money we're

4    spending today, the four translators, for heaven's sakes, three

5    lawyers, one paralegal, the law enforcement officers' time away

6    from doing their investigations of other cases, time I've spent

7    here away from other cases, all of us here, it's just --

8          MR. MARTINEZ:  Right.  It's frustrating.

9          THE COURT:  Yeah.  I mean, that's the frustration

10   I feel, honestly, but -- okay.  I believe I have it.

11          Just keep in mind that I don't do these every day, so

12   I have a little chart here to go through.  I've probably done

13   five guilty pleas as a judge, but I'll do one today.

14          So I see a signed plea agreement here.  It's been

15   signed by everybody.  He hasn't initialed every page.  He needs

16   to initial every page.

17          MR. MARTINEZ:  My mistake.  Sorry, Judge.

18          THE COURT:  That's all right.

19          Okay.  Are we ready to begin with the guilty plea

20   here?

21          All right.  Mr. Martinez?

22          MR. MARTINEZ:  Yes, Your Honor.

23          THE COURT:  So your client needs to please stand up.

24          The translator needs to tell him to stand up, please,

25   translate what I'm saying, and he's now going to be placed

1  under oath.

2        So, Magaly, can you please place him under oath.

3        COURTROOM DEPUTY:  Yes, Your Honor.

4        THE COURT:  Thank you.

5        COURTROOM DEPUTY:  Do you solemnly swear or affirm,

6  under penalty of perjury, that the statements you give in these

7  proceedings will be the truth, the whole truth and nothing but

8  the truth?

9        THE DEFENDANT:  I swear.

10        THE COURT:  Can you please state your name for the

11  record.

12        THE DEFENDANT:  Omar Ambuila.

13        COURTROOM DEPUTY:  Thank you.  You may be seated.

14        THE COURT:  Thank you.  Everybody should sit down and

15  speak into the microphone.

16        All right.  So we are in the middle of your trial,

17  Mr. Ambuila, and the lawyers have told me that you wish to

18  plead guilty, and I have a signed plea agreement with now your

19  initials on each page and your signature on the last page, and

20  it's dated the 28th of January, 2025.

21        Is this your signature here, Mr. Ambuila, on the last

22  page?

23        THE DEFENDANT:  Yes, Your Honor.

24        THE COURT:  And your initials on each and every page

25  of the plea agreement, right?

1          THE DEFENDANT:  It's correct.

2          THE COURT:  All right.  And you wish to enter a plea

3     of guilty to the charges against you, correct?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  So you will now be entering a plea of

6     guilty to Count One of the Indictment, which charges you with

7     conspiracy to launder monetary instruments, in violation of

8     18 United States Code Section 1956(h).  Is that correct?

9          THE DEFENDANT:  It's correct.

10         THE COURT:  All right.  Do you understand that you

11    are now under oath, and if you answer any of my questions

12    falsely, your answers may later be used against you in another

13    prosecution for perjury or making a false statement?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  What is your full name?

16         THE DEFENDANT:  Omar Ambuila.

17         THE COURT:  Where were you born?

18         THE DEFENDANT:  In Suárez, Cauca.

19         THE COURT:  And is that in Colombia?  What country --

20         THE DEFENDANT:  Suárez Cauca, Department of Cauca in

21    the country of Colombia.

22         THE COURT:  And you are a citizen of Colombia?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  All right.  How old are you?

25         THE DEFENDANT:  63 years old.

1    THE COURT:  How far did you go in school?

2    THE DEFENDANT:  I specialized in Customs rights.

3    THE COURT:  Are you a high school graduate?

4    THE DEFENDANT:  Yes, high school and University.

5    THE COURT:  All right.  So after high school you went

6    to the University, and you enrolled in this special program;

7    is that what you're saying?

8    THE DEFENDANT:  No.  After high school I started

9    college, and after college I started a specialization.

10    THE COURT:  All right.  So you're a high school

11    graduate, a university graduate, and you participated or you

12    attended this special specialization program?

