IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

CASE NO.: 8:21-cr-103

v.

OMAR AMBUILA,

    Defendant.
_____/

## SENTENCING MEMORANDUM

The Defendant, OMAR AMBUILA, respectfully submits this Sentencing Memorandum for this Honorable Court's consideration. Mr. Ambuila requests this Court impose a variance in this case pursuant to 18 U.S.C. § 3553.

## STATEMENT OF THE FACTS

On January 28, 2025, Mr. Ambuila pled guilty pursuant to a Plea Agreement to Count I of the Indictment which charged the Defendant with conspiracy to launder monetary instruments in violation of 18 U.S.C. §1956(h). (D. E. 127)

The Presentence Report ("**PSR**") calculates Mr. Ambuila's total offense level as a level 40 with a criminal history category of I. See PSR at ¶14. As a result, Mr. Ambuila is facing an advisory guideline sentencing range, as calculated by probation, of 292-365 months of incarceration. However, since the statutory maximum sentence is 240 months, the guideline term of imprisonment is 240. (PSR @ ¶73).

1

# **MEMORANDUM OF LAW**

1. Under statutory authority and Supreme Court precedent, this Court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 53 (2007) (quoting Koon v. United States, 518 U.S. 81 (1996)).

2. To conduct an individualized assessment, the Sentencing Reform Act provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This right is not only fundamental, but also has been a durable tradition in federal sentencing. See Concepcion v. United States, 597 U.S. 481, 486 (2022).

> There is a "long" and "durable" tradition that sentencing judges "enjo[y] discretion in the sort of information they may consider at an initial sentencing proceeding. This history dates back to before the founding: Both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist her in determining the kind and extent of punishment to be imposed within limits fixed by law. Early state and English courts broadly recognized this discretion.
> 3. *See Concepcion*, 597 U.S. at 486 (internal quotations and citations

omitted). As contemplated by the Supreme Court, this Court's ability to consider all relevant information at the time of Mr. Ambuila's sentencing is critical to its ability to fashion a just sentence in his case. See *Pepper v. United States*, 562 U.S. 476, 488 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

4. After Booker, there was comfort in the thought that the era of mandatory prison sentences had ended for most crimes. In a post-Booker realm, then, a defendant expects that this Court's conception of individualized sentencing provides the bulwark against punishments prescribed in advance and penalties determined by a rigid matrix created by bureaucratic fiat.

5. Protected by a touchstone of individualized consideration, that same defendant hopes that his cause will be governed by judicial discretion informed by complete and accurate information. Finally, he hopes that pursuant to such an individualized assessment, he will be sentenced as he appears at sentencing and thus the court will impose a punishment that "fit[s] the offender and not merely the crime." *Pepper*, 562 U.S. at 487-88 (2011) (citation omitted).

6. Consistent with this principle, § 3553(a) requires sentencing courts to consider not only the advisory sentencing guidelines range, but also the facts of a specific case through the lens of statutory sentencing factors. See 18 U.S.C. §

3553(a)(1)-(7). Because many of the § 3553 factors support Mr. Ambuila's request for a variance in their unique and separate ways, this memorandum concludes that a guideline sentence to the statutory maximum penalty of twenty (20) years would be unreasonable and is much greater than necessary under these statutory factors.

**An Examination of the § 3553 Factors Establishes that a Variance is Warranted in Mr. Ambuila's case**

The following sections analyze the § 3553 factors against the factual backdrop of Mr. Ambuila's case. Each of these sentencing factors support the Defendant's request for a variance.

**The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

7. The first § 3553(a) factor comprehends that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime. "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." As noted in *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

8. The tenet that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. For the weighing of the good with the bad in Mr. Ambuila's life reveals that his criminal conduct should not be the sole measure of his fate.

**Nature and Circumstances of the Offense**

9. Although Mr. Ambuila's crime was serious, the PSR's advisory guideline calculations, while arguably applicable under the principles of relevant conduct, overstates the nature and extent of his offense conduct.

10. Mr. Ambuila is a citizen of Columbia and worked as a public servant with Columbian tax and customs agency. As part of the offense conduct, Mr. Ambuila agreed to assist in laundering money into the United States from Columbia.

11. In exchange for his assistance, Mr. Ambuila received bribes and illegal commissions from co-conspirators. See Stipulated Fact section of the Plea Agreement, pages 21-25. (D. E. 127).

12. Albeit a late decision to plead guilty on day two of his trial, Mr. Ambuila has now demonstrated that he is on the path of rehabilitation. Based on the recognition of the seriousness of his conduct and his guilt, Mr. Ambuila ultimately accepted his responsibility in this matter.

