# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA

v.                          CASE NO. 8:21-CR-103-VMC-AAS

OMAR AMBUILA

## Government's Sentencing Memorandum

The United States of America, by and through its undersigned attorneys, ("the Government") hereby submits this memorandum regarding the sentencing of defendant Omar Ambuila ("the Defendant") scheduled for May 8, 2025, at 11:00 am. This memorandum consists of the Government's response to the Defendant's sentencing memorandum (Doc. 136), and summarizes the Government's position on the findings of the initial presentence investigation report (Doc. 133) and the final presentence report (Doc. 134), which includes written objections by the Defendant dated April 1, 2025. The Government has no objections to the initial and final presentence reports, disagrees with the Defendant's guideline calculation, and opposes all motions and arguments for a downward variance or departure.

Consistent with the terms of the plea agreement (Doc. 127) and the United States Sentencing Guidelines, the Government seeks a sentence of 151 months imprisonment and forfeiture of two seized vehicles described in the plea agreement and herein. Such a sentence represents a just outcome that reflects the seriousness of money laundering, that provides a deterrent to those considering similar actions, and is not greater than necessary.

## I. Background

On March 17, 2021, a sealed Indictment was returned against the Defendant, a Colombian national residing in Colombia, charging him with a single count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). Doc. 1. On May 5, 2021, the Indictment was unsealed. Doc. 7. The Defendant made an initial appearance in the Middle District of Florida on November 16, 2023, before the Honorable Amanda Arnold Sansone (Doc. 12) and was ordered detained pending trial. Doc. 19. Trial commenced on January 27, 2025. Doc. 121. On January 28, 2025, during a recess of trial proceedings, the Court accepted a plea of guilty to the sole count in the Indictment, and a plea agreement with the Government was entered into the record. Doc. 127. The Defendant is scheduled to be sentenced on May 8, 2025. Doc. 128.

As part of his plea, the Defendant admitted, among other things, that "[a]t all times relevant," he "was employed by the Colombian government as a public servant with the Colombian Tax and Customs Directorate" Doc. 127 at 21. Furthermore,

> In or about 2012, AMBUILA met with three people at a hotel in Miami Beach, Florida, and discussed laundering money into the United States from Colombia...
>
> During the meeting, AMBUILA, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and CO-CONSPIRATOR 6, agreed that for a fee CO-CONSPIRATOR 2 and CO-CONSPIRATOR 6 would transfer cash and other payments from AMBUILA in Colombia to CO-CONSPIRATOR 1 and others in Florida.
>
> As part of the agreement with AMBUILA, CO-CONSPIRATOR 2 and CO-CONSPIRATOR 6 agreed to conceal AMBUILA's

> involvement in the transfers, and agreed to conceal the true nature and origin of the funds.
>
> The true nature and origin of the cash and other payments to CO-CONSPIRATOR 1 and others in Florida was bribes and illegal commissions paid to AMBUILA from benefactors in Colombia.
>
> Through a long series of transfers in 2013, 2014, 2015, and 2016, AMBUILA utilized CO-CONSPIRATOR 2 and CO-CONSPIRATOR 6 to deliver a total of approximately $1,000,000 of unlawful proceeds to CO-CONSPIRATOR 1 and others in the United States, including in the Middle District of Florida.
>
> The $1,000,000 included cash that CO-CONSPIRATOR 2 and CO-CONSPIRATOR 6 deposited into CO-CONSPIRATOR 1's bank accounts, cash they paid to CO-CONSPIRATOR 1's landlord for rent on an apartment, cash they hand-delivered directly to CONSPIRATOR 1, as well as funds delivered for the purchase of a 2013 Porsche Cayenne and a 2017 Lamborghini Huracan Spyder. At no time did AMBUILA, CO-CONSPIRATOR 2, or CO-CONSPIRATOR 6 possess or apply for a state or federal license to transmit money

*Id.* at 21-22. As part of his plea, the Defendant described the involvement of at least six co-conspirators in his illegal money laundering scheme. *See Id.* at 21-25.

## II.     Presentence Investigation Report

The findings and recommendations of the Presentence Investigation Report ("PSR") include a total offense level calculation of 40. Doc. 133 at 10. Although the PSR recommendation is accurate and reasonable based on the complete record in this case, the Government's recommendation diverges from the PSR in two areas. First, in paragraph 31 ("Base Offense Level… 24"), the Government seeks a sentence that reflects a slightly lower base offense level calculation of 22, rather than 24. *Id.* at

3

8-9. Second, the Government seeks a sentence without the "Special Offense Characteristic… +6" recommended in paragraph 32 of the PSR regarding drug knowledge, with reasoning described below. *Id*. at 9. Accordingly, the Government recommends a total offense level of 32, which corresponds with a recommended sentence of 121-151 months.  The Government therefore recommends a sentence of 151 months imprisonment and the forfeiture of the two seized vehicles.

