# Incident 2014SZ002796501

| | | | |
|---|---|---|---|
| Fiscal Year: | 2014 | Port Code: | 5206 - MIAMI INTL ARPT |
| Environment Type: | | Port Director Name: | R SULIVERAS |
| Incident Type: | SEIZURE ONLY | Agency: | Office of Field Operations |
| Form Type: | Long Form | | |
| Incident Status: | Approved | | |
| FP&F Case Number: | 2014520600039801 | | |

## Overview

EID Event Number:
Owning Agency: CBP FIELD OPS - MIAMI FL (C52)
SAC Office:
HSI Office:
Incident Topic: FAILURE TO DECLARE/$20,958/MITI-PENALTY/$1000/AV 38/CALI, COL /NO ARREST
Incident Type: SEIZURE ONLY (SZ)
Incident Categories: OTHER (O)
Notify if Incident is Queried?:  No

### Discovery Information

Discovering Agency:  CBP, OFFICER (CSI)
Place of Discovery:  Port of Entry (P)
Place of Discovery Description:
MIAMI-DADE/FLUS/FIS-J/M619
Discovery Date: 2014-01-04

### Agency Participation

### Contributing Information

CBP/ICE:
TECS:
Other Agencies:
Referring Officer Code: BAGGAGE CONTROL

### Additional Information

Project Codes:
Incident Enforcement Aid:
Incident Presumptive Testing Devices:

FOR OFFICIAL USE ONLY                    MLARS_031392

HSI Case Number:
Involves Victim:  No
Current Case Agent:
Declaration Taken By: CRUZ/J-CBP OFFCR-C
HSI Office Code:
TOMIS Mission Number:
TOMIS Event Number:

# Conveyance

Conveyance Type: COMMERCIAL AIR
Conveyance Searched:  No
Conveyance Seized:  No
Detention Number:

## Aircraft Detail

Country Registered:
Tail #:
Overflight Exemption:

## Itinerary Information

In/Out Bound: Inbound
In/Out Bound Date: 2014-01-04
Country Originated From: COLOMBIA
Via Country:
Bill Of Lading #:
Carrier Name:
Trip #:
Carrier Code: AV
Flight #: 38
PAX Embark Airport: CALI, ALFONSO B. ARAGON
Departure Airport: CALI, ALFONSO B. ARAGON
Departure Country: COLOMBIA

## Exam Details

Reason For Exam:
Exam Complete Percent:

## TECS Information

TECS Record Created:  No
TECS Record ID:
TECS Primary:  No
Armed and Dangerous:  No
Remarks:

MLARS_031393

# Seizure Details

Requires HQ Approval:  No
Seizure Date / Time: 2014-01-04 15:45
Seizing Agency: CBP, OFFICER
Place of Seizure: Port of Entry
Place of Seizure Description: MIAMI-DADE/FLUS/FIS-J/M619
Seizing Officer: CRUZ/J-CBP OFFCR-C

## e-allegation Information

Is result of an e-allegation:  No

# Violators

## FP&F Case #: 2014520600039801

Last Name: AMBUILA
First Name: OMAR
Middle Name:
Date of Birth: ▆▆▆▆▆▆▆
Sex: Male
Citizenship: COLOMBIA
Race: BLACK OR AFRICAN AMERICAN
Hispanic: HISPANIC OR LATINO ORIGIN
Personal Search Conducted:  No

## Address

Street: CALLE 12A #108-30
Apartment #:
City: CALI
Country: COLOMBIA

## Prosecutorial Information

Prosecutorial Acceptance:
Prosecutorial Remarks:
Administratively Handled:

## TECS Information

TECS Record ID: P7A02985900C52
TECS Primary:  No
Remarks: SUBJECT FAILED TO DECLARE $20,958 USD/ REFER PASSENGER TO
BAGGAGE CONTROL SECONDARY TO CONDUCT A 100% CURRENCY
EXAMINATION/ SUBJECT TRAVELED WITH ELBA CHARA HIS WIFE

MLARS_031394

## Penalty/Mitigation Details

Penalty Assessed:
Class Code: FORFEITED CURRENCY/MONETARY INSTRUMENT
Mitigated Amount:  $1000
Mitigating Officer: SCBPO CARR
Collected Amount:  $1000
Date Collected: 2014-01-04
Receipt Number: 000000000
Promissory Amount:

# Properties

## Property  0001 - (U.S. CURRENCY) MITIGATED

Property Category: CURRENCY/MONETARY
Property Type: U.S. CASH OR CURRENCY
Tariff:
Enforcement Aids:

## Property Details

Owning Port: 5206 - MIAMI INTL ARPT
Seized Quantity: 10
Unit of Measurement: EACH
Package Barcode:
Number of Packages:
Package Type:
Country of Origin: UNITED STATES
Country of Export: COLOMBIA
Country of Destination: UNITED STATES
Destination State:
Abandoned:  No
Prohibited Item:  No

## Currency / Monetary Instrument Details

Currency Base: UNITED STATES
Negotiable Monetary Instrument:  No

### Bill Counts

| Denomination | Count |
|---|---|
| 100 | 10 |

## Property Status

Legal Status: SZ - SEIZED

Physical Status: DF - DEPOSIT SEIZED CURRENCY/OMI TO FORFEITURE FUND
Custodian: CSI - OFFICER, OFO
To Custodian:
SAC Office:
HSI Office:
Storage:
Acceptance Date: 2014-01-04

## Property Value

Appraising Officer/Import Specialist:
Declared Value:
Duty Amount:

## Property Values

Type: DOMESTIC/ESTIMATED - $1000
Type: CURRENCY VALUE AT TIME OF INCIDENT APPROVAL - $1000
Type: CFO FINANCIAL - $1000

## Concealment Information

Concealment Code: SUITCASE
Concealment Sub Code:
Other Concealment Description:
Concealed in Commodity:
Found in Secret Compartment:  No

## Property Violations

IMPORTATION VIOLTN-CURRENCY/MONETARY INST
Citations: 31USC5317, 31USC5316

SMUGGLING - BULK CASH
Citations: 31USC5332, 31USC5317, 31USC5316

REPORTS ON EXPORTING/IMPORTING MON. INSTRU.
Citations: 31USC5316

## Property  0002 - (U.S. CURRENCY) REMITTED

Property Category: CURRENCY/MONETARY
Property Type: U.S. CASH OR CURRENCY
Tariff:
Enforcement Aids:

## Property Details

Owning Port: 5206 - MIAMI INTL ARPT

FOR OFFICIAL USE ONLY

MLARS_031396

Seized Quantity: 236
Unit of Measurement: EACH
Package Barcode:
Number of Packages:
Package Type:
Country of Origin: UNITED STATES
Country of Export: COLOMBIA
Country of Destination: UNITED STATES
Destination State:
Abandoned:  No
Prohibited Item:  No

## Currency / Monetary Instrument Details

Currency Base: UNITED STATES
Negotiable Monetary Instrument:  No

### Bill Counts

| Denomination | Count |
|---:|---:|
| 100 | 192 |
| 50 | 8 |
| 20 | 14 |
| 10 | 4 |
| 5 | 5 |
| 1 | 13 |

## Property Status

Legal Status: SZ - SEIZED
Physical Status: RE - REMITTED
Custodian: CSI - OFFICER, OFO
To Custodian:
SAC Office:
HSI Office:
Storage:
Acceptance Date: 2014-01-04

## Property Value

Appraising Officer/Import Specialist:
Declared Value:
Duty Amount:

## Property Values

Type: CFO FINANCIAL - $19958
Type: CURRENCY VALUE AT TIME OF INCIDENT APPROVAL - $19958

FOR OFFICIAL USE ONLY
MLARS_031397

Type: DOMESTIC/ESTIMATED - $19958

## Concealment Information

Concealment Code: SUITCASE
Concealment Sub Code:
Other Concealment Description:
Concealed in Commodity:
Found in Secret Compartment:  No

## Property Violations

IMPORTATION VIOLTN-CURRENCY/MONETARY INST
Citations: 31USC5317, 31USC5316

SMUGGLING - BULK CASH
Citations: 31USC5332, 31USC5317, 31USC5316

REPORTS ON EXPORTING/IMPORTING MON. INSTRU.
Citations: 31USC5316

# Narrative

On January 4, 2014 passenger, OMAR AMBUILA arrived at Miami International Airport
aboard flight AV-38 from Bogota, Colombia. AMBUILA was referred to Baggage Control
secondary along with his wife ELBA CHARA and his two daughters.CBPO Cruz obtained a
binding declaration wherein AMBUILA claimed ownership of his luggage and all contents
within. AMBUILA was asked the purpose of his trip and the length. AMBUILA stated that he
will spend 2 weeks vacation. AMBUILA was asked about his occupation and he stated that
he is an accountant. CBPO Cruz asked AMBUILA how much currency he was traveling
with. AMBUILA stated that he had $10,000.USD. CBPO Cruz asked AMBUILA if he
understand the requirements of importing currency into the UnitedStates. AMBUILA stated
that he declare money before and that he understands theprocedure. CBPO Cruz instructed
AMBUILA to write the amount of currency that he was carrying in the back of the CBP form
6059B and to sign. AMBUILA wrote $10,000USD and signed. CBPO Cruz informed SCBPO
Carr of the inspection and requested a currency verification that was approved. CBPO Cruz
and CBPO Raymore escorted AMBUILA tothe Enforcement area to conduct a currency
verification. The currency verification was performed by CBPO Cruz witnessed by CBPO
Raymore that revealedthe amount of $20,958USD. AMBUILA was asked why he didn't
declare the currency and he stated that he forgot that his daughter was carrying currency
that was given to her by him and her uncle. CBPO Cruz informed SCBPO Carr of the
findings and authorized a mitigated penalty of $1,000USD for Failure to Report (31USC5316
/5317). AMBUILA filed the Fincen 105 for the amount of $20,958.00USD. The $1,000USD
Mitigated penalty wasassessed on DHS form 6051S #6375981, and logged into CBP Duty
collection book with the code A-871. All monies were returned and signed over to AMBUILA
via DHS form 6051S # 6375997. A copy of the receipt and the DHS form 6051's was given

to the passenger. The monetary reporting requirements were explained to AMBUILA and he was allowed to depart the FIS area. SIGMA EVENT#2168161 Present during currency verification: CBPO Raymore.

## Document Attachments

No Attachments

## Changes Made to Incident Since Approval

No updates have been made to this incident since approval.

MLARS_031399

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  18 - mj - 02031 - AOR |
| Residence Located at 18201 Collins Avenue, Unit 5407 Sunny Isles, Florida, 33160 | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _January 22, 2018_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   _1/8/18 @ 5:15 pm_          _Alicia O. Reyes_
                                                                                     *Judge's signature*

City and state:     Miami, Florida                          ALICIA M. OTAZO-REYES, U.S. Magistrate Judge
                                                                                  *Printed name and title*

MLARS_031441

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>18-MJ-2031-AOR | Date and time warrant executed:<br>1/9/18 @ ≈1000 | Copy of warrant and inventory left with:<br>Jenny Ambuila |
| Inventory made in the presence of : Jenny Ambuila | | |
| Inventory of the property taken and name of any person(s) seized: | | |

Titles for Vehicles:
VIN ZHWUR1ZF7HLA05916
VIN WP1AA2A29HKAB3052

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

MLARS_031442

**ATTACHMENT A**

**The TARGET RESIDENCE**

The TARGET RESIDENCE is located in the Trump Royale condominium tower located at 18201 Collins Avenue, Sunny Isles, Florida, and is clearly marked with Unit 5407. There are two hi-rise towers located on the property and the Trump Royale is the building on the northern end of the property. The property is located between Collins Avenue (to the West) and the Atlantic Ocean (to the East). The TARGET RESIDENCE is actively protected by security officers responsible for protecting the Trump Royale and its occupants.