13    THE DEFENDANT:  That is correct.

14    THE COURT:  All right.  Have you been treated

15    recently for any mental illness or addiction to narcotic drugs

16    of any kind?

17    THE DEFENDANT:  No.

18    THE COURT:  Are you currently under the influence of

19    any drug, medication or alcoholic beverage of any kind?

20    THE DEFENDANT:  No.  No.

21    THE COURT:  Have you received a copy of the

22    Indictment pending against you, that is, the written charges

23    made against you in this case, and have you fully discussed

24    those charges and the case in general with Mr. Martinez as your

25    counsel?

 1          THE DEFENDANT:  Yes, Your Honor.

 2          THE COURT:  All right.  Are you fully satisfied with

 3     the counsel, representation and advice given to you in this

 4     case by Mr. Martinez?

 5          THE DEFENDANT:  That's correct.

 6          THE COURT:  All right.  Did you have an opportunity

 7     to read and discuss the plea agreement with your lawyer before

 8     you signed it?

 9          THE DEFENDANT:  Yes, we read it several times.

10          THE COURT:  Does the plea agreement represent in its

11     entirety any understanding you have with the Government?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  All right.  Do you understand the terms

14     of the plea agreement?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Has anyone made any promise or assurance

17     that is not in the plea agreement to persuade you to accept

18     this agreement?

19          THE DEFENDANT:  No.  No way.

20          THE COURT:  Has anyone threatened you in any way to

21     persuade you to accept this agreement?

22          THE DEFENDANT:  No, Your Honor.

23          THE COURT:  Do you understand that the terms of the

24     plea agreement are merely recommendations to the Court, that

25     I can reject the recommendations without permitting you to

1  withdraw your plea of guilty and impose a sentence that is more
2  severe than you may anticipate?
3          THE DEFENDANT:  Yes, Your Honor.
4          THE COURT:  All right.  So you understand that this
5  is a recommendation, it's a recommendation to the Court?
6  That's why I was trying to get that information earlier, the
7  Government isn't able to provide it to me, but I was trying to
8  get that information to tell you, generally speaking, what the
9  guidelines were.  Again, the guidelines are advisory.  I can
10 sentence below the guidelines, I can sentence above the
11 guidelines, I can sentence within the guidelines, and, I mean,
12 honestly, I'll identify for you that to me there's an issue as
13 to whether you are entitled to an acceptance of responsibility
14 because you've waited until the middle of trial to plead
15 guilty, all right?
16          So do you understand that these are things that --
17 the guidelines are advisory?  The Court does not have to accept
18 any recommendation from the United States.  Do you understand
19 that?
20          THE DEFENDANT:  Yes, Your Honor.
21          THE COURT:  Were all formal plea offers -- and this
22 is to Mr. Martinez.  All former plea offers by the Government
23 were conveyed to the defendant, right, Mr. Martin?
24          MR. MARTINEZ:  That's correct, Judge.
25          THE COURT:  Right.  And we had that hearing

1 January 2nd or 3rd concerning this matter, right?

2     MR. MARTINEZ: That's correct, Judge. On January the

3 3rd we went through all of the plea agreements and the terms

4 and that they had been conveyed to the defendant.

5     THE COURT: Right. And at that time your client did

6 not wish to plead guilty, and at the beginning of the trial he

7 moved to continue the trial, saying something about discovery,

8 that he hadn't seen discovery or gotten discovery, but today,

9 Mr. Ambuila, it's your desire, regardless, to plead guilty,

10 right?

11     THE DEFENDANT: Yes, Your Honor.

12     THE COURT: Has anyone attempted in any way to force

13 you to plead guilty or otherwise threaten you?

14     THE DEFENDANT: No, Your Honor.

15     THE COURT: Has anyone made any promises or

16 assurances of any kind to get you to plead guilty other than

17 those that are in the plea agreement?

18     THE DEFENDANT: No. No way.

19     THE COURT: Are you pleading guilty of your own free

20 will because you are guilty?