**The Need for the Sentence Imposed**

**To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

13. The PSR calls for a prison sentence of 240 months or 7,305 days in a prison cell. (PSR @ D. E. 133). This is an overly harsh punishment. Moreover, it is a harsh punishment inflicted by guidelines that most federal judges believe are too harsh. See USSC, *Fifteen Years of Guideline Sentencing, An Assessment of How*

*Well the Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 52. (November 2004). See also *United States v. Hayes*, 948 F.Supp.2d 1009 (W.D. Iowa 2013); *United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. Jan. 2013).

14. Furthermore, Mr. Ambuila's lack of any criminal history and his level of culpability compels the conclusion that the advisory guideline range of imprisonment effectuates an unjust result. While "[r]etribution is a legitimate reason to punish ... 'the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.'" *Graham v. Florida,* 560 U.S. 48, 71 (2010)(citation omitted).

15. In addition to these considerations, the imposition of a just sentence should account for the significant punishment stemming from the collateral consequences of Mr. Ambuila's conviction. Based on his felony conviction, Mr. Ambuila will certainly not be able to return to work for the Columbian Government in any future capacity. These collateral consequences will certainly follow Mr. Ambuila and will last a lifetime.

**History of the case and historical position of the parties**

16. Mr. Ambuila was originally represented by Mr. Alfredo Izaguirre who was privately retained and entered the case on November 14, 2023. (D. E. 9)

Mr. Izaguirre filed a Motion to Withdraw on March 14, 2024. (D. E. 36)

The Court granted the Motion to Withdraw on March 28, 2024. (D. E. 46)

Undersigned was appointed as CJA counsel on April 8, 2024. (D. E. 50)

17. Thereafter and during the course of extended plea negotiations with the Government it was finally agreed upon between the parties that a reasonable sentence, pursuant to a negotiated plea, would result in a joint recommendation by the parties to this Honorable Court to impose a sentence of "time-served".

18. On June 6, 2024 the parties finalized their joint sentencing recommendations and proposed advisory guideline calculations. The attached e-mail communication between the parties memorialized the joint position of the parties. (See attached e-mail between Victor D. Martinez and Joseph Palazzo as Exhibit "**A**").

19. On June 18, 2024, there was a status conference held in this cause. See (transcript of status conference) (D. E. 110). At the status conference the parties represented to the Court the details of the plea offer that had been extended to Mr. Ambuila. Specifically, the parties advised the Court that:

A. The parties calculation of the advisory guideline calculations would presently permit this defendant (given his period of detention) to be eligible for a time served sentence;

B. The parties further agreed that the Government would <u>not</u> oppose a defense request to waive the PSR report given that the defendant was looking at a time served sentence; and

C. That the Government would assist (if possible) in transporting the defendant after his sentencing, with the assistance of a case agent, to the Tampa International Airport so the defendant could board a plane and be flown back to Columbia and reunited with his family. (D. E. 62)

20. Given the weight of the evidence against Mr. Ambuila, coupled with the offer by the Government to recommend a time-served sentence, it was the recommendation of undersigned to Mr. Ambuila that he accept the offer. The defendant rejected the plea offer and stated that he wanted to proceed to trial.

21. Upon learning of Mr. Ambuila's decision to reject the Plea offer, the government requested of the Court that it conduct a Lafler-Frye hearing, to make certain that the defendant had been fully advised of all the particulars of the plea offer. The Court held the Lafler-Frye hearing on January 23, 2025. (D. E. 101).

22. At the conclusion of the Lafler-Frye hearing the Court determined that the defendant had in fact knowingly and intelligently rejected the Government's plea offer.

23. On January 27, 2025, Mr. Ambuila proceeded to trial. On the second day of trial, Mr. Ambuila requested that undersigned confer with the Government to ascertain if the Government would permit Mr. Ambuila to enter into the <u>same</u> plea agreement previously offered, rejected, and presently "off the table". The

Government agreed and subsequent to Mr. Ambuila's plea colloquy with the Court, the Court accepted Mr. Ambuila's guilty plea. (D. E. 125)

**So why did Mr. Ambuila reject the Government's Initial Plea Offer only to accept it on the second day of trial?**

24. Subsequent to the defendant's guilty plea, undersigned put this very question to Mr. Ambuila, who advised undersigned as follows: Mr. Ambuila advised that he could <u>not</u> bring himself to accept the plea offer because the plea agreement <u>directly</u> implicated his daughter and referred to her in his Indictment as an unnamed "coconspirator". Additionally, the Stipulated Fact section of the Plea Agreement required Mr. Ambuila to further stipulate as true the details surrounding his daughter's role and participation.

25. I reminded Mr. Ambuila that the Government had previously advised (at the Government's proffer) that the Government had "no present interest" in initiating a prosecution against Mr. Ambuila's daughter if Mr. Ambuila were to resolve his case via a plea.