### III. Government's Guideline Calculation of 32 Levels

#### A. Base Offense Level of 22

United States Sentencing Guidelines[1] calculations for money laundering offenses are governed by §2S1.1, which calls for a base offense level of 8 where a calculation for the "offense level for the underlying offense from which the laundered funds were derived" cannot be determined. U.S.S.G. §2S1.1(a)(1). Here, the parties agree that Defendant's money laundering conspiracy involved "bribes and illegal commissions paid to AMBUILA from benefactors in Colombia." Doc. 127 at 22. The offense levels for this conduct cannot be determined because it took place in Colombia in violation of Colombian law. Accordingly, the appropriate base offense level is "8 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds." §2S1.1(a)(1)-(2); *See United States v. Gross*, 661 F. App'x. 1007, 1025-1026 (11th Cir.

---

[1] All references to the United States Sentencing Guidelines in this filing are pursuant to the United States Sentencing Commission's 2024 Guidelines Manual Annotated (effective November 1, 2024).

2016) (court properly calculated defendant's guidelines using §2S1.1(a)(2) where offense level for underlying smuggling violation could not be determined).

The parties agreed in the plea agreement that the value of the laundered funds is "a total of approximately $1,000,000 of unlawful proceeds." Doc. 127 at 22. In §2B1.1, the sum of $1,000,000 corresponds with (b)(1)(H)-(I), "More than $550,000" but less than "$1,500,000." Therefore the applicable levels pursuant §2B1.1(b)(1)(H)-(I) is 14, and the overall base offense calculation under §2B1.1 is 22 levels.

### B. Specific Offense Characteristics Add 4 Levels

The Government seeks the application of §2B1.1(b)(2)(C), and an increase of four levels because the defendant was in the business of laundering funds. In the application note 4(B) to this provision, the United States Sentencing Commission calls upon the Court to consider the "totality of the circumstances" and some specific possible factors such as,

> (i)   The defendant regularly engaged in laundering funds.
>
> (ii)  The defendant engaged in laundering funds during an extended period of time.
>
> (iii) The defendant engaged in laundering funds from multiple sources.
>
> (iv)  The defendant generated a substantial amount of revenue in return for laundering funds.

Here, the Defendant and the Government agree that Ambuila's money laundering conspiracy involved "bribes and illegal commissions" originating in

5

Colombia while Ambuila was a public official, and was carried out by at least six co-conspirators "[t]hrough a long series of transfers in 2013, 2014, 2015, and 2016… to deliver a total of approximately $1,000,000 of unlawful proceeds to CO-CONSPIRATOR 1 and others in the United States." Doc. 127 at 22. The parties further agree that the origin of the laundered funds was multiple "benefactors in Colombia." *Id*. Given that these agreed upon facts align with the factors suggested by the United States Sentencing Guidelines application notes, as well as the totality of the circumstances demonstrating that Ambuila was in the business of laundering illicit proceeds, the Court should apply an increase of four levels pursuant to §2B1.1(b)(2)(C). *E.g., United States v. Bindranauth*, 2024 WL 4440291, *8-9 (11th Cir. Oct. 8, 2024) (four-level enhancement under § 2B1.1(b)(2)(C) affirmed where defendant's conduct fulfilled several factors from application note 4(B) of the United States Sentencing Guidelines); *United States v. Ramirez*, 2024 WL 1090720, at *2 (11th Cir. Mar. 13, 2024) (four-level enhancement under §2B1.1(b)(2)(C) affirmed where defendant's "conduct was not isolated, casual, or sporadic" and resulted in the laundering of $786,000 over more than two years); *United States v. Tabares*, 2021 WL 5279404 (11th Cir. Nov. 12, 2021) (four-level enhancement under §2B1.1(b)(2)(C) affirmed where defendant laundered by cashing 24 checks through personal and shell company bank accounts during a period of approximately 15 months).

In the alternative, the Government seeks the application of §2B1.1(b)(2)(B), and an increase of 2 levels because the defendant was convicted under 18 U.S.C. § 1956; as well as the application of § 2B1.1(b)(3) for a further increase of two levels

6

because Ambuila's offense involved sophisticated laundering. Application note 5 to §2B1.1(b)(3) of the United States Sentencing Guidelines advises that "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the money laundering offense. Furthermore, sophisticated laundering typically involves the use of—

    (i) fictitious entities;

    (ii) shell corporations;

    (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

    (iv) offshore financial accounts.