MLARS_031443

## ATTACHMENT B

## Items and Records to Be Seized

Evidence to be seized includes the following items relating to the period May 2, 2013 through the date of the execution of the warrant:

1. US Currency in excess of $5,000.00

2. Business activity records including records of employment, applications, entity organizations, solicitations, promotions, training, products, services, contracts, accounting, journals, receipts, expenses, disbursements, sales, billing, payables, receivables, payrolls, review/audits, appointments/contacts, travel, administration, customers, and related-communication records.

3. Financial activities records including records of transactions, statements, receipts (taxable and non-taxable), distributions, dispositions, contracts, purchases, sales, financing, loans, review/audits, administration, safety deposit box records and keys, and related-communication records.

4. Tax-related activities, records including tax forms and returns (filed or not filed), workpapers, summary sheets, notes, supporting items, declarations, training materials, promotional materials, and tax-related communications records.

5. Records of bankruptcy activities including petitions, schedules, and other forms (filed or not filed), workpapers, summary sheets, notes, supporting records, training materials, promotional materials, and bankruptcy-related communications records.

6. Audio, video, or photographic records relating to any of the business, financial, tax, or bankruptcy activities detailed in the preceding paragraphs.

7. Any and all information of the types described in the preceding paragraphs which is stored in the form of magnetic or electronic coding on a computer or with the aid of computer-related equipment (including iPads, tablets, and mobile phones).

8. Any and all electronic devices which are capable of analyzing, creating, displaying, converting, storing, or transmitting electronic or magnetic computer impulses or data. These devices include but are not limited to: computers and computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, fixed hard disks, external hard drives, removable hard disk cartridges, CD-ROM drives, and other computer-related electronic devices and connection equipment, floppy diskettes, tapes, laser disks, video cassettes, and other media which are capable of storing magnetic coding; any and all instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components, along with operating systems,

application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission; any and all written or printed material which provides instructions or examples concerning the operations of a computer system, computer software, and/or any related device.

9. In addition to the data files and records described above, the agents are authorized to seize any software and/or hardware if necessary to access, read, and print the information. This includes but is not limited to a) operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components; b) any documentation and manuals that describe the software or hardware and give instructions on its installation and use; c) any software or hardware based licensing schemes that restrict the access or operation of the software without such item; and d) computer passwords and data security devices including any data security hardware or software (such as devices or software used to encrypt data) that is required to access computer programs or data or to otherwise render programs or data into a useable form.

10. The agents are authorized to seize computer(s) and electronic devises storing or capable of storing such information and remove them along with peripheral devices, software, documentation manuals, and passwords to a laboratory setting for a sufficient period of time to obtain access to and make image copies and ensure that the image copies can be properly restored and verified.

11. The agents searching for such information are authorized to image, that is, create a bit-by-bit copy of the computer hard disk(s). In the event that the agents cannot image the computer hard disk(s) on-site, the agents are then authorized to seize the storage media of such computer for later analysis or to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to the computer, image the storage media, search for, and recover the files and records described above. The agents are further authorized to seize floppy disks, compact disks and other "removable media" so that these items can be imaged off-site and returned as soon as practical.

All of which constitute fruits, evidence, indicia and/or instrumentalities of violations of the Title 18, U.S.C. §1957 (money laundering), and a conspiracy to commit money laundering.

2

MLARS_031445

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18 - mj - 02031 - AOR

IN RE SEALED SEARCH WARRANT

_____/

## CRIMINAL COVER SHEET

1.    Did this matter originate from a matter pending in the Northern Region of the United States
      Attorney's Office prior to October 14, 2003?    _____ Yes    __x__ No

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

BY: _____

FREDERIC C. SHADLEY
Assistant United States Attorney
No. A5502298
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9349
Fax: (305) 530-7976
Frederic.Shadley@usdoj.gov

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _18 - Mj - 02031 - AOR_

IN RE SEALED SEARCH WARRANT.

_____/

## **MOTION TO SEAL**

COMES NOW, the United States of America, by and through its undersigned attorney, and respectfully requests that the Search Warrant, Application for Search Warrant, Supporting Affidavit and Attachments A and B, this Motion to Seal, and any resulting Order be SEALED until the arrest of the defendant or until further order of this court, excepting the United States Attorney's Office and Law Enforcement Personnel, which may obtain and use copies of any of the sealed documents, and this Motion to Seal, and any resulting Order, including for purposes of executing the Search Warrant as required under Federal Rule of Criminal Procedure 41, for the reason that the integrity of the ongoing investigation might be compromised should knowledge of this Search Warrant become public.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

By: _____

FREDERIC C. SHADLEY
Assistant United States Attorney
No. A5502298
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9349
Fax: (305) 530-7976
Frederic.Shadley@usdoj.gov

MLARS_031447

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _18 - Mj - 02031 - AOR_

IN RE SEALED SEARCH WARRANT.

_____/

## <u>SEALING ORDER</u>

THIS CAUSE is before the Court on the Government's Motion to Seal.   Being fully advised, IT IS HEREBY ORDERED that the Search Warrant, Application for Search Warrant, Supporting Affidavit and Attachments A and B, this Motion to Seal, and any resulting Order be SEALED until the arrest of any defendant or until further order of this Court. However, the United States Attorney's Office or any other relevant law enforcement agency may obtain and use copies of any of the sealed documents for purposes of executing the search as required under Federal Rule of Criminal Procedure 41; or for purposes of arrest, extradition, or any other necessary cause.

DONE AND ORDERED in chambers at Miami, Florida, this _8th_ day of January 2018.

_____
HON. ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: AUSA Frederic C. Shadley

MLARS_031448

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*       )
*or identify the person by name and address)*        )    Case No.  18-mj-02031-AOR
                                                  )
Residence Located at 18201 Collins Avenue, Unit 5407  )
Sunny Isles, Florida, 33160                        )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956, 1957 | Money Laundering, Money Laundering Conspiracy |

The application is based on these facts:

See Attached Affidvait

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Shortway, Special Agent, IRS-Criminal Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __1/8/18__

_____
*Judge's signature*

City and state:  Miami, Florida

ALICIA M. OTAZO-REYES, U.S. Magistrate Judge
*Printed name and title*

MLARS_031449

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, John Shortway, after being duly sworn, depose and state as follows:

### Agent Background and Qualifications

1.      I am a special agent with the Department of Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI"), assigned to the Saint Petersburg Post of Duty in the Tampa Field Office. I began my federal law enforcement career in March 2008 as a special agent with IRS-CI. I have personally participated in numerous investigations, which concentrated on the laundering of millions of dollars through domestic and foreign financial institutions.

2.      I have personally participated in this investigation and I am aware of the facts contained herein based upon my own investigation, as well as from discussions with other investigators and law enforcement officers having knowledge of the investigation through their own personal participation.

3.      During the course of this investigation, as well as other investigations, I have learned how criminals transfer and conceal criminal proceeds from law enforcement.

### Purpose of Affidavit

4.      This affidavit does not include every fact known at this time, just those facts which are believed to be necessary to establish probable cause to support the requested search warrant.

5.      I make this affidavit in support of an application for a search warrant for 18201 Collins Avenue, Unit 5407, Sunny Isles, Florida, 33160 ("TARGET RESIDENCE"), more particularly described in Attachment A, for the Items and Records to Be Seized, more particularly described in Attachment B, which constitute evidence, fruits and instrumentalities of criminal violations of 18 U.S.C. §§ 1956 and 1957 (money laundering), and a conspiracy to commit said offense ("the TARGET OFFENSES").

MLARS_031450

## Probable Cause

### A. Overview of the Investigation

6.     This investigation stems from information obtained during the course of other investigations associated with the Panama Express Strike Force (PanEx). PanEx is an Organized Crime Drug Enforcement Task Force that includes the Drug Enforcement Administration, Homeland Security Investigations, U.S. Coast Guard, Federal Bureau of Investigation, and IRS-CI. The mission of PanEx is to disrupt and dismantle Colombian maritime smuggling organizations responsible for cocaine trafficking and the associated money laundering organizations. PanEx is operated out of the Middle District of Florida, Tampa Division.

7.     During the course of this investigation, law enforcement has identified bribes received by Omar Ambuila ("AMBUILA"), a Colombian national and employee of the Direccion de Impuestos y Aduanas Nacionales de Colombia ("DIAN")[1] in connection with AMBUILA's official duties, specifically with regard to overseeing the importation and exportation of maritime cargo at the Colombian Port of Buenaventura.

8.     Based on my training, experience, and knowledge of the investigation, I believe that beginning on an unknown date but not later than on or about May 2, 2013, and continuing through at least on or about October 13, 2016, AMBUILA did unlawfully, knowingly, and willfully conduct, and aid and abet others who conducted, monetary transactions in amounts greater than $10,000, knowing that the money was derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.  In addition, based on my training, experience, and knowledge of the investigation I believe that AMBUILA did unlawfully, knowingly, and willfully conspire with

---

[1]     National Tax and Customs Directorate of Colombia.

2

MLARS_031451

other persons to conduct monetary transactions in amounts greater than $10,000, knowing that the money was derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.[2]

9.      It is alleged that the specified unlawful activity is the bribery of a public official, punishable under the laws of Colombia.

**B.  Background of DIAN and Omar Ambuila**

10.     DIAN is a government agency responsible for financial regulation and tax collection in Colombia. The agency falls under the Ministry of Finance and Public Credit and is based in Bogota.

       a.      In tax matters, DIAN is responsible for administering the income and complementary tax, sales tax, national stamp tax, other domestic taxes and the collection of customs duties and other taxes on foreign trade and foreign currency exchange.

       b.      In customs matters, DIAN is responsible for administering customs duties and other taxes on foreign trade, as well as the management and administration of customs management, including the seizure, confiscation or declaration on abandonment of merchandise.

11.     According to DIAN officials, AMBUILA holds the position of Head of Charges and Transits, for DIAN in the Port of Buenaventura.

12.     On January 4, 2014, AMBUILA, arrived at Miami International Airport aboard a flight from Bogota, Colombia. AMBUILA, his wife, and two daughters were referred to Baggage Control Secondary where AMBUILA declared ownership of their luggage and all contents therein. AMBUILA stated that he was traveling to the United States for a two-week vacation, his

---

[2]      Pursuant to 18 U.S.C. § 1956(h), any person who conspires to commit any offense defined in section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

3

MLARS_031452

occupation was an accountant, he was traveling with exactly $10,000.00 USD, and he understood

his obligation to declare currency based on previous travel experience. A currency verification was

conducted and revealed that AMBUILA was actually carrying $20,958.00. AMBUILA was fined

$1,000.00 for failing to declare the currency he was transporting into the United States[3].