21     THE DEFENDANT: Yes, Your Honor.

22     THE COURT: Okay. Do you understand that the offense

23 to which you are pleading guilty is a felony offense, that if

24 your plea is accepted, you will be adjudged guilty of that

25 offense, and that such adjudication -- well, you're not an

American citizen, I don't know how this would impact you in
Colombia, but it may deprive you of valuable civil rights, such
as the right to vote, the right to hold public office, the
right to serve on a jury, the right to possess any kind of
firearms.  I mean, those are the issues in the United States if
you are an American citizen.  I have no idea how this would be
treated in Colombia, but do you understand that an adjudication
here may deprive you of certain rights even in Colombia?
Do you understand that?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Okay.  And I don't make any
representations about what will happen in Colombia, because,
honestly, I simply don't know.

        Okay.  You were paroled into the United States for
prosecution.

        Is that right, Mr. Martinez, he was paroled here?

        MR. MARTINEZ:  That's my understanding, Judge.  Yes.

        THE COURT:  Okay.  So you are obviously a citizen of
Colombia.  A plea of guilty, I'm quite certain, will subject
you to deportation back to Colombia and would prevent you from
obtaining United States citizenship.  Do you understand that?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Okay.  Thank you.  All right.

        So I now am just going to ask the Government, I've
got it here in the plea agreement, but I normally ask the

1  Government to answer these things or to inform the defendant of
2  the following:  The maximum possible penalty provided by law
3  and any mandatory minimum penalty.  And it should be there
4  right in the plea agreement.
5           MR. PALAZZO:  Yes, Your Honor.
6           There is no minimum mandatory.  The maximum sentence
7  is a term of 20 years imprisonment and a fine no greater than
8  $500,000.
9           THE COURT:  Okay.  Do you understand that,
10 Mr. Ambuila?
11          THE DEFENDANT:  Yes, Your Honor.
12          THE COURT:  Okay.  I don't know if there's any
13 enhancements here.  Normally if there is an enhancement because
14 of a prior offense, I need to tell him.  I doubt there's such a
15 thing here in this case.  Are you familiar with that at all?
16          MR. PALAZZO:  I'm not aware of any prior offenses by
17 the defendant.
18          THE COURT:  Yeah.  That's that I thought.
19          Can you tell me the mandatory term of supervised
20 release, please?
21          MR. PALAZZO:  Three years.
22          THE COURT:  Okay.  So that's what you're looking at.
23          What was it again?  20 years maximum prison time.
24 Three years maximum term of supervised release.
25          Do you understand that, Mr. Ambuila?

1            THE DEFENDANT:  Yes, Your Honor.

2            THE COURT:  And remind me, the maximum possible fine

3    is?

4            MR. PALAZZO:  So greater than $500,000.

5            THE COURT:  Okay.  $500,000.

6            Do you understand that, Mr. Ambuila?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  Okay.  And here pursuant to the

9    plea agreement, as I read it very quickly, but it appeared to

10   me that you have to agree to forfeit -- I think it was two

11   vehicles.  One is the subject of a civil action, but I imagine

12   they're going to forfeit these things administratively, if you

13   agree to do that, or it could be done as part of the criminal

14   case too.  But, in any event, you agree to forfeit those two

15   vehicles, right?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  Okay.  Tell me those two vehicles again,

18   from the Government?

19           MR. PALAZZO:  A 2017 Lamborghini Huracán Spyder and a

20   2017 Porsche Cayenne, and they are both named in the

21   Indictment.

22           THE COURT:  All right.  And in addition to that, you

23   may have to pay a special assessment of $100 required by

24   18 United States Code 3013.

25           Do you understand that, Mr. Ambuila?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Do you understand these possible

3   consequences of your plea that I have just gone over with you?

4   Do you understand that?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  Your sentence is going to be

7   determined by a combination of advisory sentencing guidelines,

8   possible authorized departures from those guidelines and other

9   statutory sentencing factors.  I've had defendants that think

10  that they're looking at a five year sentence and, you know,

11  they come in and, you know, they're looking at a ten year

12  sentence or a 15 year sentence pursuant to the guidelines, and

13  even if that happens, you're not allowed to withdraw your

14  guilty plea.  Do you understand that?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  So the sentencing guidelines

17  today are advisory, as I said earlier, I can depart upwards,

18  depart downwards, there are departures from the guidelines.