26. Nonetheless, Mr. Ambuila advised undersigned that he was still concerned as to how the Government might, in the end proceed against his daughter given that the Government's representations to Mr. Ambuila did <u>not</u> constitute an <u>unequivocal</u> promise to <u>not</u> prosecute.

27. Finally, Mr. Ambuila advised undersigned that shortly after the commencement of his trial, he became convinced that not pleading guilty <u>and</u>

proceeding to trial might be more detrimental to his daughter given that it could potentikally motivate the Government to proceed against her.

**Sentencing Parity**

28. The PSR (at page 2) identifies two coconspirators in this case. Both defendants have been previously sentenced. They are Jose Irizarry and his wife, Natalie Gomez Irizarry.

29. Coconspirator, Jose Irizarry was a special agent with the DEA from August of 2009 until January of 2018. During this time, Mr. Irizarry was married to coconspirator Natalie Gomez Irizarry. These Defendants engaged in a corrupt scheme wherein Mr. Irizarry worked with confidential informants investigating money laundering activities, while at the same time, secretly enriching the couple by using Jose Irizarry's position and special United States Government access to divert drug proceeds from DEA control to the control of himself.

30 Mr. Ambuila is referred to in both Irizarry charging documents as an unidentified coconspirator. The Indictments both allege the same money laundering activities, as set forth in Mr. Ambuila's Indictment, regarding a 2017 Porsche Cayenne and a 2017 Lamborghini Huracan Spyder. (D. E. 1 – of Case No.: 8:20-cr-00077)

31. Mr. Irizarry's plead guilty to a 19 count Indictment which charged as follows:

**Count One** charged conspiracy to commit money laundering (along with his wife (Natalia Gomez).

**Counts Two - Five** charged Mr. Irizarry with Honest Services Wire Fraud.

**Count Six** charged Mr. Irizarry with conspiracy to commit bank fraud.

**Counts Seven -Twelve** charged Mr. Irizarry with bank fraud.

**Count Thirteen** charged Mr. Irizarry with conspiracy to commit aggravated identity theft.

**Count Fourteen - Nineteen** charged Mr. Irizarry with aggravated identity theft.

Mr. Irizarry was sentenced to 145 months imprisonment. (D. E. 173)

32. In contrast coconspirator Natalia Gomez Irizarry (like Mr. Ambuila) plead guilty <u>only</u> to the one count Indictment charging money laundering and was sentenced to five years probation. (D. E. 79).

33. Undersigned would contend that Mr. Ambuila's culpability lies somewhere between the probationary sentence imposed upon coconspirator Mrs. Gomez Irizarry, and the 145 month term of imprisonment imposed upon coconspirator, Mr. Irizarry. Undersigned would further contend that a time served sentence would still be a reasonable sentence in this case and would comport with the sentences imposed upon the coconspirators given their respective degrees of individualized culpability.

## CONCLUSION

Greed born from association with a corrupt DEA agent shattered Mr. Ambuila's vision for his future. However, aside from the conduct giving rise to his case, Mr. Ambuila's life was one in which he was devoted to his family and his work as a Columbian Government Officer.

Mr. Ambuila has paid a heavy price for his misdeeds. It has destroyed his life and all that he worked for – his career, his family, his dignity, and his good name. Mr. Ambuila is deeply repentant and tortures himself every day questioning his conduct and regretting his lack of moral fortitude.

The ultimate question before this Court is what constitutes a reasonable sentence in this case? To be sure, the parties were in agreement prior to the commencement of the trial, and were prepared at that time, to jointly recommend that a reasonable sentence for the defendant's role, <u>and</u> for his offense conduct would be a sentence of 30-37 months.

Concededly, the parties agreement, as to what would constitute a reasonable Sentence, anticipated that Mr. Ambuila would <u>not</u> proceed to trial.

However, the Government ultimately agreed to re-tender the Plea Agreement under the same identical terms. It should also be noted that as a consequence of Mr. Ambuila rejecting the initial plea offered to him in June of 2024, Mr. Ambuila has since served an additional ten (10) months of incarceration.

Wherefore, undersigned prays this Court conclude, under all the attendant circumstances, that a time-served sentence is reasonable.

Respectfully submitted,

*/s/ Victor D. Martinez*
Victor D. Martinez, Esquire
Florida Bar No. 0444601
Victor D. Martinez, P.A.
110 North 11th Street, First Floor
Tampa, FL 33602
Telephone: (813) 289-0600
Email:vmartinez@tampabay.rr.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to counsel of record.

*/s/ Victor D. Martinez*
Victor D. Martinez, Esquire
Florida Bar No. 0444601
Victor D. Martinez, P.A.
110 North 11th Street, First Floor
Tampa, FL 33602
Telephone: (813) 289-0600
Email:vmartinez@tampabay.rr.com