Here, the entire factual record clearly describes a sophisticated laundering scheme by Ambuila sufficient to satisfy this enhancement. *See United States v. Watts*, 519 U.S. 148, 151 (1997) (the Court has broad discretion to consider various kinds of information as relevant conduct in determining sentence). On Day 2 of trial, the Government introduced records from 25 bank accounts at financial institutions in the United States and Colombia that were involved in Ambuila's money laundering operation. GovEx 101-115, 117-120, 127-128, 132-133, and 139. Those records include fictitious entities and shell corporations such as Export Boxes Corp (GovEx 107-108) and NGI Global Export Corp (GovEx 119). The bank records and other exhibits introduced on Day 2 of the trial are evidence of at least two levels of layering that occurred as part of the scheme to conceal the Defendant's participation in illicit money transfers. *See United States v. Alaniz*, 726 F.3d 586, 626 (5th Cir. 2013) (use of

multiple bank accounts and convoluted transactions supported enhancement for sophisticated money laundering)

For example, dealership records (GovEx 126), bank records (GovEx 127) and the testimony of IRS-CI Special Agent Stephen Wajert (Trial Transcript, ECF 132, pgs. 33 – 41) demonstrate that at least two levels of layering took place for each of the six payments totaling approximately $330,000 that the defendant arranged to pay for the 2017 Lamborghini in Miami. The defendant admits that at least five co-conspirators were involved in the complex payment operation. Doc. 127 at 25.

For another example, the Defendant has admitted that some of the laundered funds were sent through a series of eight wire transfers from Colombia to the United States between January 21, 2014 and March 9, 2016. *Id.* at 23, para. h. The receipts from Western Union of these international transfers (GovEx 132) demonstrate that cash payments to the Defendant's daughter in Miami were funneled through at least three people listed in the exhibit: Marco Aurelio Torres, Luis Aponte, and Jorge Ramirez. Then the funds were, "deposited into CO-CONSPIRATOR 1's bank accounts… paid to CO-CONSPIRATOR 1's landlord for rent on an apartment… [and] hand-delivered directly to CONSPIRATOR 1" *Id.* at 23, para. g. Such unnecessary steps to transfer money between two people are the hallmarks of a sophisticated laundering scheme, and are sufficient by themselves to show that the laundering was sophisticated. *See, e.g., United States v. Ramdeo*, 682 F. App'x. 751 (11th Cir. 2017) (it is sufficient for totality of scheme to be sophisticated, even if not every step is sophisticated); *United States v. White*, 850 F.3d 667 (4th Cir. 2017)

(totality of fraud scheme which involved series of complex transactions and multiple bank accounts to conceal fraud was sophisticated under §2B1.1(b)(10)(C)).

### C. Adjustments

#### i. Aggravating Role for Organizer/Leader Adds 4 Levels

The Government avers that a four-level enhancement should be added to the guideline calculation pursuant §3B1.1(a) because the "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Application note 4 states,

> [f]actors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

The agreed-upon facts in this case describe a prolonged money laundering enterprise that involved at least six co-conspirators all working towards the same two goals: to transfer illicit proceeds to the United States on behalf of Defendant Omar Ambuila while simultaneously concealing his participation. Nothing in the record indicates anyone other than Ambuila leading and organizing the scheme. A four-level upward adjustment should therefore be added to the guideline calculation under §3B1.1(a).

#### ii. Abuse of Position of Trust

The Government seeks application of §3B1.3 and a two-level enhancement because "the defendant abused a position of public or private trust, or used a special

9

skill, in a manner that significantly facilitated the commission or concealment of the offense." Here, Ambuila admits to laundering "bribes and illegal commissions" while he was "employed by the Colombian government as a public servant with the Colombian Tax and Customs Directorate, also known as the *Dirección de Impuestos y Aduanas Nacionales*." Doc. 127 at 21-22. At trial, bank records (GovEx 127 and 128), payment records from the Lamborghini dealer (GovEx 126), and testimony from Special Agent Wajert (Trial Transcript, ECF 132, pg. 38, ¶¶ 1-3) all demonstrate that illicit funds transferred to the United States on behalf of Ambuila were paid by importers and exporters with interests overseen by Ambuila and the Colombian Tax and Customs Directorate. Furthermore, the very purpose of concealing his illegal proceeds in the United States was to avoid detection by Colombian authorities of his underlying corruption as a public official. A two-level enhancement under §3B1.3 should therefore be applied.

      iii.    **Mitigating Role**

The plain language of the agreed upon facts in the plea agreement clearly illustrate that Ambuila did not play a minimal or minor role in the money laundering conspiracy. *See Id*. at 21-25. In fact, Ambuila sat at the very top of an organizational pyramid that included at least six others. *Id.* Accordingly, there is no applicable role adjustment under §3B1.2.