13.     According to DIAN officials, AMBUILA has not reported income exceeding

161,523,000 (COP), which is approximately $56,500.00 (USD), for any calendar year between

and including 2013 and 2016.

14.     The Department of Homeland Security ("DHS") has confirmed that AMBUILA is

not authorized to work in the United States.

**C. Cooperator 1 and J.A.**

15.     During April 2017, a cooperating defendant ("Cooperator 1") provided information

to law enforcement regarding drug trafficking organizations responsible for shipping thousands of

kilograms of cocaine from Colombia to the United States and elsewhere. Cooperator 1 also

provided information regarding money-laundering organizations ("MLOs") repatriating laundered

proceeds from the United States and elsewhere back to Colombia. Cooperator 1 has not yet been

charged in this case but is cooperating with law enforcement in the hope that cooperation provided

in this case will result in lesser charges or a reduced sentence. Law enforcement has corroborated

---

[3]     Financial Crimes Enforcement Network's ("FinCEN") regulations implementing the Bank
Secrecy Act ("BSA") stipulate that a Report of International Transportation of Currency or
Monetary Instruments ("CMIR") must be used to report the physical transportation of currency or
other monetary instruments in an aggregate amount exceeding $10,000.00 at one time into the
United States from any place outside the United States. The obligation to report falls on each
person who physically transports, mails, or ships the currency or other monetary instruments. The
obligations to report also falls on each person who receives currency or other monetary instruments
in the United States which have been transported, mailed, or shipped from any place outside the
United States.

MLARS_031453

information Cooperator 1 has provided through other means and finds Cooperator 1 to be credible. Cooperator 1 provided the following information:

a.      In 2011, Cooperator 1 was introduced to AMBUILA in Miami by a mutual friend ("Person 1"). AMBUILA was introduced as a person who held one of the top customs positions for DIAN in the Colombian Port of Buenaventura.

b.      AMBUILA explained that he, and other DIAN officials, accepted bribes from individuals and businesses located in Colombia in exchange for reducing the scrutiny of under-declared or mis-declared imported and exported cargo containers under his control coming through the Port of Buenaventura. AMBUILA described how he and others would stage the destruction of contraband seized at the Port of Buenaventura and later deliver the goods to their ultimate consignee in Colombia in exchange for bribes (bribery of a public official is a crime punishable under the laws of Colombia).

c.      AMBUILA used Cooperator 1, Person 1, and others to help repatriate money back to Colombia.

d.      AMBUILA orchestrated the delivery of hundreds of thousands of dollars to Cooperator 1, Person 1, and others for repatriation to Colombia.

e.      Between 2012 and 2016, AMBUILA caused approximately $43,000.00 per month to be delivered to Cooperator 1 using third-party wire and cash transfers, including the delivery of bulk cash to the TARGET RESIDENCE.

f.      Cooperator 1 was paid for his services with money he was instructed to take from the money he was holding for AMBUILA.

g.      Cooperator 1 was always on call to run errands for AMBUILA and members of his family. For instance, Cooperator 1 would chauffer AMBUILA and his

5

family around Florida when they were there. On many occasions, AMBUILA instructed Cooperator 1 to deliver large amounts of cash to his daughter, J.A., at the TARGET RESIDENCE. Additionally, AMBUILA instructed Cooperator 1 to use some of the cash he was holding for AMBUILA to satisfy debts incurred on behalf of his daughter; i.e., rent for the TARGET RESIDENCE, tuition, vehicle purchases, etc.

 h. In May 2013, Cooperator 1 received instructions from AMBUILA to travel to a Porsche dealership in Tampa, in the Middle District of Florida, and purchase a Porsche for J.A. with some of the money Cooperator 1 was holding for AMBUILA.

16. A review of an Instagram account profile for 'XXXXambuila' reveals that the social media account belongs to J.A., the daughter of AMBUILA. J.A. describes herself as a "World Traveler... University of Miami Finance Student" on her Instagram profile. Based on my training and experience, the photographs and captions posted to J.A.'s Instagram account demonstrate an extravagant lifestyle laden with high-end international travel and very expensive personal items such as watches, purses, and luggage from vendors such as Hublot, Rolex, Gucci, Dolce & Gabana, Hermes, Chanel, Karl Lagerfield, and Louis Vuitton. Below are screenshots from her account representative of her lifestyle. In the first photograph below, J.A. is pictured with AMBUILA:

MLARS_031455



MLARS_031456

17.    According to records obtained from DHS and the University of Miami, J.A. is a Colombian national currently attending the University of Miami as a graduate student on an F1 visa provided to foreign students under the Student Exchange Visa Program. J.A. obtained an undergraduate degree in Business Administration from the University of Miami in May 2017. Although J.A. was issued an Employment Authorization Document ("EAD") which is valid until July 2018, as of November 28, 2017, records indicate J.A. has not worked.  Additionally, J.A. did not have employment authorization to work in the United States prior to receiving an EAD. Based on my training, experience, and knowledge of the investigation, I believe there is no legitimate explanation for J.A.'s wealth because she is not working and that the money used to pay for her lifestyle is the result of money she received from AMBUILA derived from bribes linked to his DIAN position at the Port of Buenaventura, Colombia.

**D.  Purchases of Luxury Cars By J.A.**

18.    As more fully described below, based upon the evidence discovered and reviewed during the course of this investigation, a 2017 Lamborghini Huracan Spyder and a 2017 Porsche Cayenne are believed to be evidence of and fruits of criminal activity and constitute property involved in money laundering, in violation of 18 U.S.C. § 1957.  Those cars are both currently parked in the parking garage of the building where the TARGET RESIDENCE is located. On January 5, 2018, the Honorable Jonathan Goodman, Magistrate Judge for the United States District Court for the Southern District of Florida, approved the seizure of both vehicles (see 18-mj-02014-JG, 18-mj-2015-JG). Those warrants have not yet been executed.

19.    In addition to the aforementioned vehicles, based on the evidence discovered and reviewed during the course of this investigation, as well as other similar money laundering investigations, I have learned that individuals who attempt to hide, conceal, or otherwise prevent

8

MLARS_031457

the discovery of large sums of income, whether legally or illegally acquired, will normally maintain records related to their financial activities, and those records are usually kept continuously at or near the location where those individuals reside. These books and records, more particularly described in Attachment B, include but are not limited to, records of transactions, statements, receipts (taxable and non-taxable), distributions, dispositions, contracts, purchases, sales, financing, loans, review/audits, administration, safe deposit records and keys, and related-communication records.

### 2017 Lamborghini Huracan Spyder

20.    According to records obtained from Prestige Motor Car Imports of Miami ("Prestige"), J.A. signed a Retail Buyer's Order on December 26, 2016, to purchase a 2017 Lamborghini Huracan Spyder assigned Vehicle Identification Number ("VIN") ZHWUR1ZF7HLA05916. The sales price for the 2017 Lamborghini was $308,710.00 and, after additional taxes and fees, the total cost was to be $329,323.84. Prestige received a total of $329,489.60 for the 2017 Lamborghini in the following manner:

a.    On April 4, 2016, Prestige received a $10,000.00 check drawn on J.A.'s Wells Fargo Bank checking account ending in 3429.

b.    On December 5, 2016, Prestige received a $97,763.20 wire transfer from Bancolombia bank account ending in 1331, owned by Importadora Y Comerzializadora Jisara.

c.    On December 9, 2016, Prestige received a $99,763.20 wire transfer from Bancolombia bank account ending in 1331, owned by Importadora Y Comerzializadora Jisara.

d.    On December 14, 2016, Prestige received a $99,963.20 wire

MLARS_031458

transfer from Bancolombia bank account ending in 1331, owned by Importadora Y

Comerzializadora Jisara.

   e.  On December 20, 2016, Prestige received $3,300.00 in cash.

   f.  On December 27, 2016, Prestige received an $18,700.00 check

from an unknown source.

   g.  There is no reconciliation for the additional $165.76 received by

Prestige.

   21.  According to records obtained from Dun & Bradstreet, Importadora Y

Comerzializadora Jisara ("ICJ") is a company owned by Esteban Asprilla Vanegas ("Asprilla

Vanegas") operating out of Cali, Colombia. Based on my training, experience, and knowledge of

this investigation, I believe that ICJ is a company Omar Ambuila uses to funnel proceeds of his

bribery activity

   22.  According to records obtained from DHS, Asprilla Vanegas resides in Valle del

Cauca, Colombia, a small town near the Port of Buenaventura, and is employed in a position

dealing with "foreign trade operations."

   23.  According to records obtained from Infobel.com, a website known by law

enforcement to provide reliable information, Asprilla Vanegas also owns a company involved with

importing and exporting cargo through the Port of Buenaventura.

   24.  According to records obtained from Bank of America, the Bancolombia bank

account ending in 1331 that was the source of $297,489.60 used to purchase the 2017 Lamborghini

belonged to ICJ.

   25.  Based on my training, experience, and knowledge of the investigation, I believe the

2017 Lamborghini is evidence, and constitutes fruit of criminal violations of 18 U.S.C. §1957, and

MLARS_031459

a conspiracy to commit said offenses because a majority of the funds used to pay for the 2017
Lamborghini were derived via electronic transfer from ICJ, a maritime transportation company
doing business in the port controlled by Omar Ambuila. J.A. had no known legitimate income or
funds to pay for Lamborghini. Based on my training, experience, and knowledge of the
investigation, I believe that Omar Ambuila used bribe money to pay for the Lamborghini for his
daughter. Therefore, each of the wire transfers and one of the checks used to purchase the
Lamborghini were monetary transactions in criminally derived property of a value greater than
$10,000 derived from specified unlawful activity. For that reason, the Lamborghini is property
involved in money laundering, in violation of 18 U.S.C. § 1957 and it is subject to forfeiture
pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).

### 2017 Porsche Cayenne and Previous Purchase of 2013 Cayenne

26.    According to records obtained from Reeves Import Motorcars of Tampa
("Reeves"), J.A. signed a Retail Purchase Agreement on May 2, 2013 to purchase a 2013 Porsche
Cayenne for $66,769.88. The total cost of the vehicle was $71,911.97 after taxes and fees. Reeves
received a total of $79,911.97 for the 2013 Porsche Cayenne. Reeves received payment for the
2013 Porsche Cayenne in the following manner:

a.    On November 19, 2012, Reeves received $1,000.00 in cash.

b.    On April 23, 2013, Reeves received the following cashier's checks:

    i.    Check dated April 19, 2013, for $20,000.00.

    ii.    Check dated April 19, 2013, for $9,873.17.

    iii.    Check dated April 22, 2013, for $20,000.00, Remitter: Cooperator
        1.

    iv.    Check dated April 23, 2013, for $20,000.00.

11

MLARS_031460

c.      On May 2, 2013, Reeves received $1,038.80 in cash.

27.      Based on my training, experience, and knowledge of the investigation, I believe the 2013 Porsche Cayenne is evidence of criminal violations of 18 U.S.C. §1957, and a conspiracy to commit said offenses because J.A. has no known legitimate income or funds to pay for the vehicle and the evidence supports that Omar Ambuila used bribe money to pay for the vehicle.