19  There are other statutory sentencing factors, your background,

20  your situation.  All those come into play in determining what

21  an appropriate sentence would be.

22         All right.  Have you -- have you and your lawyer

23  talked about the advisory sentencing guidelines and how they

24  might apply to your case?  Have you had the chance to discuss

25  that with Mr. Martinez?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  Okay.  As I said, I wanted to try to find

3  out what the advisory guidelines, generally speaking, were for

4  you.  I have not been able to do that, so the Court will not be

5  able to determine the advisory guideline range until after the

6  presentence report has been completed and you've had the

7  opportunity to challenge the reported facts and the application

8  of the guidelines recommended by the probation officer.  And it

9  may be different than what you think today, it may be different

10 than what Mr. Martinez has told you, it may be different if

11 you've had a conversation with the prosecutor, what he told

12 you, you know, I don't know, because nobody's told me, but do

13 you understand that it may be different than what you've been

14 told?

15    THE DEFENDANT:  Yes, Your Honor.

16    THE COURT:  Okay.  And do you understand that after

17 your initial advisory guideline range has been determined,

18 I have the authority in certain circumstances to depart upward

19 or downward, and will also examine other statutory sentencing

20 factors that may result in the imposition of a sentence that is

21 either great or lesser than the advisory guideline sentence.

22 Do you understand that?

23    THE DEFENDANT:  Yes, Your Honor.

24    THE COURT:  Do you understand that parole has been

25 abolished, and that if you are sentenced to prison, you will

1  not be released on parole?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  All right.  Do you understand that under

4  certain circumstances you or the Government may have the right

5  to appeal any sentence that I impose?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  I think there's a waiver in that, in this

8  plea agreement, when I looked at it, and by entering into this

9  plea agreement and entering a plea of guilty you will have

10  waived or given up your right to appeal or collaterally attack

11  all or part of the sentence except for certain very limited

12  circumstances, and let me just turn to that.

13          MR. PALAZZO:  Your Honor, it's on page 18 of 26, if

14  that helps, paragraph 7.

15          THE COURT:  Okay.  Thank you.

16          So the defendant agrees that this Court has

17  jurisdiction and authority to impose any sentence up to the

18  statutory maximum, that means up to 20 years, and you expressly

19  waive the right to appeal the sentence on any ground, including

20  the ground that I erred in determining the applicable guideline

21  range, except: (a) the ground that the sentence exceeds the

22  defendant's applicable guideline range as determined by the

23  Court pursuant to the United States Sentencing Guidelines,

24  (b) the ground that the sentence exceeds the statutory maximum

25  penalty, or (c) the ground that the sentence violates the

Eighth Amendment to the Constitution. But if the Government

exercises its right to appeal, then you are released from this

waiver and you may appeal the sentence as authorized by

18 United States Code Section 3742(a).

So the bottom line is you understand that there are

just a few limited reasons why you can appeal your sentence.

It's the ones I've just mentioned. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Do you understand that you have

the right to maintain your right to plead not guilty, which is

what you had initially done, and we started the trial today.

You have the right -- do you understand that you have the right

to continue with your plea of not guilty?

Did he not understand? Let me say it again.

You have the right to continue --

THE DEFENDANT: Si.

THE COURT: You know, yesterday you said you were

not guilty. This morning you said you were not guilty, before

the trial started. You've now said you're guilty. You have

the right to continue to say that you're not guilty, and you're

giving up that right by saying that you are guilty. Do you

understand that you have every right to say that you are

not guilty? Do you understand that that is your right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Okay. And that you have the

1  right to a trial by jury, which is what those 14 people over

2  there were, your jury.  Do you understand that you have that

3  right?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Thank you.