    **D. Acceptance of Responsibility**

Under the terms of the plea agreement, while the Government does not seek any downward adjustment for the Defendant, the Government "will not oppose the

defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a)." *Id.* at 3. Ultimately, it is the Court's decision and other Courts have denied the decrease for acceptance of responsibility even when a defendant has pled guilty. *See, e.g., United States v. Onimole*, 2024 WL 1232089, *8 (11th Cir. Mar. 22, 2024) (although defendant pleaded guilty, "he, at the very least, frivolously contested relevant conduct, which is inconsistent with acceptance of responsibility"); *United States v. Gaviria*, 140 F. App'x. 826, 834 (11th Cir. 2005) (defendant who does not fully and openly concede that he committed money laundering knowing that the funds were drug proceeds does not get a § 3E1.1 reduction even if he pleaded guilty to money laundering); *United States v. Suarez*, 2024 WL 4719250, *2 (3d Cir. Nov. 8, 2024) (although defendant pleaded guilty, refusing to grant sentencing reduction for acceptance of responsibility because defendant "'routinely shifts blame to [a co-conspirator] and highlights how little monetary gain he incurred from his participation in the'" money laundering scheme).

The Government opposes any further downward adjustment, including but not limited to a third level decrease regarding acceptance of responsibility. The Defendant has already agreed that, "the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the Government, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise." *Id.* at 4.

## IV. 3553(a) Factors and Government Opposition to Downward Variance

The Government seeks a United States Sentencing Guideline calculation of 32 levels and a period of imprisonment at the top end of the commensurate range in the sentencing table found in Chapter 5, Part A of the United States Sentencing Guidelines Manual, which is 121-151 months.

While the United States Sentencing Guidelines are purely advisory, the Court "must consult those Guidelines" and the factors set forth in 18 U.S.C. § 3553(a) when determining the appropriate sentence. *United States v. Booker*, 543 U.S. 220, 264 (2005). Here, a sentence for Ambuila at the top of the recommended Guideline range would fulfill the need for his sentence to reflect the seriousness of his money laundering conspiracy, promote respect for the law, provide just punishment, and serve as adequate deterrence to others contemplating the laundering of illicit proceeds into the United States. See 18 U.S.C. § 3553(a)(2).

### A. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The Court should impose a significant sentence given the serious nature and circumstances of the offense. The Defendant was employed by the Colombian Tax and Customs Directorate, or the *Dirección de Impuestos y Aduanas Nacionales* (DIAN), from 1992 to 2017. Ambuila became one of the highest-ranking officials with the DIAN at the port of Buenaventura. Doc. 134, para. 12. The duties of the DIAN included checking transport containers carrying merchandise that came into the port and verifying certain regulated products. *Trial transcript*, Doc. 131 at 22, rows 10-25.

12

Furthermore, the port of Buenaventura is one of the most important ports in Colombia, given its geographic characteristics. *See Id.* at 20, rows 18-20. The Defendant abused his position over a period of several years to obtain massive bribes and to launder those bribes into Florida with the help of his various co-conspirators.

The Defendant also employed false statements to facilitate the entry of the illicit funds into the United States. For example, in one border crossing into the United States, the Defendant stated that he had U.S. $10,000 of cash, but upon further inspection, agents found U.S. $21,000. *See Id.*, Doc. 132 at 23, rows 12-15. Furthermore, as stipulated in the plea agreement, when the Defendant was purchasing a luxury car, he falsely represented himself to the car dealer as being a retired professional soccer player in order to conceal the corrupt nature of the funds. Doc. 127 at 25.

The history and characteristics of the Defendant also favor the imposition of a Guideline sentence. The Defendant advised that he grew up with a large, loving, supportive family with no abuse. Doc. 134, para. 51. He stated that he has no history of substance abuse. *Id.*, para. 63. Ambuila also completed higher levels of education, including specialized course work in customs law. *Id.*, para. 65. This was not an immature or unsophisticated defendant. Instead, despite the tools and opportunity to serve his community as a loyal public servant, Omar Ambuila deliberately chose to engage in the criminal conduct over a lengthy period of time.