28.      According to records obtained from The Collection, LLC of Miami ("The Collection"), J.A. signed an Order for a Motor Vehicle on October 14, 2016, to purchase a 2017 Porsche Cayenne assigned VIN WP1AA2A29HKA83052 ("the 2017 Porsche"). The listed sales price for the 2017 Porsche was $78,345.00. With taxes and fees, the total cost of the vehicle was to be $82,142.91 (although, ultimately, $82,442.81 was paid for the vehicle[4]). The vehicle was paid for as follows:

a.      J.A. traded in her 2013 Porsche Cayenne ($30,000.00 trade-in value).

b.      On September 27, 2016, J.A. paid $500.00 using a credit card.

c.      On October 13, 2016, The Collection received a wire in the amount of $51,942.81 on behalf of J.A. from Holguines Trade Center in Cali, Colombia.

29.      Based on my training, experience, and knowledge of the investigation, I believe the 2017 Porsche Cayenne is evidence of criminal violations of 18 U.S.C. §1957, and a conspiracy to commit said offenses because J.A. had no known legitimate income or funds to pay for the vehicle and the evidence supports that Omar Ambuila used bribe money to pay for the vehicle. Additionally, the 2013 Porsche Cayenne (an asset directly traceable to money laundering) was

---

[4]      There is no reconciliation for the additional $299.90 received by The Collection.

MLARS_031461

used to pay for the 2017 Porsche. Therefore, the trade-in and wire transfer used to purchase 2017 Porsche were monetary transactions in criminally derived property of a value greater than $10,000 derived from specified unlawful activity. For that reason, I believe the 2017 Porsche is property involved in money laundering, in violation of 18 U.S.C. § 1957 and it is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).

### E. False Statements of J.A. to Law Enforcement at Miami International Airport on January 5, 2018; Evidence Involving TARGET RESIDENCE

30.     On January 5, 2018, J.A. arrived at Miami International Airport aboard a flight from Cali, Colombia. J.A. was referred to Baggage Control Secondary where she declared ownership of her luggage and all contents therein. During her interview, J.A. stated that she was returning to the United States after spending the holidays with family, that she resides at the TARGET RESIDENCE, her father (Omar AMBUILA) stays at the TARGET RESIDENCE when he comes to visit the Miami area, and that she was traveling with exactly $7,000.00 USD that her parents gave her to keep in the TARGET RESIDENCE. She further confirmed that she understood her obligation to declare currency based on her self-described extensive travel experience. A currency verification was conducted and revealed that J.A. was actually carrying $12,577.00. J.A. subsequently admitted to providing law enforcement with inaccurate information about the amount of money she was carrying, but said she did not actually know the exact amount and gave an estimate. J.A. said she did not know how much currency she was carrying because her father gave her an unknown amount of money before she returned to Miami. J.A. intended to take the money her father gave her and keep it in the TARGET RESIDENCE for him. J.A. was permitted to leave Baggage Control Secondary with all of her personal items and currency to make an accurate currency declaration and then she left the area without further incident.

13

31.    Based on my training, experience, and knowledge of the investigation, I believe that J.A. intentionally misrepresented to law enforcement, while at Baggage Control Secondary at Miami International Airport, the amount of currency she was carrying in furtherance of the conspiracy and to avoid reporting currency in excess of $10,000. Furthermore, based on my training, experience, and knowledge of the investigation, I believe that the United States currency she was holding for her father constituted proceeds of the TARGET OFFENSES and that J.A. intended to safeguard the currency at the TARGET RESIDENCE.

32.    J.A. has been observed coming and going from the TARGET RESIDENCE with very expensive personal items such as watches, purses and luggage from vendors such as Hublot, Rolex, Gucci, ~~Docle~~ Dolce & Gabana, Hermes, Chanel, Karl Lagerfeld and Louis Vuitton that, based upon the evidence discovered through the course of this investigation, appear to be property, real or personal, which constitutes or is derived from proceeds traceable to the sale of controlled substances or money laundering.

33.    J.A. uses the TARGET RESIDENCE to register her vehicles, receive correspondence from financial institutions and for registration purposes on her visa.

34.    During the course of this investigation, as well as other similar financial frauds and white-collar related criminal investigations, I have learned that individuals who attempt to hide, conceal, or otherwise prevent the discovery of large sums of income, whether legally or illegally acquired, will normally maintain records related to their financial activities and those records are usually kept continuously at or near the location(s) where those individuals reside. These books and records, more particularly described in Attachment B, include, but are not limited to, records of transactions, statements, receipts (taxable and non-taxable), distributions, dispositions,

14

MLARS_031463

contracts, purchases, sales, financing, loans, review/audits, administration, safe deposit box records and keys, and related-communication records.

35.    During the course of this investigation, as well as other similar financial frauds and related investigations, I have learned that it is common practice for individuals to maintain and store the Items and Records to Be Seized on other forms of new technology such as iPads, tablets and mobile phones, which are capable of executing all of the business functions described herein. Furthermore, it is common practice to maintain such new technology within the residential property.

36.    During the course of this investigation, as well as other similar financial frauds and related investigations, I have learned that computer hardware, computer software, computer-related documentation, passwords, and data security devices may be utilized by one engaging in criminal activity in two distinct and important respects as instruments for the violations of federal law enumerated herein; and, as devices used in conjunction with the collection and storage of electronic data and records.

37.    In order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a.    The volume of evidence – Computer storage devices (such as hard disks, diskettes, tapes, optical drives (CDs, DVDs), Universal Serial Bus (USB) flash drives, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may

MLARS_031464

seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."; and,

38.    Technical requirements -- Analyzing computer systems for criminal evidence is a highly technical process requiring specialized skills and a properly controlled environment. Since computer evidence is extremely vulnerable to tampering or destruction, a controlled environment is essential to its complete and accurate analysis.

39.    Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units and self-contained "laptop" or "notebook" computers), internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices and other memory storage devices), peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers), and related communication devices (such as modems and other connections), as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

40.    Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic, optical or other media which are capable of being interpreted by a computer or its related components. Computer

16

software may also include certain data, data fragments, or control characters integral to the operation of computer software. This software commonly includes the operating systems, other programs/applications (such as word-processing, graphics, spreadsheet, and database programs, and accounting and tax preparation software), utilities, compliers, interpreters and communications programs.

41.    Computer passwords and data security devices are described as all those devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records, documents or materials within the scope of this application. These items include but are not limited to any data security hardware (such as any encryption devices, chips, circuit boards and dongles), passwords, data security software or information (such as test keys and encryption codes), and similar information that is required to access computer programs or data or to otherwise render programs or data into a useable form.

42.    Searches and seizures of evidence from computers sometimes requires the agents to seize all of a computer system's input/output peripheral devices that are necessary to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, when computers are removed from the subject(s), and in order to fully retrieve data from a computer system, it may be necessary to seize the central processing units (CPUs) and related peripheral devices as well as the electronic storage devices.

43.    The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file

17

MLARS_031466

cabinet for the markings it contains and opening a drawer believed to contain pertinent files), "opening" or reading the first few "pages" of such files in order to determine their precise contents, "scanning" storage areas to discover and possibly recover recently deleted data, scanning storage areas for deliberately hidden files, or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

44.     The terms "records, documents, and material, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, hard drives, diskettes, tapes, USB storage media (thumb/flash drives), other solid state type storage media or any other media capable of storing information in a form readable by a computer.

45.     All attempts will be made by the computer specialist(s) to obtain images of the computer's hard drive and leave the equipment intact at the search location. However, if attempts prove to be unsuccessful/impractical, specific permission is requested from the Court to remove such equipment to an off-site location, such as the computer specialist's laboratory, to process and search the computer related media.

## Conclusion

46.     Based upon the foregoing summary, my review of the evidence, my training and experience, and the information gathered through various investigative techniques, I have probable

MLARS_031467

cause to believe evidence, fruits and instrumentalities of the TARGET OFFENSES are currently maintained in the TARGET RESIDENCE.

47.    Accordingly, I respectfully request that this Court issue a search warrant for the TARGET RESIDENCE.


John Shortway, Special Agent
Internal Revenue Service – Criminal Investigation


Sworn to and subscribed before me
This _8th_ day of January, 2018


HONORABLE ALICIA M. OTAZO-REYES
United States Magistrate Judge

19

MLARS_031468

## ATTACHMENT A

## The TARGET RESIDENCE

The TARGET RESIDENCE is located in the Trump Royale condominium tower located at 18201 Collins Avenue, Sunny Isles, Florida, and is clearly marked with Unit 5407. There are two hi-rise towers located on the property and the Trump Royale is the building on the northern end of the property. The property is located between Collins Avenue (to the West) and the Atlantic Ocean (to the East). The TARGET RESIDENCE is actively protected by security officers responsible for protecting the Trump Royale and its occupants.

MLARS_031469

## ATTACHMENT B

## Items and Records to Be Seized

Evidence to be seized includes the following items relating to the period May 2, 2013 through
the date of the execution of the warrant:

1. US Currency in excess of $5,000.00

2. Business activity records including records of employment, applications, entity
   organizations, solicitations, promotions, training, products, services, contracts, accounting,
   journals, receipts, expenses, disbursements, sales, billing, payables, receivables, payrolls,
   review/audits, appointments/contacts, travel, administration, customers, and
   related-communication records.

3. Financial activities records including records of transactions, statements, receipts (taxable
   and non-taxable), distributions, dispositions, contracts, purchases, sales, financing, loans,
   review/audits, administration, safety deposit box records and keys, and
   related-communication records.

4. Tax-related activities, records including tax forms and returns (filed or not filed),
   workpapers, summary sheets, notes, supporting items, declarations, training materials,
   promotional materials, and tax-related communications records.

5. Records of bankruptcy activities including petitions, schedules, and other forms (filed or
   not filed), workpapers, summary sheets, notes, supporting records, training materials,
   promotional materials, and bankruptcy-related communications records.

6. Audio, video, or photographic records relating to any of the business, financial, tax, or
   bankruptcy activities detailed in the preceding paragraphs.

7. Any and all information of the types described in the preceding paragraphs which is stored
   in the form of magnetic or electronic coding on a computer or with the aid of
   computer-related equipment (including iPads, tablets, and mobile phones).

8. Any and all electronic devices which are capable of analyzing, creating, displaying,
   converting, storing, or transmitting electronic or magnetic computer impulses or data.
   These devices include but are not limited to: computers and computer components,
   computer peripherals, word processing equipment, modems, monitors, printers, plotters,
   encryption circuit boards, optical scanners, fixed hard disks, external hard drives,
   removable hard disk cartridges, CD-ROM drives, and other computer-related electronic
   devices and connection equipment, floppy diskettes, tapes, laser disks, video cassettes, and
   other media which are capable of storing magnetic coding; any and all instructions or
   programs stored in the form of electronic or magnetic media which are capable of being
   interpreted by a computer or related components, along with operating systems,

application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission; any and all written or printed material which provides instructions or examples concerning the operations of a computer system, computer software, and/or any related device.

9.  In addition to the data files and records described above, the agents are authorized to seize any software and/or hardware if necessary to access, read, and print the information.   This includes but is not limited to a) operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components; b) any documentation and manuals that describe the software or hardware and give instructions on its installation and use; c) any software or hardware based licensing schemes that restrict the access or operation of the software without such item; and d) computer passwords and data security devices including any data security hardware or software (such as devices or software used to encrypt data) that is required to access computer programs or data or to otherwise render programs or data into a useable form.