6          And that you are presumed to be innocent and the

7  Government has to prove your guilt beyond a reasonable doubt?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  That you have the right to the assistance

10  of counsel for your defense, which you have here

11  Court-appointed counsel, Mr. Martinez, at trial and every other

12  stage of the proceedings, the right to see and hear all the

13  witnesses and have them cross-examined in your defense, the

14  right on your part to decline to testify unless you voluntarily

15  elected to do so in your own defense, and the right to compel

16  the attendance of witnesses to testify in your defense.  Do you

17  understand that?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Do you understand that, should you decide

20  not to testify or put on any evidence, those facts cannot be

21  used against you?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Do you further understand that by

24  entering a plea of guilty, if that plea is accepted by the

25  Court, there will be no trial, or it will be suspended, and you

1  will have waived or given up your right to a trial as well as
2  those other rights associated with the trial as I just
3  described them?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  All right.  So now I'm going to have the
6  prosecutor explain to you or list for you the charges to which
7  you are pleading guilty and explaining the essential elements
8  of the crime that is what you would -- what the Government
9  would be required to prove at trial, although there is a
10  statement -- there should be that statement of facts here.
11  Let's see.

12         MR. PALAZZO:  Yes, Your Honor.

13         THE COURT:  Yeah.  It is, right, beginning at
14  page 21.  Right.

15         But, anyway, if you could please describe for him the
16  charges to which he is pleading guilty.

17         MR. PALAZZO:  Yes, Your Honor.

18         The charge is Count One, conspiracy to launder
19  monetary instruments, in violation of 18 U.S.C. Section
20  1956(h).  There are two elements that the Government would
21  prove at trial beyond a reasonable doubt.  First, two or more
22  people agreed to try to accomplish a common and unlawful plan
23  to violate 18 U.S.C. Sections 1956 and 57, and the defendant
24  knew the unlawful purpose of the plan and voluntarily joined in
25  it.

1        Would you -- would the Court like me to read the

2  facts?

3        THE COURT:  Yes.  That's right, you should do so now,

4  the ones on page 21 of the plea agreement.

5        MR. PALAZZO:  Should the trial of the defendant

6  continue to a verdict, the Government would have proved beyond

7  a reasonable doubt the following facts:  At all times relevant,

8  the defendant, Omar Ambuila, lived in the Republic of Colombia

9  and was employed by the Colombian Government as a public

10  servant with the Colombian Tax and Customs Directorate, also

11  known as the Dirección de Impuestos y Aduanas Nacionales.

12        Is the podium better or is this okay, Your Honor?

13        THE COURT:  Stay seated.  No, that's perfect.

14  Thank you.

15        MR. PALAZZO:  In or about 2012, Ambuila met with

16  three people at a hotel in Miami Beach, Florida and discussed

17  laundering money into the United States from Colombia.  The

18  three people were an individual referred herein and in the

19  Indictment as Co-conspirator 1, and two individuals referred to

20  herein as Co-conspirator 2 and Co-conspirator 6.

21        During the meeting, Ambuila, Co-Conspirator 1,

22  Co-conspirator 2 and Co-conspirator 6 agreed that for a fee

23  Co-conspirator 2 and Co-conspirator 6 would transfer cash and

24  other payments from --

25        THE COURT:  You've got to slow down a bit.  The court

reporter --

MR. PALAZZO:  Oh.  Apologies.  I thought it was
electronic.

I'm sorry, sir.

Agreed that for a fee Co-conspirator 2 and
Co-conspirator 6 would transfer cash and other payments from
Ambuila in Colombia to Co-conspirator 1 and others in Florida.

As part of the agreement with Ambuila, Co-conspirator
2 and Co-conspirator 6 agreed to conceal Ambuila's involvement
in the transfers, and agreed to conceal the true nature and
origin of the funds.

The true nature and origin of the cash and other
payments to Co-conspirator 1 and others in Florida was bribes
and illegal commissions paid to Ambuila from benefactors in
Colombia.