Nor did the defendant act out of desperation. The Defendant informs that his wife has held many occupations including attorney, event planner, and a comptroller

at Suarez City Hall, as well as managing several businesses. *Id.*, para. 56. The Defendant's bribe proceeds were not used for staples for his family such as housing or food. Instead, as stipulated in the plea agreement, they were used to support a lavish family lifestyle and to purchase luxury goods like Porsches and a Lamborghini. Doc. 127 at 23-25.

### B. Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The Court should impose a Guideline sentence to reflect the seriousness of the offense. The Defendant abused the power of his position of trust and oversight to enrich himself and his family. He compromised his government position by receiving bribes and illegal commissions from benefactors in Colombia. *Id.* at 22. The Defendant sacrificed the Colombian people's interests for his own illicit enrichment. His illegal conduct spanned at least four years. Given the lengthy duration of the crime, the abuse of a position of public trust, and the substantial impact from his criminal activity, the Court should impose a significant sentence.

### C. Need for Adequate Deterrence

The Court should impose a Guideline sentence to deter other similarly situated foreign officials from using Florida as a safe haven for corrupt proceeds. Cross-border money laundering crimes, such as the defendant's scheme, are uniquely difficult for the United States to investigate and bring to trial.

First, the Government must prove the underlying bribery offense that occurred in the foreign country. This requires obtaining foreign documents and securing foreign

witnesses outside of U.S. subpoena power, and requires costly and time-consuming methods to bring them to the United States District Court. The instant case is a prime example. The Government facilitated the appearance of three witnesses from outside the United States to prove its case, as well as thousands of foreign financial documents and foreign public records.

Second, the Government must trace the illicit funds transferred into the United States that typically have traveled through multiple jurisdictions. This case required multiple official diplomatic requests for assistance to Colombia simply to track the source and movement of Ambuila's illicit funds. Furthermore, the case required coordination with law enforcement agents across Colombia. Such requests can take months, or even years, to see results, if results are obtained at all.

Such investigative challenges are particularly magnified in a case such as this in which the Defendant took deliberate and sophisticated steps to avoid detection. For example, the Defendant used corporate entities and at least six co-conspirators to conceal his involvement in the transfers. He utilized surrogates to transfer funds to his co-conspirators who in turn would transfer the cash into his daughter's bank accounts, use the cash to make rent payments, or deliver the cash in hand to his daughter – all methods that left no trace of the defendant's name. *See, e.g.,* Trial Transcript, Doc. 132 at 36 ("Q: And can you point to any reference to the defendant? A: I cannot. Q: Can you point to any reference to the defendant's adult daughter? A: No."); Doc. 127 at 22-23.  The Defendant further had co-conspirators make wire transfers to vendors on

his behalf, therefore adding further layers of complexity and concealment to his transactions. *See Id.* at 35 and 38.

### D. Kinds of Sentences Available

There is no credible argument for any sentence other than a custodial one for the Defendant, who greedily abused his position of trust to obtain at least $1,000,000 in bribes and kickbacks, and then laundered those funds to Florida to create significant illicit wealth for himself and his family. The crimes were as brazen as they were sophisticated and calculated, and the Defendant pled to his knowing and deliberate criminal actions.

### V. Conclusion

Consistent with the terms of the plea agreement (Doc. 127) and the United States sentencing guidelines, the Government seeks a sentence of 151 months imprisonment and forfeiture of two seized vehicles described in the plea agreement and herein. The Government's position is based on the following calculation of 32 offense levels and no decreases, variances, or downward departures:

| | |
|---|---|
| Base Offense level: | 8 |
| Loss Amount of $1,000,000 (over $550,000 but under $1,500,000) | +14 |
| In the business of laundering (alt. §1956 + sophisticated laundering) | +4 |
| Organizer/Leader | +4 |
| Abuse of Position of Trust | +2 |
| | 32 offense levels |

A Guideline sentence of 151 imprisonment and the forfeiture of two luxury vehicles represents a just outcome that reflects the seriousness of international money laundering, provides a deterrent to those considering similar actions, and is not greater than necessary.

    Respectfully submitted,

    MARGARET MOESER
    Chief

By:   */s/ Joseph Palazzo*
    JOSEPH PALAZZO, Court ID No. A5502141
    Ariana Lazzaroni
    Adrienne E. Rosen
    Trial Attorneys
    Money Laundering and Asset Recovery Section
    U.S. Department of Justice
    1400 New York Avenue, N.W. – 10th Floor
    Washington, D.C. 20005
    Tel: (202) 514-1263
    joseph.palazzo@usdoj.gov
    ariana.lazzaroni@usdoj.gov
    adrienne.rosen@usdoj.gov

DATED this 5th day of May, 2025.