10. The agents are authorized to seize computer(s) and electronic devises storing or capable of storing such information and remove them along with peripheral devices, software, documentation manuals, and passwords to a laboratory setting for a sufficient period of time to obtain access to and make image copies and ensure that the image copies can be properly restored and verified.

11. The agents searching for such information are authorized to image, that is, create a bit-by-bit copy of the computer hard disk(s).   In the event that the agents cannot image the computer hard disk(s) on-site, the agents are then authorized to seize the storage media of such computer for later analysis or to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to the computer, image the storage media, search for, and recover the files and records described above.   The agents are further authorized to seize floppy disks, compact disks and other "removable media" so that these items can be imaged off-site and returned as soon as practical.


All of which constitute fruits, evidence, indicia and/or instrumentalities of violations of the

Title 18, U.S.C. §1957 (money laundering), and a conspiracy to commit money laundering.

2

MLARS_031471

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 17-2432-MJ-Simonton

IN THE MATTER OF THE SEARCH:

the Premises located at 6231 NW 171st Street, Hialeah, Florida,
as more fully described in Attachment A.

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States
    Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

WIFREDO FERRER
UNITED STATES ATTORNEY

BY:

TIMOTHY J. ABRAHAM
ASSISTANT UNITED STATES ATTORNEY
Fla. Bar No. 114372
99 Northeast 4th Street
Miami, FL 33132-2111
(305) 961-9438 Office
(305) 530-7976 Facsimile

MLARS_031350

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 17-2432- MJ-Simonton

IN RE: SEALED
SEARCH WARRANT
_____/

## MOTION TO SEAL

**COMES NOW**, the United States of America, by and through its undersigned attorney,

and respectfully requests that the Search Warrant, Application and Affidavit for Search Warrant,

and this Motion to Seal and any resulting Order be **SEALED** until further order of this court,

excepting the United States Attorney's Office and Law Enforcement Personnel, which may obtain

copies of any Application and Affidavit for Search Warrant, Search Warrant, and this Motion to

Seal, and any resulting Order, or other sealed document for purposes of executing the Search

Warrant, for the reason that the integrity of the ongoing investigation might be compromised

should knowledge of this Search Warrant become public.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: _____

Timothy J. Abraham
Assistant United States Attorney
Florida Bar No. 114372
99 N.E. 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9438
Fax: (305) 530-7976
Timothy.Abraham2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-2432-MJ-Simonton

IN RE: SEALED
SEARCH WARRANT

_____/

## SEALING ORDER

**THIS CAUSE** comes before the Court on the United States of America's Motion to Seal.

Being fully advised and finding good cause, it is hereby

**ORDERED AND ADJUDGED** that the Motion to Seal is **GRANTED** and the following

be **SEALED** until further order of the Court with the exception of copies provided to law

enforcement personnel; and as necessary to execute the warrant. AMS

1.    Application and Affidavit for Search Warrant dated March 22, 2017;

2.    Search Warrant dated March 22, 2017;

3.    Motion to Seal dated March 22, 2017; and

4.    This Order.

**DONE AND ORDERED** at Miami, Florida, this 22nd day of March, 2017.

HONORABLE ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

cc: AUSA TIMOTHY J. ABRAHAM

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

the Premises located at 6231 NW 171st Street, Hialeah,
Florida, 33015, as more fully described in Attachment A.

)
)
)
)
)
)

Case No. 17 - 2432 - MJ-
Simonton

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. §§ 7201 & 7206(1) | Tax Evasion and the Filing of False Tax Returns |
| 18 U.S.C. §§ 1956(h) & 1957 | Money Laundering |

The application is based on these facts:
Please see attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Stephen Wajert, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/22/17

*Judge's signature* 3/22/17

City and state: Miami, Florida

ANDREA M. SIMONTON, U.S. MAGISTRATE JUDGE
*Printed name and title*

MLARS_031353

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Stephen Wajert, a Special Agent with the Internal Revenue Service, Criminal Investigation, being duly sworn, depose as follows:

### Agent Qualifications and Background

1.     I have been a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI) from September 28, 2009 through the present. Between September 2009 and September 2016, I served in the Cincinnati Post of Duty. I am currently serving in the Sarasota, Florida post of duty. I hold a Bachelor's degree in Accounting from Pfeiffer University. I also hold a Master's degree in Business Administration with emphasis in project management from Northern Kentucky University.

2.     On June 3, 2010, I successfully completed training at the Federal Law Enforcement Training Center (FLETC), located in Glynco, Georgia. I attended approximately twenty- six (26) weeks of special agent training in various aspects of criminal investigation dealing specifically with criminal law, criminal tax law, money laundering, wire fraud, search and seizure warrants, and various financial investigative techniques. My duties as an IRS-CI Special Agent involve analyzing records to determine the existence of criminal activity and to develop evidence of criminal activity. My duties as a Special Agent also include conducting financial investigations of individuals and businesses that have violated Federal Law, particularly those laws found under Title 18, Title 26, and Title 31 of the United States Code. I have been the affiant on multiple search warrants and seizure warrants.

I have participated in multiple search warrants and seizure warrants.

### Property to Be Searched

3.    The property owned and controlled by Jorge PENA-RAMIREZ (hereinafter referred to as **FERCHO**) located at 6231 NW 171st Street, Hialeah, Florida 33015 (TARGET PREMISES); all of which is pictured and/or more fully described in Attachment A, incorporated herein by reference.

### Evidence to Be Seized

4.    Evidence, fruits and instrumentalities of violations of 26 U.S.C. § 7201, 26 U.S.C § 7206(1), 18 U.S.C § 371, 18 U.S.C § 1956(a)(1)(B)(i), 18 U.S.C § 1956(h), and 18 U.S.C § 1957, consistent with Federal Rule of Criminal Procedure 41(c)(1), (2) and (3), all as more fully described in Attachment B, incorporated herein by reference.  Based on my training and experience, the items to be seized listed in Attachment B may contain information relevant to the offenses being investigated.

### Summary of Investigation and Agent's Bases for Knowledge

**A.    Summary**

5.    I am currently investigating **FERCHO** for various tax-related offenses related to his personal and business tax obligations under Title 26 of the United States Code.  I further submit that there is probable cause to find that evidence, fruits, and instrumentalities of said crimes are currently where **FERCHO** and his wife Marynella RIVAS reside and which they control: 6231 NW 171st Street, Hialeah, Florida 33015 (TARGET PREMISES).  The current address of record on the bank

MLARS_031355

account(s), business, and tax returns associated with **FERCHO** correspond with the
TARGET PREMISES. These records demonstrate that **FERCHO** has deposited
approximately $1,000,000 into various bank accounts in his name and the name of
his businesses in the last five years but has only reported income to the IRS of
approximately $76,518.

6. I am also investigating **FERCHO**, Marleidy POTES, Jennifer PENA-
RAMIREZ, Marynella RIVAS and others for money laundering offenses under
Title 18 of the United States Code. The Federal Bureau of Investigation (FBI),
Homeland Security Investigations (HSI), and the Drug Enforcement Agency (DEA)
are also involved in this investigation. **FERCHO** is an alleged participant in a drug
trafficking organization responsible for trafficking large loads of cocaine from
Colombia to Central America and Mexico. Based on the evidence to date, the
following summarizes the targets and their backgrounds:

 a. **FERCHO** created an entity with the State of Florida called Cell
Box Co. This company was created on November 15, 2011 and
subsequently cancelled on September 27, 2013 by the State of
Florida. The company buys and sells cellular telephones for profit.
**FERCHO** also created an entity with the State of Florida called
Export Boxes, Corp. This entity was created on August 26, 2015.
This entity in still active with the State of Florida.

 b. Marleidy POTES was employed by Chivas Express as a

MLARS_031356

restaurant worker in South Florida. During analysis of the POTES account, payroll checks from Chivas Express were noted as deposit items into her account(s). POTES currently resides in Toledo, Ohio.

c.    Jennifer PENA-RAMIREZ is believed to do household-type work including cleaning based on information provided on her joint U.S. Individual Income Tax return(s) as filed with the IRS. PENA-RAMIREZ was involved in a fraudulent marriage to **FERCHO** according to records secured from the United States Citizenship and Immigration Services (USCIS). The fraudulent marriage was an attempt to get **FERCHO** U.S. Citizenship. In the information provided by USCIS, **FERCHO** admitted that he married PENA-RAMIREZ under fraudulent pretenses. **FERCHO** further admitted that he was actually married to Marynella RIVAS, the mother of his three (3) children. **FERCHO** stated he paid PENA-RAMIREZ $10,000 to go along with the marriage scheme.

The evidence developed to date shows it is reasonable to conclude that from at least 2012 to the present, **FERCHO** has: (1) dealt in currency significantly exceeding his reported income, to include the use of several financial institutions to deposit currency to ultimately fund his lifestyle; (2) conspired

4

MLARS_031357

with unknown individuals to utilize cash funnel accounts[1] in at least two different states, including New York and New Jersey; and (3) conspired with others to evade income taxes, file false tax returns and conceal the source and nature of his income and assets. Supported by evidence outlined in this affidavit, I submit that there is probable cause to believe **FERCHO** filed false individual returns for tax years 2012 through 2015 in violation of 26 U.S.C. § 7206(1) and has attempted to evade the assessment and collection of his taxes in violation of 26 U.S.C. § 7201 for at least the 2012 through 2015 tax years; that **FERCHO** conspired with the known and unknown individuals to conceal proceeds from specified unlawful activities to conduct transactions in violation of 18 U.S.C § 1956(a)(1)(B)(i), 18 U.S.C § 1956(h), and 18 U.S.C § 1957.

7.    The information set forth in this affidavit is based on my training, knowledge and experience, that of other law enforcement officers and agents with whom I have conferred, bank records, witness testimony, IRS records, and public records. Because this affidavit is offered only to demonstrate probable cause in

---

[1]    "**Cash Funnel**":    Funnel account activity often involves a customer structuring currency deposits into an account in one geographic area, with the funds subsequently withdrawn in a different geographic region with little time elapsing between deposit and withdrawal. The rapid flow of funds may also span a large geographic area between the deposits and withdrawals, including instances where the deposit location is thousands of miles away from the withdrawal location. The currency deposits and withdrawals often have no apparent lawful or business purpose and do not reflect the stated occupation of the account holder.

MLARS_031358

support of a search warrant, it does not set forth all facts known to this investigation.