Through a long series of transfers in 2013, 2014,
2015 and 2016, Ambuila utilized Co-conspirator 2 and
Co-conspirator 6 to deliver a total of approximately $1 million
of unlawful proceeds to Co-conspirator 1 and others in the
United States, including in the Middle District of Florida.
Co-conspirator 2 and Co-conspirator 6 each received fees for
the transfers.

The $1,000,000 included cash that Co-conspirator 2
and Co-conspirator 6 deposited into Co-conspirator 1's bank
accounts, cash they paid to Co-conspirator 1's landlord for

rent on an apartment, cash they handed directly to
Co-conspirator 1, as well as funds delivered for the purpose of
a 2013 Porsche Cayenne and a 2017 Lamborghini Huracán Spyder.
At no time did Ambuila, Co-conspirator 2, or Co-conspirator 6
possess or apply for a State or Federal license to transmit
money.

The $1 million also included the following sums of
money that were wire transferred into the United States from
Colombia:

There's, on January 21st, 2014, approximately
$3,535.62 from Colombia.

On February 3rd, 2014, an approximate amount of
$606.06 from Colombia.

April 22nd, 2014, $2,525.25 from Colombia.

On April 29th, 2014, $6,666.70 from Colombia.

October 24th, 2014, $1,010.10 from Colombia.

April 9th, 2015, $709.95 from Colombia.

September 30th, 2015, $3,042.60 from Colombia.

March 9th, 2016, $2,000 from Colombia.

During a period beginning on or about November 19th,
2012 until on or about May 2nd, 2013, while Co-conspirator 1
resided in the Middle District of Florida, Ambuila utilized
Co-conspirator 2 and Co-conspirator 6 to transfer approximately
$72,000 in illicit proceeds from Colombia to a car dealership
in Tampa, Florida, to purchase a 2013 Porsche Cayenne.  As part

of a series of transfers for the purchase, Co-conspirator 2 and

Co-conspirator 6 received and delivered approximately $50,000

in cash. They each received a fee for the transfers.

In or about October of 2016, Ambuila and

Co-conspirator 1 traded in the 2013 Porsche that had been

purchased with illicit proceeds, and received a $30,000 credit

at a Miami area car dealership towards the purchase of a 2017

Porsche Cayenne, Vehicle Identification Number

WP1AA2A29HKA83052, to be registered in the name of

Co-conspirator 1.

On or about December 26th, 2016, Ambuila,

Co-conspirator 1 and others traveled to a luxury car dealer in

the Southern District of Florida (hereinafter referred to as

"Car Dealer") and purchased a 2017 Lamborghini Huracán Spyder,

Vehicle Identification Number ZHWUR1ZF7HLA05916, to be

registered in the name of Co-conspirator 1.

During the sale, Ambuila represented himself to the

car dealer as being a retired professional soccer player in

order to conceal the true nature and origin of the funds to be

used to pay for the Lamborghini, which in reality was bribes

and illegal commissions paid to Ambuila from benefactors in

Colombia.

To pay the Lamborghini's purchase price of

approximately $330,000, Ambuila paid a fee to Co-conspirator 2

for Co-conspirator 2 to deliver cash to the bank account of

1   Co-conspirator 1.  The funds were then transferred to

2   Car Dealer via a check for approximately $10,000.

3           The purchase remainder was paid to Car Dealer via

4   wire transfer and check deposit by individuals known herein as

5   Co-conspirator 3, Co-conspirator 4 and Co-conspirator 5.

6           THE COURT:  Okay.  Is that it?  All right.

7           So, Mr. Ambuila, did you hear everything that the

8   prosecutor just said?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Did you understand everything that the

11  prosecutor just said?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And do you agree that that's what the

14  prosecutor would be able to prove if this case -- if the trial

15  in this case were to continue?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  All right.  Can you tell me in your own

18  words, summarizing what the prosecutor said, what occurred

19  here, using what the prosecutor just said, I need you to agree

20  with either -- you need to either agree with what the

21  prosecutor said or you need to say it in your own words.