## B.    Basis of Background Knowledge – Financial Investigations

Based on my training and experience as a Special Agent, the experience of other agents and law enforcement officers with whom I have conferred, and persons knowledgeable in computer forensics, I know:

8.    That individuals engaged in an income-producing activity normally maintain financial records, income tax records, property records, and business records in their residences and offices. Financial, property, and business records are also maintained on computers, discs, flash drives, DVD drives, detachable drives, and other electronic devices that store data and are maintained at residences and offices;

9.    That individuals engaged in fraud frequently retain records of their transaction within their place of business, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media;

10.    People engaged in fraud often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address

MLARS_031359

directories, check books, videotapes, photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, which may be retrievable by a trained forensic computer expert;

11.    Owners and operators of businesses maintain records including: invoices, cash receipts journals, loan records, notes, ledgers, bank records, blank forms, contracts, receipts, copies of cashier's checks, copies of money orders, customer lists, and other financial instruments. Business records including books, ledgers, copies of checks, and employee information are maintained where they are most readily accessible, usually on the business premises but sometimes at the residence of the business owner;

12.    It is often impossible to directly prove the income of people who have engaged in financially deceptive or unrecorded transactions. In those cases, the IRS must resort to a net worth or other indirect analysis. To perform that analysis, it is necessary to have the records for a base year immediately preceding the first year in which suspect activities have been identified;

13.    Businesses typically maintain safes on the premises in which cash,

MLARS_031360

receipts, and other records are often kept in the ordinary course of business;

14.    Business owner(s) often use computers to record business information and generate business documents including sales data, accounting information, inventory reports, customer lists and the like;

15.    That a taxpayer's cars often contain taxpayer asset ownership and expenditures records including registrations, vehicle tax information, insurance records, and maintenance records;

16.    That computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a business computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only

MLARS_031361

overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits;

17.    That computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched;

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer

MLARS_031362

hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs;

10

MLARS_031363

d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime;

## C.   Basis of Background Knowledge – Drug Trafficking

Based on my training and experience as a Special Agent, the experience of other Special Agents, with whom I have conferred, and persons knowledgeable in narcotics trafficking, I know:

MLARS_031364

18.    That large scale narcotics traffickers maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing narcotics activities and other businesses, as well as for paying bills, acquiring assets, and making other purchases;

19.    That it is common for large scale dealers to secret contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence for ready access and to conceal them from law enforcement authorities;

20.    That persons engaged in large scale drug trafficking conceal in their residences and business locations, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in narcotics trafficking activities;

21.    That it is common for large scale dealers to secure "stash pads," that is, premises other than their personal residence, maintained by themselves or others, for the purpose of storing narcotics, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in narcotics trafficking activities;

22.    That when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to make these profits appear to be legitimate;

MLARS_031365

23.     That to accomplish these goals, drug traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts, and that even if off-site locations are used to store the above records, some evidence of such, such as safety deposit box keys, records, and receipts, as well as receipts and/or documents about mini-warehouses, mail and answering services, etc., will be present;

24.     That drug traffickers often take or cause to be taken photographs of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs in their possession.

## PROBABLE CAUSE

### A.     Overview of Investigation

25.     Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA), Internal Revenue Service – Criminal Investigation (IRS-CI), and the Federal Bureau of Investigation (FBI), initiated an investigation into a narcotics smuggling organization based in Colombia. On August 8, 2011, a go-fast vessel (GFV) was interdicted by the United States Coast Guard in international waters off the coast of Panama with approximately 239 kilograms of cocaine. The majority of the cocaine was jettisoned by the crewmembers prior to the interdiction by the United States Coast Guard. The crewmembers of this boat were later interviewed and acknowledged that the boat was actually carrying approximately 2000 kilograms of cocaine. The GFV crewmembers, consisting of two (2) Colombian nationals, were

MLARS_031366

arrested, prosecuted and convicted in the Middle District of Florida. On February 3, 2012, a second GFV was interdicted by the United States Coast Guard in international waters off the coast of Panama with approximately 450 kilograms of cocaine. The GFV crewmembers, consisting of three (3) Colombian nationals, were arrested, prosecuted and convicted in the Middle District of Florida. Members of the Panama Express South Strike Force South (U.S. Strike Force enforcing Maritime Drug Laws – hereinafter referred to as PANEX-S) identified several co-conspirators including Jamez PENA-RAMIREZ (aka SAWASKI), **FERCHO**'s brother, as responsible for the above described seizures.    Jamez PENA-RAMIREZ has been identified as the leader of a Colombian Drug Trafficking Organization (DTO), and several other co-conspirators have been identified as coordinators and recruiters of GFV operations for the DTO. In addition, PANEX-S agents have identified Jairo PENA-RAMIREZ (aka Bigman), another brother of **FERCHO**, as a GFV organizer of cocaine-trafficking operations specializing in the movement of cocaine from the West Coast of Colombia to Panama via the Eastern Pacific Ocean. Most recently, Jairo PENA-RAMIREZ has worked with the Carlos ASPRILLA-JAEN a leader of a separate DTO who is now incarcerated for drug trafficking in the United States. Through source information, agents have identified several additional, successful, GFV operations which were coordinated and dispatched by the Jairo PENA-RAMIREZ DTO.

26.    PANEX-S members have identified several additional subjects during this investigation who appear to be involved in illicit financial activities relating to the PENA-RAMIREZ DTO. Significant sums of monies have been identified; including

14

MLARS_031367

international transactions involving several of these related subjects. PANEX-S, in conjunction with IRS-CI, has identified a group with connections to the PENA-RAMIREZ DTO operating out of Florida. **FERCHO** is moving large sums of monies through bank accounts under his control, as well as accounts involving known individuals such as Marleidy POTES, Marynella RIVAS, and Jennifer PENA-RAMIREZ. During bank deposit analysis, I noted that several cash deposits into POTES account(s) had similar withdrawals shortly thereafter. Subsequently, deposits mirroring these withdrawals were deposited into accounts controlled by **FERCHO**. In addition, **FERCHO** has been identified involving international financial transactions between Colon, Panama and Hialeah, Florida. These international financial transactions also involve a co-conspirator residing in Panama who was previously convicted on cocaine charges in the United States.

**B.    Source Information**

27.    This investigation also includes statements of cooperating witnesses. These individuals were incarcerated for drug trafficking offenses and are cooperating with the United States in the hope of reduced prison sentences. Cooperating witnesses provided the following information pertaining to the PENA-RAMIREZ DTO. Their cooperation was a result of an operation conducted on August 8, 2011, wherein a maritime patrol aircraft spotted a go-fast vessel (GFV) approximately 75 miles southeast of the Azuero Peninsula, Panama, and observed the individuals on the GFV jettisoning bales. The United States Coast Guard Cutter (USCG) successfully stopped

MLARS_031368

the GFV and recovered ten bales from the water which tested

positive for cocaine. The two Colombian crew members along with the bulk

contraband were transferred to USCGC STEADFAST.

28.    CW1 has been deemed reliable and credible by HSI Agents.  CW1 has

provided information that has led to the arrests of multiple individuals.  CW1 told

investigators that in 2009, SAWASKI requested CW1 to construct a GFV with a false

bottom to store drugs.  SAWASKI specifically requested that CW1 build the false

bottom so that it could store 300 KG of cocaine.  SAWASKI said that the GFV was

owned by him (SAWASKI).  The GFV was needed for a cocaine-transportation trip

in which cocaine was to be transported by GFV from Colombia to Panama by way of

the Eastern Pacific Ocean.  CW1 constructed the false deck into the GFV.  In return,

SAWASKI paid 30 million Colombian Pesos to CW1 for the work.  The payment

occurred at an apartment in Cali owned by SAWASKI.  SAWASKI told CW1 that he

(SAWASKI) was working for **FERCHO**.  Similar activities happened in 2007 and

2008 at the direction of SAWAKSI and **FERCHO.**  CW1 has known **FERCHO** and

SAWAKSI for several years and has socialized and worked with/for both of them in

the drug trafficking business.  CW1 identified SAWASKI and **FERCHO** in a photo

lineup.

29.    CW2 has been deemed reliable and credible by HSI Agents.  CW2 has

provided information that has led to the arrest of another individual.  In 2011, CW2

attended a meeting in Cali, Colombia, at the home of **FERCHO**.  The meeting

MLARS_031369

pertained to the planning of a cocaine-transportation deal in which approximately 800 KG of cocaine was successfully transported by GFV from Colombia to Panama. The following people were at the meeting: CW2 , CW3, Jamez PENA-RAMIREZ (SAWAKSI), **FERCHO**, and Adolfo ARAGON-PANDALES. During the meeting, Jamez PENA-RAMIREZ (SAWASKI) stated that he already had the captain and crewmen of the cocaine-transportation vessel hired. **FERCHO's** job was to ensure that the money was sent from the purchaser (Mexican Drug Cartel) in Mexico to Colombia. During the meeting, **FERCHO** said that he had a contact (intermediary) who arranged for the Mexican cocaine-purchase money to go from Mexico to Colombia. CW2 identified **FERCHO** in a photo lineup and stated that he was in charge of sending and receiving the money associated with the aforementioned cocaine purchase.

30. CW3 has been deemed reliable and credible by HSI Agents. CW3 has provided information that has led to the arrest of another individual. A few days prior to the launch of the GFV as described in paragraph 27, CW3 met with **FERCHO** and SAWAKSI at his apartment in Cali, Colombia. **FERCHO** said that the source of supply for the cocaine (that was later transported on the 8-8-11 GFV) was Olindo PERLAZA-CAICEDO. SAWAKSI reiterated that the cocaine had been supplied by Olindo PERLAZA-CAICEDO. SAWAKSI told CW3 that he (SAWAKSI) had hired Junier MURILLO-MOSQUERA, Biller MINA-PALACIOS, and Henry LEON-RIVAS to recruit and hire mariners for the trip (in which a large quantity of cocaine

17

MLARS_031370

would be transported aboard a GFV from Colombia to Panama). At the time, SAWAKSI was working under **FERCHO**. During the meeting, **FERCHO** said that he (**FERCHO**) was part investor in the cocaine load. **FERCHO** said that 700 KG of the approximate 2,000 KG of cocaine belonged to him (**FERCHO**). **FERCHO** also said that he (**FERCHO**) was in contact with a Mexican DTO that was to ultimately receive the load of cocaine. **FERCHO** specified that he (**FERCHO**) was handling all financial aspects of the operation. **FERCHO** also said that he owned the GFV (the same GFV interdicted on August 8, 2011). CW3 worked with **FERCHO** on at least ten occasions. **FERCHO** also laundered money for the "El Nino Malo" group of "sicarios" ("assassins," in English) based out of Colombia (El Nino Malo is believed by agents to be Heder SARIA-MARTINEZ).

31.    **FERCHO** was married to Jennifer PENA-RAMIREZ on August 9, 2010, based on Miami-Dade County marriage records. As previously mentioned, **FERCHO** admitted to USCIS that the marriage to Jennifer PENA-RAMIREZ was fraudulent in nature and he paid Jennifer PENA-RAMIREZ $10,000. **FERCHO** went on to tell USCIS that his true wife was Marynella RIVAS, the mother of his three (3) children. **FERCHO**, his true wife, and his children entered the United States together on July 13, 2010 according to USCIS records. Since 2011, **FERCHO** has filed his U.S. Individual Income Tax Returns with the Internal Revenue Service. For the years 2011 through 2014, **FERCHO** filed jointly with his fraudulent wife, Jennifer PENA-RAMIREZ. For the year 2011, **FERCHO** claimed his only income was from

MLARS_031371

a Schedule C Business that earned a net profit of $8,047. His Schedule C lists "Retail" as the principal business or profession. The business name on the Schedule C is blank. For the year 2012, **FERCHO** claimed his only income was from a Schedule C Business that earned a net profit of $15,850. His Schedule C lists "Export Sales of Cell Phones and Accessories" as the principal business or profession. The business name on the Schedule C is blank. For the year 2013, **FERCHO** claimed his only income was from a Schedule C Business that earned a net profit of $12,500. His Schedule C lists "Services" as the principal business or profession. The business name on the Schedule C is Jorge F Ramirez. For the year 2014, **FERCHO** claimed his only income was from a Schedule C Business that earned a net profit of $10,306. His Schedule C lists "Services" as the principal business or profession. The business name on the Schedule C is Jorge F Ramirez. In 2015, **FERCHO** filed as head-of-household. For the year 2015, he claimed that his total income was $15,014, which was made up of W-2 wages, Schedule C Income, and a loss via a K-1 on the company Export Boxes Corp. His Schedule C lists "Sales" as the principal business or profession. The business name on this Schedule C is Export Boxes Corp. IRS records yielded no results for corporate tax returns filed in the name of Export Boxes Corp.