22          So do you agree --

23          THE DEFENDANT:  (Speaking in Spanish.)

24          THE COURT:  I'm sorry.

25          THE DEFENDANT:  I agree with what he said, because

1  we've already read it several times.

2         THE COURT:  Okay.  So you agree with what he said and

3  that the United States would be able to prove that if the case

4  were to continue?

5         THE DEFENDANT:  Yes, Your Honor.

6         THE COURT:  All right.  I need the prosecutor to

7  please read the essential elements of the offense.  Sometimes

8  you just read -- if you've done the jury instruction, you could

9  read the jury instruction, or just read the essential elements,

10  even though we've got the facts here.  I would like to do that

11  here.  Even though we've had the facts, it's the essential

12  elements of the offense, in other words, we would be required

13  to prove A, B, C, D, E if this case were to go to the jury.  So

14  if you can just -- you can just look at what the jury

15  instructions are, and that would tell you that.

16         MR. PALAZZO:  Yes, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         MR. PALAZZO:  The following essential elements need

19  to be proved beyond a reasonable doubt:  (1) two or more people

20  agreed to try to accomplish a common and unlawful plan to

21  violate either 18 U.S.C. Section --

22         THE COURT:  Slow.  Slow down a little bit.

23         MR. PALAZZO:  Oh.  Apologies.  Apologies.  Let me

24  start over.

25             (1) two or more people agreed to try to accomplish a

common and unlawful plan to violate either 18 U.S.C. Section

1956 or 18 U.S.C. Section 1957; and (2) the defendant knew

about the plan's unlawful purpose and voluntarily joined in it.

THE COURT: Okay. All right. So you agree that the

United States would be able to prove that if the case were --

if the trial of this case were to continue?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So read again the Indictment, the

charge in the Indictment, to him, please.

MR. PALAZZO: Count One charges the defendant with

conspiracy to launder monetary instruments, in violation of

18 U.S.C. Section 1956(h).

THE COURT: Thank you.

How do you plead to that charge, guilty or not

guilty?

THE DEFENDANT: Guilty.

THE COURT: All right. So I make the finding that in

the case of United States versus Omar Ambuila, that the

defendant is fully competent and capable of entering an

informed plea, the defendant is aware of the nature of the

charges and the consequences of the plea, and that the plea of

guilty is a knowing and voluntary plea supported by an

independent basis in fact containing each of the essential

elements of the offense.

Before I accept the plea, is there anything else,

1   Counsel, that you want me to cover with him?  Remember, I don't
2   do guilty pleas on a daily basis, so I'm just trying to cover
3   all my bases, but is there anything else that you think you'd
4   like me to ask him?
5           MR. PALAZZO:  No, Your Honor.
6           THE COURT:  Okay.
7           MR. PALAZZO:  I'd just like to note for the record
8   though that prior to sentencing the Government will be filing a
9   preliminary order of forfeiture motion so that it can be read
10  at sentencing.
11          THE COURT:  Well, right.  And he's agreed to forfeit
12  it --
13          MR. PALAZZO:  Yes.
14          THE COURT:  -- so he's -- he's given that up, and the
15  preliminary order of forfeiture would divest him of any
16  interest in it.
17          Okay.  That's fine.
18          How about you, Mr. Martinez?  Anything else that you
19  would like to say?
20          MR. MARTINEZ:  No, thank you, Judge.
21          THE COURT:  Okay.  The plea is therefore accepted and
22  the defendant is now adjudged guilty of that offense.
23          So what is going to happen is this is going to be
24  referred to the probation office for presentence investigation,
25  and I think that there's a form here that needs to be -- that

1  we can sign off on, right?

2          And, Mr. Martinez, it still has Maria Dominguez's

3  name here.  Do you want to just cross -- I was ready to cross

4  it off, but I don't think I ought to do that.  Can you cross

5  off her name?  She's not representing him, so I think that

6  ought to be crossed off, and if you could initial it, or have

7  him initial it too, just so that we're safe on that.