32.    Evidence thus far indicates that **FERCHO's** spending and deposit habits do not correlate with his reported income to the IRS. For example, **FERCHO** has deposited approximately $1,000,000 into various bank accounts in his name and the name of his businesses in the last five years.

MLARS_031372

33.    FERCHO, according to Florida Secretary of State records, currently owns one (1) business, Export Boxes Corp. **FERCHO** previously owned Cell Box Co. as well. Based on information provided by financial institutions, deposit activity for accounts in the name of Cell Box Co. and Export Boxes Corp. made up for only a small portion of the total deposit activity. Therefore, deposit activities of these accounts were not included in the table labeled "Approximate Bank Deposits" as seen on page 26.

**C.    Public Records Search**

34.    I conducted a records search within the Miami-Dade Recorder's Office to ensure no outstanding liens or lines of credit were in the name of JORGE PENA-RAMIREZ (**FERCHO)** and/or his associates, which may account for some of the activity listed herein. There were no items found. I also conducted a business search for JORGE PENA-RAMIREZ (**FERCHO**). **FERCHO** was listed as the president of Cell Box Co. As previously mentioned, the company was cancelled by the State of Florida on September 27, 2013. **FERCHO** is also listed as the president of Export Boxes Corp, which was formed on August 26, 2015. This company is still current according to Florida Secretary of State Records. The address listed on the forms for Cell Box Co. was the prior personal residence of **FERCHO**. The address listed on the filing for Export Boxes Corp., is the TARGET PREMISES.

35.    I conducted a property search within Miami-Dade Property Appraiser' site and found a property with the address of 6231 NW 171st Street, Miami, Florida

MLARS_031373

33015. The mailing address listed for the property on the website is the same, but lists

the city as Hialeah. Based on the records, **FERCHO** purchased the home for

approximately $171,500 on or about June 25, 2014 from the Federal Home Loan

Mortgage Corporation. Based on available records, the house was purchased using

cash or cash equivalents. On or about September 9, 2015, **FERCHO** quitclaimed the

deed for the property to Marleidy POTES. I have analyzed bank records for which

POTES is a signatory and they contain corresponding deposits and withdrawals to

accounts associated with **FERCHO** which appear to indicate that her accounts are

vehicles for **FERCHO** to move money back and forth. Based on this, POTES may

be an associate of **FERCHO,** and directly involved in the laundering of drug proceeds.

Based on my experience and training, individuals often do this in an effort to conceal

their assets.

**D.    Summary of Interview with FERCHO**

36.    On or about August 24, 2016, Agents with the DEA approached

**FERCHO** regarding his involvement in money laundering and cocaine distribution.

On or about September 14, 2016, **FERCHO** accompanied by his attorney, met with

DEA, HSI, and prosecutors from the U.S. Attorney's Office (collectively "the

government"). **FERCHO** informed the government that he previously was employed

by Park One as a Valet. He currently earns money by driving around individuals

making $50-60 per day (NFI). **FERCHO** stated he was supported by his brother

"Eddy Pena" from Colombia. **FERCHO** stated that "Eddy" sends him approximately

$1,500 USC a month. **FERCHO** would not provide a reason as to why "Eddy" was sending the money. **FERCHO** told the government that he buys cars and car parts and ships parts to Panama through his company Export Boxes. **FERCHO** stated he had recently shipped a car and earned $1,500 in profit. **FERCHO** also stated he makes approximately $150 a month by shipping car parts to Panama. **FERCHO** told the government that he did not have any knowledge of drug proceeds, and he was not involved in the importation of cocaine from Colombia to the U.S.

## E.    Surveillance Involving the TARGET PREMISES

37.    On or about December 14, 2016, at approximately 1:24 p.m., HSI Special Agent Kelly Hite and I observed a 2015 White Toyota Sienna Van parked in front of the unit marked "6231" on 171st street in Hialeah, Florida near the TARGET PREMISES. The vehicle was bearing a Florida Tag ANDQ06. A records search revealed this vehicle is registered to **FERCHO**. At approximately 2:13 p.m., agents observed Marynella Rivas exit unit "6231", enter the van, and leave the residence. At approximately 6:15 p.m., agents observed a 2015 Gray Lexus NX200T arrive at the residence. This vehicle was bearing Florida tag BAZG23. This vehicle is registered to **FERCHO**. Agents observed **FERCHO** exit the vehicle to retrieve his mail and ultimately park the vehicle and enter the unit marked "6231."

38.    On or about December 15, 2016, HSI Special Agent Hite and I began surveillance at the TARGET PREMISES. Upon arrival, both vehicles as mentioned in the above paragraph were present. At approximately 9:30 a.m., agents observed

MLARS_031375

FERCHO, Rivas, and at least two children enter the Sienna Van. **FERCHO** was driving the van. The vehicle departed the community, seemingly taking the long route to exit. The vehicle then proceeded into a shopping center where it made a u-turn, ultimately exiting out onto the street. Agents proceeded to follow the van onto Florida 826 heading towards the airport. During the surveillance, **FERCHO** made numerous lane changes, signaled in the opposite direction of the lane changes, quickly accelerated and decelerated, and would move from the far left lane to the far right lane for no apparent reason. At approximately 6:21 p.m., agents observed **FERCHO** leave the unit marked "6231" and enter the van. Agents followed **FERCHO** out of the community where **FERCHO** proceeded to cut in front of a number of cars into the shopping center. Based on my training and experience, I believe **FERCHO** was engaging in counter-surveillance to detect the presence of law enforcement.

39.     On or about February 23, 2017, I drove by the TARGET PREMISES. There, I observed the 2015 Gray Lexus NX200T, bearing Florida tag BAZG23, at the TARGET PREMISES. As explained above, this vehicle is registered to **FERCHO**.

40.     On or about March 20, 2017, I drove by the TARGET PREMISES. There, I observed the 2015 White Toyota Sienna Van again parked in front of the unit marked "6231" on 171st street in Hialeah, Florida near the TARGET PREMISES. At approximately 9:00 p.m., I observed Marynella Rivas exit the vehicle and enter unit "6231" with her children.

MLARS_031376

41.    On or about March 21, 2017, at approximately 7:50 a.m., I observed **FERCHO** driving the 2015 Gray Lexus NX200T, bearing Florida tag BAZG23, leave the parking area in front of the unit marked "6231" at the TARGET PREMISES.

**F.    Analysis of Individual Income Tax Returns**

42.    IRS records indicate that **FERCHO** filed 2011 through 2015 Forms 1040 – U.S. Individual Income Tax Return. The address listed for the returns for the years 2011-2013 is 6288 NW 186th Street Apartment 114, Hialeah, Florida 33015 (**FERCHO**'s prior residence).  The address listed on the 2014 and 2015 returns is the TARGET PREMISES.   All the returns in question list two (2) dependents of **FERCHO** bearing the Rivas last names as mentioned in paragraph 5.

43.    The 2011-2015 returns for **FERCHO** show Schedule C Income from services (No further information – **FERCHO** claimed to be a taxi driver to multiple financial institutions) and retail business including the exportation of cell phones and accessories. Export Boxes Corp. is listed as the business name on the 2015 Schedule C Return filed with **FERCHO's** 2015 U.S Individual Income Tax Return.   The business name listed on the other returns was either a variation of his name or left blank.  The W-2 wages listed on the 2014-2015 U.S. Individual Income Tax Returns are from Park One of Florida, which provides monthly parking solutions according to their website.

44.    The following chart summarizes information taken from **FERCHO's** individual income tax returns for tax years 2011 through 2015 (please note – some of

MLARS_031377

the income noted in years 2011-2013 is reported as Jennifer PENA-RAMIREZ's

Income):

## Jorge PENA-RAMIREZ (FERCHO)

|  | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Wages (Form W-2) |  |  |  |  |  |
| Business Income |  |  |  |  |  |
| K-1 Income (Loss) |  |  |  |  |  |
| Total Income |  |  |  |  |  |
| Less: Total Adjustments |  |  |  |  |  |
| Adjusted Gross Income |  |  |  |  |  |
| Less: Standard/Itemized |  |  |  |  |  |
| Less: Personal Exemptions |  |  |  |  |  |
| Taxable Income |  |  |  |  |  |
| Refund[2] |  |  |  |  |  |

## G.    Deposit Activity Including Structuring

45.    The addresses of record on the bank accounts noted below correspond

with the respective address where **FERCHO** was living at the time of said deposits (i.e.

Account information for the years 2012-2014 indicate the address of record as 6288

NW 186th Street Apartment 114, Hialeah, Florida 33015 (prior residence of **FERCHO)**

and for the years 2014-2015 indicate the address of record as the TARGET

PREMISES). Furthermore, information obtained from financial institutions indicates

---

[2]    The total amount of refunds generated from the false returns was approximately
$27,186.

25

MLARS_031378

that **FERCHO** uses electronic devices to access his bank accounts online, including

mobile banking applications. An analysis of records provided by Chase Bank, Wells

Fargo, Bank of America, and Bank United indicated that **FERCHO,** RIVAS, and

POTES made deposits of the following approximate amounts from 2012 through

2016:

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Approximate Bank Deposits** | | | | | |
| Wells Fargo ending 0581 in the name of **FERCHO** | $101,286 | $88,166 | $166,063 | $52,730 | |
| Wells Fargo ending 2119 in the name of **FERCHO** | $31,915 | $8,320 | $120,004 | $47,240 | |
| Bank of America ending 4189 in the name of **FERCHO** | | | | $40,100 | |
| Bank of America ending 8176 in the name of **FERCHO** | | | | $15,100 | |
| Wells Fargo ending 1088 in the name of **Potes** | | | $95,982 | $61,370 | |
| Bank United ending 3189 in the name of **FERCHO** | | | *$140,861.24** | | |
| Bank United ending 6740 in the name of **Rivas** | | | $140,861.24* | | |

MLARS_031379

| | | | | | |
|---|---|---|---|---|---|
| TD Bank ending 8160 in the name of **FERCHO** | | | | $40,373 | $33,935 |
| TD Bank ending 6715 in the name of **FERCHO** | | | | $37,589 | $1,070 |
| Ocean Bank ending 3406 in the name of **FERCHO** | $18,618 | $8,990 | | | |
| TOTALS | **$151,819** | **$105,476** | **$522,910.24** | **$294,502** | **$35,005** |

*\*The amounts listed above in the Bank United cells are derived from wires into the Rivas account from Jairo Pena-Ramirez – these amounts were then immediately withdrawn from the Rivas account via check and then deposited into the FERCHO account. It is believed that these funds were used to purchase the home as described in paragraph 35. The amount listed above was only counted once for purposes of showing a true picture of deposit activity.*

*Agent Note – Several of the accounts identified above in the name of FERCHO also listed PENA-RAMIREZ as the co-signer and / or Payable on Death recipient on the account.*

46.     As depicted by the above tables, I submit that it is reasonable to conclude that **FERCHO's** total business activities from an indiscernible source or sources for the years 2012-2015 were either not reported, or underreported, to the Internal Revenue Service.