8          All right.  Thank you, Mr. Martinez.

9          I think we need to have him sign off on the

10  presentence --

11          COURTROOM DEPUTY:  Yes.

12          THE COURT:  Oh, he did that?

13          COURTROOM DEPUTY:  Yes, he did.

14          THE COURT:  Okay.  Wonderful.  You're a step ahead of

15  me.

16          So I think -- wait a minute.  You know what, I don't

17  think this is -- Magaly, I think we need to do a different

18  one -- I'm sorry I didn't catch this -- because it says here

19  "so that it may be considered by the District Judge in deciding

20  whether to accept a plea agreement."  I've already accepted it.

21  So I think this is the one for the magistrate.  It's just that

22  District Judges don't, generally speaking, do what's happening

23  today.  So how about -- Mr. Martinez, I think this last

24  sentence needs to be crossed out.  It's hard because we're kind

25  of trying to put a square peg in a round hole here.

1          MR. MARTINEZ:  Understood.

2          THE COURT:  I think that this has to end with --

3    where we've got the comma after attorney, if you can put a

4    period.  It's not so that I can consider it.  I've already

5    accepted the plea agreement.

6          MR. MARTINEZ:  Right.

7          THE COURT:  But we just need to do this so that the

8    investigation can begin.

9          Sorry, Magaly.  I didn't catch that because I don't

10   do these very often.

11         COURTROOM DEPUTY:  No worries.  I'm going to print

12   out this other one.

13         THE COURT:  So just put the period there and cross

14   out the next -- oh, that's right.  You've got your computer

15   there.  I'm doing things the old fashioned way here.

16         COURTROOM DEPUTY:  So you're referring to -- so

17   that -- this right here at the bottom?  I have it here.

18         THE COURT:  Yes.  Perfect.  That's exactly right.

19         COURTROOM DEPUTY:  Okay.

20         THE COURT:  Okay.  Thank you.

21         So we have that form.  We have the plea agreement,

22   which will be filed on the record.

23         All right.  Is there anything else to take care of

24   today?

25         I guess you all get to go back to Washington, the

1   cold weather, huh?  Leave the sunshine of sunny Tampa, huh?

2             MR. PALAZZO:  Unfortunately, yes, Your Honor.

3             THE COURT:  All right.  Anything else that you guys

4   need to -- I shouldn't say "you guys."  Anything else that the

5   prosecutors need to say before we conclude this proceeding?

6   Because I'm going to go out and discharge the jury and thank

7   them.  Is there anything else?

8             MR. PALAZZO:  Nothing further, Your Honor.  It's been

9   a pleasure.  Thank you.

10            COURTROOM DEPUTY:  Do we need to set the sentencing

11  date today?

12            THE COURT:  Yeah.  What's the sentencing date?

13            COURTROOM DEPUTY:  April 24th at 10:00 a.m.

14            THE COURT:  And we need to get the challenge coins

15  for them, for all 14.  Is it too late to get it?

16            COURTROOM DEPUTY:  Let me see.

17            THE COURT:  If not, we can mail it to them.

18            Over here, Mr. Martinez, anything from your side?

19            MR. MARTINEZ:  Nothing further.  Thank you, Judge.

20            THE COURT:  Okay.  And thank you, Mr. Martinez,

21  I know it's hard to step in on the case, I know there were,

22  you know, issues, but as always you did a very fine job.  All

23  my interactions with you have been so positive, and this one is

24  no different.  I think you did a fine job representing your

25  client.

1           MR. MARTINEZ:  Thank you, Your Honor.

2           THE COURT:  Okay.  Well, with that, I'll say

3    thank you, and I'm going to go thank the jury, and we are in

4    recess.  Thank you.

5                        - - - - -

6              (Proceedings concluded at 2:30 p.m.)

7                        - - - - -

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4   proceedings taken in a jury trial and change of plea hearing in

5   the United States District Court is a true and accurate

6   transcript of the proceedings taken by me in machine shorthand

7   and transcribed by computer under my supervision, this the 9th

8   day of February, 2025.

9

10

11                                   /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25