47.     The majority of the deposits listed above came from indiscernible sources (i.e. cash deposits, money order deposits).

48.     After conducting analysis on the bank accounts in the names of **FERCHO** and his associates, I believe it is reasonable to conclude that the bank accounts are being used to merely sweep monies in and out to pay personal and business expenditures of **FERCHO** and others. Furthermore, I conducted a summary of bank accounts in name of **FERCHO** and his associates and determined that during

the time-period of January 1, 2012, through December 31, 2016, **FERCHO** and others deposited approximately $1,109,712.24[3]. Furthermore, I submit that is reasonable to conclude that **FERCHO** set up multiple bank accounts in an effort to hinder the financial institutions as well as the IRS to identify transactions in excess of $10,000. **FERCHO**, due to the number of financial accounts in his name, was able to deposit in excess of $10,000 in a day without the production of a Currency Transaction Report (CTR) by spreading out his deposits over multiple accounts in multiple financial institutions. For example, on or about July 15, 2014 and continuing through July 16, 2014, approximately $26,000 in U.S. currency was deposited over three accounts in the name of **FERCHO** and Potes. Two of these deposits occurred on different days in different states, both indicative of funnel activity. The total amount of cash deposited would have triggered a Currency Transaction Report (CTR), however, due to the structured layering of deposits over two days in various accounts, **FERCHO** and/or POTES evaded the CTR filing requirements.

**H.    Disposition of Proceeds**

49.    An analysis was conducted on the personal and/or business bank accounts belonging to **FERCHO**. A review of the expenditures outlines the total expenses paid during the years versus the total income claimed for the year. The chart shows that **FERCHO** spent approximately $158,807.60[4] over his reported income in

---

[3]    The total reported income for all years (2011-2015) as reported to the IRS was approximately $76,518.

[4]    This includes the readily identifiable expenses – the bank accounts are used to sweep

MLARS_031381

2012-2015.  The following expenditure activity was noted for the years 2012-2015.

|  | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Cashier's Check down-payment to Benji Auto Sales (plus POS purchase) | | $11,000 | | |
| Car payments to MPS Credit Union | | $2,090 | | |
| Rent paid to Abreu - Apt | $9,900 | $13,470 | $5875 | |
| Rent paid to RMAR Investments - Trump Royale | | | $11,980 | $1,500 |
| Property Tax - 6231 171st Street | | | $2,541 | |
| Toyota Payments | | | $4,444 | $3,700 |
| First American Title Co Muse 2101 | | | | $4,200 |
| Rent paid to Eduardo Alishaev Trump Royale | | | | $10,700 |
| Apple Store | $4,500 | | | |
| Barclay Card | $2,290 | | $700 | $1,585 |

money in and out.  The total deposit activity mirrored the total withdrawal activity during the years in question. (i.e. the monies that come into the bank accounts are usually spent or withdrawn within 60 days)

MLARS_031382

| | | | |
|---|---|---|---|
| Plastic Surgery – Coral Gables | | $1,000 | | |
| American Express | | $1,027 | $3,465 | |
| Costco (POS and Cashier's Check) | | | $2,300 | $11,000 |
| Movil, USA – Cashier's Check | $7,581 | | | |
| GSM Trade International – Cashier's check | $18,740 | | | |
| JC enterprises Miami LLC – Cashier's check | $16,000 | | | |
| MT Connections 1 | $19,830 | | | |
| Potamkin Hyundai – Cashier's Check | $17,754.60 | | | |
| Reeves Imports – Cashier's Check | | $20,000 | | |
| Nu-World Title - Wire | | | | $5,000 |
| 305 Plastic Surgery Center Memo Marynella Rivas | | $5,000 | | |
| **Total Expenses (Approximate)** | **$96,595.60** | **$53,587** | **$31,305** | **$37,681** |
| **Total Income (per Returns)** | **$15,850** | **$14,300** | **$15,197** | **$15,014** |

MLARS_031383

I.    **Conclusion**

50.    Based on my knowledge training and experience, that of other agents with whom I have conferred, and the facts set forth above, I submit that there is probable cause to believe that court-authorized searches of the property located at the TARGET PREMISES (all as more fully described in Attachment A), which are resided-in, controlled, owned, or possessed by Jorge PENA-RAMIREZ (**FERCHO**), will reveal fruits, evidence, and instrumentalities (as more fully described in Attachment B) of the crimes of conspiracy to file false tax returns in violation of 18 U.S.C § 371 and 26 U.S.C. § 7206(1); evasion of the assessment and collection of taxes in violation of 26 U.S.C. § 7201; conspiracy together and with others to conceal assets derived from specified unlawful activities in violation of 18 U.S.C § 1956(a)(1)(B)(i), 18 U.S.C § 1956(h), and 18 U.S.C § 1957. Accordingly, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I ask for permission to conduct lawful searches by means of warrant.

31

MLARS_031384

51.    Because this matter and related matters are still under criminal investigation, I ask that the application and affidavit for the search warrant, and all papers filed in connection therewith, be placed under seal as disclosure would prematurely reveal details of the Government's investigation of these matters, and may cause substantial harm to the Government's investigation, which is in the pre-indictment stage.

Respectfully submitted,

Stephen Wajert
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to before me on this 22nd day of March 2017.

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

MLARS_031385

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>the Premises located at <u>6231 NW 171</u>st Street, Hialeah,<br>Florida, 33015, as more fully described in Attachment A. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 17-2432-mJ-SMenton

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 4/4/17 _____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to *the duty Magistrate Judge*
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____

Date and time issued: 3/22/17   9:50 am     *Andrea M. Simonton* 3/22/17
                                                                              *Judge's signature*

City and state:     Miami, Florida     ANDREA M. SIMONTON, U.S. MAGISTRATE JUDGE
                                                                              *Printed name and title*

MLARS_031386

## Attachment A
## Description of Property To Be Searched:

The Premises located at <u>6231 NW 171st Street</u>, Hialeah, Florida 33015 (residence of

Jorge PENA-RAMIREZ (**FERCHO**)). This is multi-unit complex located in the

Moors subdivision. The unit is finished in a cream-colored stucco with reddish

brown trim. The numbers "6231" are marked next to the unit. The door to the unit

is under the roof overhang in the left corner of the structure. The complex has a

small parking lot between the structures.



**ATTACHMENT B**
**ITEMS TO BE SEIZED**

Based on the evidence in this affidavit (incorporated here by reference) as well as my training and experience, and the training and experience of other IRS-CI Special Agents and law enforcement agents, I have probable cause to believe that the following items which constitute fruits, instrumentalities and evidence of violations of Titles: 26 U.S.C. § 7201 (tax evasion); 26 U.S.C. § 7206 (filing false returns); 18 U.S.C. §§ 1956 and 1957 (money laundering); and 18 U.S.C. § 371 (conspiracy) may be located on the premises of 6231 NW 171st Street, Hialeah, Florida 33015. The items to be seized are the following items related to Jorge Pena Ramirez, Cell Box Co, Export Boxes, Marynella Rivas, and Marleidy Potes or any items related to any variations of these business' and individuals' names, for the period January 1, 2011 to the present:

A.   Financial records including:

1.   Bank or financial institution records including bank statements, passbooks, deposit slips, deposited items, withdrawal slips, cancelled checks, credit and debit cards, credit card records, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, safe deposit box records and keys;

2.   Bookkeeping/accounting records ledgers, notebooks, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes, workpapers, income statements, statements of profit and loss, check registers, invoicing records, and cost of goods sold calculations;

3.   All correspondence, letters, memorandums, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money, clients, or accounts;

4.   Records of purchase and sale of assets and investments including stocks and other securities, including statements and receipts, documents related to brokerage accounts and shares of stock, correspondence and memoranda to/from any investment firm or financial advisor;

5.   Bank and financial institution records and other records, showing acquisition, conversion, movement, secreting, transfer and disbursements of United States and foreign currency;

6.   Records of real estate transactions, including contracts, agreements settlement sheets, payments and receipts of money;

7. Records of loans or letters of credit including contracts, mortgages, note agreements, promissory notes, applications, payments, financial statements, loan or credit applications and security interests;

8. Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9. Records of purchase and/or financing of assets including statements, receipts, and payment records;

10. Records of expenditures including payments, receipts, invoices, statements, photographs, and other evidence of the expense;

11. Records indicating the purchase, lease, rental, possession, or maintaining of equipment, real estate, vehicles, capital assets and any other assets; and

12. Records of personal and living expenses including bills, invoices, payments, receipts, invoices, statements, photographs, passports, airline tickets, records of travel, and other evidence of the expense.

B. All tax records including all state, local and federal tax returns together with all schedules and attachments, drafts and copies of any returns, unfiled or partially completed returns, all tax forms and schedules, tax preparation files, work papers, correspondence to/from any tax authority, and correspondence to/from any accountant, or return preparer.

C. All correspondence regarding bookkeeping, accounting, and tax preparation matters.

D. Documentation of business ownership, organization, and control including articles of incorporation, partnership agreements, joint venture agreements, corporate minutes, corporate resolutions and by-laws, partnership dissolution records, and other official administrative records.

E. Documents identifying vendors and suppliers including lists, communications, contracts invoices and receipts.

F. Records related to the purchase, sale, ownership and control of assets such as boats, vehicles, real property, jewelry, electronics, precious gems and metals, furs, and household furnishings. Such records include insurance records and photographs of such assets.

2

MLARS_031389

G.   Real estate records including deeds, contracts for purchase/sale, settlement statements, notes, mortgages, lease agreements, property insurance documents, real estate listings, realtor agreements.

H.   Construction/property improvement records including construction/remodeling/or repair contracts, subcontracts, proposals, invoices and receipts.

I.   Indicia of occupancy, residency, rental and/or ownership of the premises including utility and telephone bills, canceled envelopes, keys, deeds, purchase lease agreements, insurance policies, and land contracts.

J.   Telephone books, address books, or papers reflecting names, phone numbers, addresses, email addresses or other contact information for persons or entities with whom a business or financial relationship may exist.

K.   The opening and search, and removal, if necessary, of any safe or locked receptacle or compartment.

MLARS_031390

*in letters A through K plus*

1. Any and all of the information described above that may be stored on magnetic media. This includes information stored on computer hard drives, diskettes, tapes, USB drives, cellular phones, tablets, PDAs, or any other media capable of storing information in a form readable by a computer. This also includes all copies of the information described above that may be stored on such media as archive or backup copies. In the event that the agents cannot, for technical reasons, obtain access to any subject computer or media device, or cannot search for or copy information contained on that computer or media device, whether this be technically too difficult or time consuming, the agents are then authorized to seize such computers or media device, and remove them from the premises to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover the files and review its contents off-site. In addition, if the files and records cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use. The search of such computers or storage areas of such computers shall be limited to seeking information that fit within the above-described information.

L.    Cash or currency with an aggregate total exceeding $3,000

Agents are hereby authorized to photograph the interior of the premises and any contents therein.

MLARS_031391